## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LEVI HUEBNER on behalf of himself and all others similarly situated, <br><br> *Plaintiff,* <br><br> vs. <br><br> MIDLAND CREDIT MANAGEMENT, INC., <br><br> *Defendant.* | X <br> : <br> : <br> : <br> : <br> : <br> :    **Case:   14-cv-6046 (BMC)** <br> : <br> : <br> : <br> : <br> : <br> : <br> X |

---

### PLAINTIFF'S RESPONSE WITH MEMORANDUM

---

### PURPOSE

Present is the Court's *sua sponte* Memorandum Opinion and Order to Show Cause directing Plaintiff Levi Huebner with Counsel Poltorak PC to show cause "why this action should not be dismissed, with fees costs awarded under 15 U.S.C. § 1692k(a)(3), and sanctions issued pursuant to Rule 11."  Plaintiff and Counsel Responds and Shows Cause: as discussed *infra*, the Court's decision is based on an honest misunderstanding of the facts and issues between the parties.  Likewise, the Court mistakenly did not apply the proper standard in reviewing the facts in the light most favorable to plaintiff.  Moreover, the Defendant continues to make deceitful assertions, which in a substantial part, induced the Court with a false letter implying that the negative information was removed from plaintiff's Credit Report; while the negative information remains on plaintiff's Credit Report.  This deceit confused the Court.

Conterminously, pursuant to FRCP Rule 60(b)(1), (3), and (6) plaintiff affirmatively moves the Court to vacate its Memorandum Opinion and Order to Show Cause, and pursuant to 28 U.S.C. §§ 144 and 455  for reassignment of this case. In the alternative, if any part of this counter-application is denied, pursuant to 28 U.S.C. § 1292 plaintiff respectfully requests leave to appeal before the entry of a judgment or any sanction.

PURPOSE ..................................................................................................................i

TABLE OF AUTHORITIES ..................................................................................iii

PRELIMINARY STATEMENT ..............................................................................1

QUESTIONS PRESENTED.....................................................................................2

    i.     Did the Amended Complaint plead enough facts to state a cause of action when even the Court acknowledged "The parties agreed that if, in fact, a violation had occurred during the recorded telephone call, then even prompt dispatch of the cessation notice following the call would not absolve defendant of the technical violation?"............2

    ii.    Would the least sophisticated consumer be befuddled regarding his consumer rights when instead of verifying the debt, the debt collector resells the debt to another debt collector, and the collection of that debt continues on the debtor's Credit Report without verification and without accepting the dispute? ...........................................2

    iii.   Does Judge Cogan's Memorandum Opinion present actual proof of the Judge's personal bias and prejudice to FDCPA suits; does the Judge's expression of displeasure to the majority attorneys suing under the FDCPA cause an objective observer to question the Judge's impartiality to FDCPA cases; would reassignment of this FDCPA case preserve the appearance of justice where the Judge is expected to have difficulty putting aside his previously expressed views demeaning FDCPA suits; does Judge Cogan's financial interest in iShares Russell 2000 Growth ETF, a company that owns over 500,000 shares of Encore Capital Group, the parent company of Midland disqualify the judge from presiding in this case?...................2

RELEVANT FACTS ...............................................................................................3

    a.    As related to the cause of action .........................................................3

    b.    The facts behind the disputed debt, which Midland Credit Management, Inc is still actively pursuing against Levi Huebner................................................................4

SUMMARY ARGUMENT .....................................................................................11

    I.     There is no reason to depart from the standard of review for a dismissal of a FDCPA case from any other case, that a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and even if a recovery is very remote and unlikely........................................................11

THE RESPONSES AND ARGUMENTS ................................................................13

    II.    The debtor was threatened by the debt collector —after the debt collector already informed the debtor that whatever smidgen of detail the debtor says will advance the debt collection—refusing to process the dispute without the debtor incriminating himself to answer and concede whether the debtor had any relationship with the creditor. ............................................................................................................13

    III.   Midland's cessation letter did not verify the disputed debt, the letter shows no intention to stop its collection activities against Huebner; instead the letter makes it clear "our credit reporting does not affect any credit reporting of this account by the original creditor," leaving Huebner in limbo that this disputed debt can further be resold to another debt-collector without acknowledging the dispute, and this pattern

of harassment without a judicial intervention is doomed to continue.  Indeed, two years elapsed since Huebner contacted Midland to the dispute the Nonexistent Debt, and Midland has yet to communicate the dispute to the Credit Bureaus..................15

IV.    Judge Cogan's Memorandum Opinion present actual proof of the Judge's personal bias and prejudice to FDCPA suits with the Judge's personal displeasure to the majority attorneys suing under the FDCPA.  The Judge's impartiality to FDCPA cases is easily questioned by an objective observer, especially to this case, where Judge Cogan has a financial interest in iShares Russell 2000 Growth ETF, a company that owns over 500,000 shares of Encore Capital Group, the parent company of Midland. Reassignment of this FDCPA case would eliminate the appearance of injustice where the Judge is expected to have difficulty putting aside his previously expressed views demeaning FDCPA suits.........................................18

CONCLUSION...........................................................................................................26

VERIFICATION.........................................................................................................27

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson News, L.L.C. v. American Media, Inc.*,
  680 F.3d 162 (2nd Cir. 2012) ................................................................................ 1

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 12

*Brady v. Credit Recovery Co., Inc.*,
  160 F.3d 64 (1st Cir. 1998)............................................................................. 13, 15

*Cabala v. Crowley*,
  736 F.3d 226 (2nd Cir. 11-19-2013) .................................................................... 15

*Easterling v. Collecto, Inc.*,
  692 F.3d 229 (2nd Cir. 2012) .............................................................................. 16

*Hooks v. Forman, Holt, Eliades & Ravin, LLC*,
  717 F.3d 282 (2nd Cir. 6-11-2013) ...................................................................... 13

*Jacobson v. Healthcare Financial Services, Inc.*
  434 F. Supp.2d 133 (E.D.N.Y. 2006) ................................................................... 23

*Jacobson v. Healthcare*,
  516 F.3d 85 (2nd Cir. 2008) .......................................................................... 17, 24

*Jerman v. Carlisle*,
  559 U.S. 573 (2010) ............................................................................................. 23

*Ligon v. City of New York*,
  736 F.3d 118 (2nd Cir. 2013) ........................................................................ 18, 19

*Lucero v. Bureau of Collection Recovery*,
  639 F.3d 1239 (10th Cir. 2011).......................................................................... 15

*Matrixx Initiatives, Inc., v. Siracusano*,
  563 U.S. ___, 131 S.Ct. 1309, 1323, 179 L.Ed.2d 398 (2011) ............................ 11

*Monique Sykes v. Mel S. Harris & Associates, LLC*,
  13 2742 cv (2nd Cir. 2-10-2015)......................................................................... 16

*Sandoz v. Cingular Wireless LLC*,
  553 F.3d 913 (5th Cir. 2008) ............................................................................. 15

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ............................................................................................. 12

*Stratton v. Portfolio Recovery Associates, LLC*,
  770 F.3d 443 (6th Cir. 10-24-2014) ............................................................... 11, 12

*Utility Metal Research, Inc. v. Coleman*,
  03 CV 1463 (SLT)(SMG) (E.D.N.Y. 3-28-2008) ................................................. 12

*Vallecastro v. Tobin, Melien & Marohn*,
  No. 3:13-cv-1441 (SRU) (D.Conn. 12-16-2014) ................................................. 12

*Walsh v. Law Offices of Howard Lee Schiff,*
  No. 3:11-cv-1111 (SRU) (D.Conn. 9-24-2012) ........................................ 12

*Weiss v. Regal Collections,*
  385 F.3d 337 (3rd Cir. 2004) .................................................................. 15

### Statutes

15 U.S.C. § 1692(e) ...................................................................................... 16

15 U.S.C. § 1692e (10) ................................................................................. 16

15 U.S.C. § 1692e(8) ............................................................... 3, 13, 15, 16

15 U.S.C. § 1692k(a)(2)(A) ......................................................................... 23

15 U.S.C. § 1692k(a)(3) ................................................................................. i

28 U.S.C.  § 455 ............................................................................................ i

28 U.S.C. § 1292 ........................................................................................... i

28 U.S.C. §144 ............................................................................... i, 19, 26

### Rules

16 NYCRR 609 .............................................................................................. 4

FRCP 8(a)(2) ............................................................................................... 11

FRCP Rule 11(b) ......................................................................................... 27

FRCP Rule 60(b) ....................................................................................... i, 26

FRCP Rule 61 ........................................................................................... 3, 11

Rule 12(b)(6) ................................................................................................. 1

## PRELIMINARY STATEMENT

1.      Usually, on a motion to dismiss, the Court reviews the facts in the light most favorable to the plaintiff.  "Even if their truth seems doubtful, Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2nd Cir. 2012).  It is long standing in this Circuit, that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id*.  The same applies on a *sua sponte* dismissal. Unfortunately, the Court made a mistake.  The February 11, 2015 Memorandum Opinion and Order to Show Cause ("Memorandum Opinion") took the actual proof of the phone recording and interpreted *sua sponte*, without prior briefing and discovery by the parties, that the facts alleged in the Amended Complaint is improbable and that a recovery is very remote and unlikely.   Thus, the Court's Memorandum Opinion rests on a reversible error of procedure, besides the errors of fact, and must be vacated.

2.      The disputed debt involved in this case has a Venue Shopping History of its own. Each time when Levi Huebner ("Huebner" or "Plaintiff") disputes the disputed debt or seeks verification, the debt collector resells the disputed debt to another debt collector; thus escaping the need to communicate the dispute or to verify the disputed debt.  First Verizon sold this disputed debt to I.C. System ("I.C."); I.C. sold it to Afni Inc ("Afni"); and now it is with Midland Credit Management ("Midland").  (Exhibits C, F, and G). Instead of communicating that disputed debt is disputed, Midland makes the disputed debt appear on Huebner's Credit Report without communicating the dispute.  This cycle of abuse, effectively escapes the core FDCPA requirement to communicate that the disputed debt is disputed.   Midland now falsely claims that

it communicated that the disputed debt is disputed by deleting it from its tradeline[1]; Midland alleges that deletion is communicating the dispute to Huebner's Credit Report. However, this is simply not the case.  Midland continues the negative publication of the disputed debt on Huebner's Credit Report. In other words, Midland never deleted from its tradeline the disputed debt, and still did not communicate to the Credit Reporting agencies that the disputed debt is disputed.  To end this cycle of abuse, Huebner sues alleging that Midland refused to accept his dispute to the disputed debt.

## QUESTIONS PRESENTED

i.   Did the Amended Complaint plead enough facts to state a cause of action when even the Court acknowledged "The parties agreed that if, in fact, a violation had occurred during the recorded telephone call, then even prompt dispatch of the cessation notice following the call would not absolve defendant of the technical violation?"

ii.  Would the least sophisticated consumer be befuddled regarding his consumer rights when instead of verifying the debt, the debt collector resells the debt to another debt collector, and the collection of that debt continues on the debtor's Credit Report without verification and without accepting the dispute?

iii. Does Judge Cogan's Memorandum Opinion present actual proof of the Judge's personal bias and prejudice to FDCPA suits; does the Judge's expression of displeasure to the majority attorneys suing under the FDCPA cause an objective observer to question the Judge's impartiality to FDCPA cases; would reassignment of this FDCPA case preserve the appearance of justice where the Judge is expected to have difficulty putting aside his previously expressed views demeaning FDCPA suits; does Judge Cogan's financial interest in iShares Russell 2000 Growth ETF, a company that owns over 500,000 shares of Encore Capital Group, the parent company of Midland disqualify the judge from presiding in this case?

---

[1] "Tradeline" is the collection industry, term of art, for a collection account. The term was introduced in the answer. DE, p. 12 ¶ (c).

## RELEVANT FACTS

a. *As related to the cause of action*

3.      "FACTUAL ALLEGATIONS PARTICULAR TO LEVI HUEBNER."[2] Docket

Entry ("DE") 3, Amend. Comp. ¶. 2. "Upon information and belief, on a date better known by

Defendant, Defendant began to attempt to collect an alleged consumer debt from the Plaintiff."

Id. ¶ 10.  "On or about October 17, 2013, Plaintiff called and spoke to Emma, a representative

from Midland Credit Management, Inc., regarding an account with Verizon, purchased by the

Defendant, account number: 855-965-9948."  Id ¶ 11.  "The Plaintiff inquired as to how he could

go about disputing the alleged debt." Id ¶ 12.  "The Defendant responded: 'Advise me what the

dispute is,' 'why are you disputing (the debt), you need to tell me what you are disputing'."  Id ¶

13.  "The Defendant threatened the failure to communicate that a disputed debt is disputed, in

violation of 15 U.S.C. § 1692e(8)." Id ¶ 14. The FDCPA does not require the consumer to

provide any reason at all in order to dispute a debt." Id ¶ 15.  "The Midland Credit Management,

Inc. employee who spoke with Levi Huebner intended to speak the said words to the Plaintiff."

Id ¶ 23.  "The acts and omissions of Midland Credit Management, Inc. and its employee done in

connection with efforts to collect a debt from the Plaintiff were done intentionally and willfully."

Id ¶ 24.  "Upon information and belief, Midland Credit Management, Inc. and its employees

intentionally and willfully violated the FDCPA and do so as a matter of pattern and practice by

not letting any of the class members orally dispute the debt and by maintaining that the debtors

have a valid reason to dispute any debt contrary to the FDCPA and the rights given by the

Defendant purportedly in the validation notice." Id ¶ 25.  "As an actual and proximate result of

_____

[2] While neither the complaint nor the amended complaint makes any reference to a cause of
action that Midland required its disputes to be in "writing," to the extent that any of Huebner's
pleadings or submissions are construed for such, or said as such, pursuant to FRCP Rule 61 the
Court should disregard all such errors and defects.  This mistake does not affect any party's
substantial rights, and can easily be corrected by further amending the complaint.

the acts and omissions of Midland Credit Management, Inc. and its employees, Plaintiff has suffered actual damages and injury, including but not limited to, fear, stress, mental anguish, emotional stress, acute embarrassment and suffering for which he should be compensated in an amount to be established by a jury at trial." Id ¶ 26.

  **b.** ***The facts behind the disputed debt, which Midland Credit Management, Inc is still actively pursuing against Levi Huebner***

  4.  At some point in 2009, after Huebner became a Cablevision customer, his home phone lines stopped working. After a Cablevision technician inspected the wiring inside and outside Huebner's home, Cablevision reported (1) that there is nothing wrong with the wiring inside Huebner's home, and (2) that Verizon interferes with Cablevision's signals outside the Huebner's residence.   As a result, Huebner was forced to become a Verizon customer.

  5.  Here is where the trouble arose. Upon becoming a Verizon customer, Huebner received a bill from Verizon of $131.21, purporting to be for a service of rewiring his home; when there was no work whatsoever done inside his home, and the signal interference was not related to the wiring of the residence.

  6.  It is important to explain, here, the reasoning for the bill.   Under the applicable law, wiring outside the Huebner's residence, is not a charge upon which Verizon is allowed. *See* 16 NYCRR 609 *et seq*.   Therefore, to manufacture billable charges, Verizon labeled the charges as work done inside Huebner's residence.  But the bill was without any merit whatsoever, (1) Cablevision already diagnosed the signal interference came from Verizon's wiring outside the Huebner's home, (2) there was no work done whatsoever inside Huebner's home, (3), Huebner disputed the bill with Verizon.  Huebner informed Verizon of his dispute, which was noted on that account, and Verizon informed Huebner by phone that the bill is cancelled.  Huebner has since called the debt a nonexistent debt (the "Nonexistent Debt").

7.      Verizon on its part made no further contact with Huebner regarding the bill.  At the same time, for some reason, Verizon failed to process the bill cancelation.  Resulting, that Verizon erroneously sold the Nonexistent Debt to I.C. System ("I.C."), a prominent debt collector.  (Exhibit F). The I.C. account number is 38136213-1-99.   I.C. was aware that the debt is disputed.  On July 27, 2011 Huebner wrote to I.C., responding to the collection notice, disputing the so-called debt in its entirety as nonexistent and *inter alia* requesting verification. Two years passed since Huebner submitted his dispute to I.C., I.C. did not validate the Nonexistent Debt, and I.C. did not respond to Huebner, and no further communication was received by I.C.

8.      On October 14, 2011, Huebner received another collection letter about this Nonexistent Debt stating to have been placed for collection with Afni, Inc. ("Afni").  (Exhibit G).  Huebner responded to Afni, in writing, disputing the Nonexistent Debt, and requesting verification.  Two years passed and Afni has yet to communicate or verify this Nonexistent Debt. From its silence, Huebner presumed that Afni had purged that Nonexistent Debt from its system.

9.      Like every other consumer would think, Huebner thought this collection game was finally over, but far from it.  On October 17, 2013, Huebner's wife received a voice mail from Mr. Strimson on behalf of Midland Credit Management ("Midland").  (Exhibit A). Knowing that Midland is a debt collector and that he had no prior business with Midland, Huebner investigated his Credit Report. To his shock, Huebner discovered that his credit score had dropped significantly because Midland had reported a "debt purchase."  Midland was the only collection account, as well as the sole negative tradeline on Huebner's Credit Report. (Exhibit H).



10.     Upset, and befuddled, knowing that the Nonexistent Debt certainly cannot be verified, Huebner contacted Mr. Strimson.  After being informed "Your call may be monitored or recorded. . . This is an attempt to collect a debt. Any information obtained will be used for that purpose," Huebner's voice mail asked Strimson to return his call, stating: "Hello, this is Mr. Huebner, I'd like to speak to Mr. Strimson, if you could kindly give me a call, I would appreciate it, 917-701-5432, 917-701-5432. Thank you." (Exhibit A, ps. 2-3).

11.     After Mr. Strimson failed to answer the phone Mr. Huebner called Midland to dispute the Nonexistent Debt. Upon pressing the number 0, Huebner was informed that "Your call may be monitored or recorded. . . This is an attempt to collect a debt. Any information obtained will be used for that purpose," Huebner was referred to Josh Gables ("Gables"), a Customer Service representative. (Exhibit A, p. 4). Gables informed Huebner that "Verizon sold your account to us," and the bill relates to "home phone service." Id.  Huebner can be heard politely asking Gables: "I want to know, if I want to dispute the debt, what do I have to do?" Gables replied: ". . . I'm going to connect your call with one of my departments, okay, the **Dispute Department**, give that account number to them, and they will go ahead and explain to

you the procedure how to dispute the accounting and how the account will be taken care of."
(Exhibit A, ps. 5-8)(Emphasis added).

12.     Upon being transferred to the so-called Dispute Department, Huebner was
informed that he is speaking to Emma Elliot ("Elliot"), who later identified herself as being in
the "**Consumer Support" Department**.  (Exhibit A, ps. 11-18).   In any way, before speaking to
Elliot, Huebner was informed that "Your call may be monitored or recorded. . . This is an
attempt to collect a debt; any information obtained will be used for that purpose."  (Exhibit A, ps.
8-9).  Huebner can be heard politely asking Elliot, "I want to know, what do I have to do if I
want to dispute the debt?"  (Exhibit A, ps. 11-12).

13.     Notwithstanding that any information Huebner says to Elliot would be used
against Huebner to further collect the Nonexistent Debt:

> Elliot informed: "Just advise me what your dispute is and I can see if I can assist you
> with that. . . Well, we need to, you know, work with what your dispute is
> in order to remove it, sir. So why are you disputing? . . . We need to
> know why they [Consumer] want it deleted and what their dispute is . . .
> I need to know what your dispute is before I can just delete it for you. So
> you're saying that you want to dispute it, why is it you want to dispute
> it?"

 (Exhibit A, ps. 12-13).

14.     Thereupon, Huebner stated that he is disputing the debt: "*Because it's a
Nonexistent Debt.*" (Exhibit A, p. 13).

15.     The entire conversation reflects the same communication back and forth several
times that notwithstanding that whatever information Huebner provides would be used to
advance the collection of this Nonexistent Debt; Elliot maintained that Midland could not
process the dispute unless Huebner gave up his right to remain silent and get implicated in
stating whether or not he was a Verizon consumer:

MS. ELLIOTT: "I understand, sir. But you haven't given me why you are disputing. You are just saying you are disputing. I need to know what you are disputing."

MR. HUEBNER: "It's a nonexistent debt."

MS. ELLIOTT: "Okay, sir, but that's not a dispute."

MR. HUEBNER: "Okay, so."

MS. ELLIOTT: "Did you ever have Verizon, sir?"

(Exhibit A, p. 16).

16.     After all, Huebner's phone call to Midland ended without Elliot communicating to Huebner whether Midland recorded the dispute to the Nonexistent Debt.

17.     Subsequently, Huebner reviewed his Credit Report and learned that Midland did not record that the disputed debt is disputed.  On October 15, 2014, Huebner commenced the underlying lawsuit.   Two years elapsed since Huebner contacted Midland to dispute the Nonexistent Debt; nevertheless, Midland has yet to communicate to the Credit Bureaus that the disputed debt is disputed.  Contrary to its representations to the Court and the record of this case, Midland did NOT delete the "tradeline concerning Plaintiff's disputed debt," DE 11, p 12 ¶ 39(c), inducing the Court to believe that the Nonexistent Debt was purged from Huebner's Credit Report, while in reality the negative tradeline does not communicate on Huebner's Credit Report that the disputed debt is disputed. See below, is a snapshot from Huebner's Credit Report which he retrieved on March 7, 2015. (Exhibit B).



18.     Unfortunately, Midland has misled its counsel in insisting it accepted Huebner's dispute, relying on a letter from Midland addressed to Huebner, backdated October 17, 2013, in which Midland purports to have removed the Nonexistent Debt from Huebner's Credit Report. However, Midland has submitted no evidence of any communication to the Credit Bureaus and the simple fact is that the tradeline remains on Huebner's credit report ***to this very day***. Moreover, the amended complaint is buttressed with the two years that elapsed since Huebner

contacted Midland to dispute the Nonexistent Debt, by Midland's negative tradeline on Huebner's credit report.

19.     Besides, Huebner maintains: that he never received Midland's collection letter; that he has not received Midland's cessation letter; and that he has only learned about Midland's collection effort through Strimson's phone call and subsequently checking his Credit Report.

20.     Conterminously, Strimson never returned Huebner's phone call to discuss the disputed debt, or to inform Huebner that the tradeline has been withdrawn from his Credit Report.

21.     What's more, the allegations made in the amended complaint that "Upon information and belief, Midland Credit Management, Inc. and its employee wrongfully stated to the Plaintiff that he could not orally dispute the debt with Midland," "Upon information and belief, Midland . . . intentionally denying the Plaintiff and any other debtor to dispute the debt orally," are "Upon information and belief, Midland . . . not letting any of the class members orally dispute the debt," are now fully verified with the collection letter Midland has attached to its answer, which requires any dispute be made in **writing** as it reads:

> "Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid. . . . Communications concerning disputed debts, including an instrument tendered as full satisfaction of a debt, **are to be sent to**: 8875 Aero Drive, Suite 200, San Diego, CA 92123; Attn: Consumer Support Services."  (DE 11-1, p. 2)(emphasis added).

It is axiomatic, NO telephone number is provided to dispute a debt or to communicate a disputed debt.  Rather, "Communications concerning disputed debts . . . are to be sent to: 8875 Aero Drive, Suite 200, San Diego, CA 92123; Attn: Consumer Support Services."  Thus, while plaintiff in its complaint did assert that Midland does not accept disputes orally, Plaintiff did not

assert, or intend to assert, that Midland requires disputes to be "in writing,"[3] that discussion is irrelevant since the least sophisticated consumer reading defendant's collection letters would not know of the right that disputes can be made orally.

## SUMMARY ARGUMENT

**I.   There is no reason to depart from the standard of review for a dismissal of a FDCPA case from any other case, that a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and even if a recovery is very remote and unlikely.**

22.   Even for FDCPA cases, the standard of review for a motion to dismiss is uniform among the circuits. "A complaint, which need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed.R.Civ.P. 8(a)(2), must be read in the light most favorable to the plaintiff." *Stratton v. Portfolio Recovery Associates, LLC*, 770 F.3d 443, 446 (6th Cir. 10-24-2014). "The plaintiffs allegations must be accepted as true, the complaint must be read 'as a whole,' and all reasonable inferences must be drawn in the plaintiffs favor." (*Citing Matrixx Initiatives, Inc., v. Siracusano*, 563 U.S. ___, 131 S.Ct. 1309, 1323, 179 L.Ed.2d 398 (2011)). *Stratton* at 446-7. "And 'of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

---

[3] The Court in its Memorandum Opinion, mistakenly asserts that 'in the complaint plaintiff was told he could only dispute the debt in writing' and that this "was reaffirmed by plaintiff's counsel at the Initial Status Conference" wherein the Court concludes that "the word 'writing' is never mention in the call." (De 16, p. 4). Obviously, the Court mistakenly assumed that the only evidence in the record of defendant's violations of the FDCPA was the phone call, when in fact; it is Huebner's position that the Midland's policy to accept disputes only by mail, which in of itself violates the FDCPA by causing consumers to believe that all disputes must be in writing. Undersigned counsel has no recollection of stating that the recorded telephone call includes a statement requiring disputes to be *in writing*. Unfortunately, the Court has no recording of the teleconference. *See* DE 2/17/2015. Indeed, counsel's notes and best recollection rests on a discussion whether Huebner was told that disputes cannot be made without stating a reason. To the extent counsel said the phone recording used the words "in writing," that was certainly error, which FRCP Rule 61 requires the Court to disregard as harmless.

improbable, and 'that a recovery is very remote and unlikely'." (*Citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) as quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).  *Stratton* at 447.[4]

23.    The Court's Memorandum Opinion rests on that very mistake, reviewing the telephone recording between plaintiff and defendant in the light most favorable to defendant; a mistake that contravenes the well settled standard of review. Indeed, the incontrovertible evidence shows that Midland still continues its negative reporting on Huebner's Credit Report, despite submitting to the Court a copy of a supposed cessation letter. While plaintiff maintains that he never received the cessation letter that Midland claims as supposedly mailed on October 17, 2013, Midland's continuous negative reporting of the Nonexistent Debt without communicating the dispute shows that the cessation letter was manufactured recently in honor of this lawsuit.   Furthermore, in reviewing the amended complaint, the Court forgot the standard that the amended complaint must be read as a whole.

24.    Every story has two sides. Every case has a plaintiff and a defendant. This is called an adversarial system of justice. On a motion to dismiss, it doesn't matter whether the facts are improbable, all facts must be viewed in the light most favorable to the plaintiff's side; not the defendant.   Where the plaintiff has set forth facts to plead a cause of action upon which the court "may" grant relief; at this stage, it is not the Judge who second guesses the wisdom of plaintiff's claim. And if the complaint is defective in anyway, the Court should rather grant leave to amend the complaint further to cure such deficiency than issue sanctions.

---

[4] The same other district courts of this circuit apply. *See Vallecastro v. Tobin, Melien & Marohn,* No. 3:13-cv-1441 (SRU) (D.Conn. 12-16-2014) and *Walsh v. Law Offices of Howard Lee Schiff*, No. 3:11-cv-1111 (SRU) (D.Conn. 9-24-2012) "*Plausibility* at the pleading stage is nonetheless distinct from *probability,*" (emphasis in original). Also see *Utility Metal Research, Inc. v. Coleman*, 03 CV 1463 (SLT)(SMG) (E.D.N.Y. 3-28-2008).

## THE RESPONSES AND ARGUMENTS

**II. The debtor was threatened by the debt collector —after the debt collector already informed the debtor that whatever smidgen of detail the debtor says will advance the debt collection—refusing to process the dispute without the debtor incriminating himself to answer and concede whether the debtor had any relationship with the creditor.**

25.     The Second Circuit is clear that "once a debt has been disputed, a debt collector cannot communicate the debtor consumer's credit information to others without disclosing the dispute. 15 U.S.C. § 1692e(8)." *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282 (2nd Cir. 6-11-2013) at 5. Likewise the First Circuit held, "But the plain language of § 1692e(8) requires debt collectors to communicate the disputed status of a debt if the debt collector 'knows or should know' that the debt is disputed." *Brady v. Credit Recovery Co., Inc.*, 160 F.3d 64, 67 (1st Cir. 1998).

26.     The facts revolving this case are clear. Midland knew or should have known from its predecessors that the disputed debt is disputed, yet Midland elected to report the disputed debt without communicating the dispute to the Credit Report.  When Huebner called to dispute the disputed debt, Midland refused to communicate the dispute, which is evidenced by Huebner's March 2015 Credit Report.   Instead, the Court erred to assume that "defendant's employee told plaintiff that all he needed to do to dispute his debt was to advise her of the dispute. There were no qualifications on that statement," (DE 16, p. 5), and "immediately after the call, defendant sent plaintiff a letter telling him that it was ceasing its collection efforts. Far from denying plaintiff the right to dispute his debt, the phone conversation and follow-up letter make clear that plaintiff disputed his debt, and did so successfully."  Id. The Court's reasoning is contradicted by the evidence and the phone call itself.  First, there is no communication at any point in the recording that the disputed debt has been marked as disputed.  Thus, that in it of itself is a clear violation of "the failure to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).

Page 13

Second, Midland's practice is misleading and false on its face, by telling Huebner that he could only dispute a debt if he answers whether he ever had Verizon.  In other words, according to the Court's logic, Huebner's dispute of the Nonexistent debt sufficed that Huebner successfully got Midland to accept the "Nonexistent Debt Dispute" without answering whether Huebner had Verizon, because Midland ceased it collection efforts.  This logic is repugnant to the FDCPA: whereas despite Midland accepting the "Nonexistent Debt Dispute" without answering whether Huebner had Verizon, Midland demanded from Huebner a smidgen of detail about the disputed debt whether he ever had Verizon, a tactic so designed to implicate Huebner especially the least sophisticated consumer into advancing the collection of a disputed debt.

27.     Indeed, Midland informed Huebner that whatever smidgen of detail he says is "monitored or recorded . . .  an attempt to collect a debt; any information obtained will be used for that purpose?"  (Exhibit A, ps. 8-9).  In simple terms, it is false and a deceptive tactic to tell the debtor that the disputed debt cannot be disputed without providing a smidgen of detail about the debtor knowing the original creditor.  The fraud and deception in refusing to record a dispute to a disputed debt, without a smidgen of detail regarding the debtor knowing the original creditor, is bolstered when the Midland told Huebner that he cannot dispute a disputed debt as "Nonexistent" because it "is existing, cause it's here in our system," was a deceptive in of itself. In violation of 15 U.S.C. § 1692e (10).  A telling to the least sophisticated consumer that he or she cannot dispute a debt as nonexistent because the debt exists in the debt collectors system is contrary to the consumer rights that FDCPA established, namely the right to dispute a disputed debt.

28.     The inner question the Court's Memorandum Opinion raises: when a debt collector informs the debtor that whatever smidgen of detail the debtor says can be and will be

used to advance the debt collection, the question is whether the least sophisticated consumer still bears the burden to provide to the debt collector a smidgen of detail of why the disputed debt is disputed?  The Court's Memorandum Opinion infers as yes.  This conclusion is "In contrast, [to] § 1692e(8) [which] does not affect debt collection practices at all. *See* 15 U.S.C. § 1692e(8).  Instead, § 1692e(8) merely requires a debt collector who knows or should know that a given debt is disputed to disclose its disputed status to persons inquiring about a consumer's credit history." *Brady* at id.  No difference is here, when Midland knew or should have known (from its predecessors) that this underlying disputed debt is disputed, there was no reason to further hold Huebner hostage to the phone—in pretending that the dispute cannot be process unless Huebner implicates whether he knew of Verizon—a false and misleading tactic to elicit information that would befuddle the least sophisticated consumer.

**III.** **Midland's cessation letter did not verify the disputed debt, the letter shows no intention to stop its collection activities against Huebner; instead the letter makes it clear "our credit reporting does not affect any credit reporting of this account by the original creditor," leaving Huebner in limbo that this disputed debt can further be resold to another debt-collector without acknowledging the dispute, and this pattern of harassment without a judicial intervention is doomed to continue. Indeed, two years elapsed since Huebner contacted Midland to the dispute the Nonexistent Debt, and Midland has yet to communicate the dispute to the Credit Bureaus.**

29.     The circuits that have reviewed the issue have found that "FDCPA claims, being 'acutely susceptible to mootness,' are analogous to those 'capable of repetition yet evading review.' *See Lucero v. Bureau of Collection Recovery*, 639 F.3d 1239, 1248 (10th Cir. 2011) adapting *Weiss v. Regal Collection*s, 385 F.3d 337 (3rd Cir. 2004) and *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913 (5th Cir. 2008). The Second Circuit has applied the same analogue that in FDCPA cases "a settlement offer does not moot the dispute." *Cabala v. Crowley*, 736 F.3d 226, 227 (2nd Cir. 11-19-2013).  This case presents that very logical reasoning why

Midland's cessation letter does not moot this case. If anything, the Venue Shopping History pattern of this particular disputed debt shows that the controversy is capable of repetition yet evading review.

a) *The sophisticated scheme to avoid complying with the FDCPA—further violates § 1692e*

30.     The core purpose of the FDCPA is to eliminate abusive and evasive practices by debt collection agencies.  "The FDCPA was enacted 'to eliminate abusive debt collection practices by debt collectors.' 15 U.S.C. § 1692(e)." *Monique Sykes v. Mel S. Harris & Associates, LLC*, 13 2742 cv (2nd Cir. 2-10-2015) at 25.  "The FDCPA establishes certain rights for consumers whose debts are placed in the hands of professional debt collectors for collection, and requires that such debt collectors advise the consumers whose debts they seek to collect of specified rights." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233 (2nd Cir. 2012).  "In particular, section 1692e of the FDCPA provides that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Easterling* at Id.  An essential fixture to the FDCPA is that (1) the consumer be informed of his or her rights; (2) upon the consumer's request in writing, the debt collector verify the debt; and (3) that the debt collector accept disputes to disputed debts.  *See* 15 U.S.C. § 1692 *et seq*.

31.     To avoid these basic requirements, the Nonexistent Debt involved in this case has a Venue Shopping History of its own.  Each time when Huebner disputes the debt or seeks verification, the debt collector ceases its collection activities by reselling the disputed debt to another debt collector; an effective escape to comply with the very basics of the FDCPA.   This is a tactic so designed to leave the least sophisticated consumer struggling without getting a disputed debt removed from his or her Credit Report, unless he or she pays the disputed debt.  It is that type of deceptive means which 15 U.S.C. § 1692e (10) prohibits "The use of any false

representation or deceptive means to collect or attempt to collect any debt or to obtain
information concerning a consumer." Id.  "In order to prevail, it is not necessary for a plaintiff to
show that she herself was confused by the communication she received; it is sufficient for a
plaintiff to demonstrate that the least sophisticated consumer would be confused. In this way, the
FDCPA enlists the efforts of sophisticated consumers like Jacobson as 'private attorneys general'
to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the
Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought
by others." *Jacobson v. Healthcare*, 516 F.3d 85, 91 (2nd Cir. 2008).

     32.     The facts leading to this case is just so situated.  After Huebner rightfully disputed
with Verizon the consumer charges because no work was done inside his home, while telling
Huebner the charges are canceled instead of verifying or purging the charges from its system,
Verizon sold this disputed debt to I.C.  When Huebner contacted I.C. to dispute the Nonexistent
Debt and demanded verification for the disputed debt, I.C. sold the Nonexistent Debt to Afni.
When Huebner contacted Afni to dispute the Nonexistent Debt and demanded verification for the
disputed debt, Afni, I.C., and Verizon were just quiet for two years, to allow the FDCPA statute
of limitations to run, and Verizon has now resumed its collection activities through Midland.
This case reveals that instead of communicating the dispute, Midland continues to publish the
disputed debt on Huebner's Credit Report without communicating the dispute.  This debt
collection practice presents many problems, including: first, this cycle of abuse, effectively
escapes the core FDCPA requirements to accept and communicate disputes and verify the
disputed debt.   Second, Midland now falsely claims that the disputed debt is removed from
Huebner's Credit Report; a deceptive means, since Midland still continues the negative

publication on Huebner's Credit Report. To end this cycle of abuse, Huebner justifiably sues alleging that Midland refused to communicate he has disputed the disputed debt.

33.     The idea that a debt collector instead of having to comply with the FDCPA can pass on, or resell, the disputed debt to another debt collector presents a controversy yet evading review.  Even if Midland's cessation letter claims that disputed debt was removed from Huebner's Credit Report, which letter actually is deceptive in of itself, the supposed cessation letter makes it clear "our credit reporting does not affect any credit reporting of this account by the original creditor," (DE 11-2), leaving the least sophisticated consumer like Huebner in limbo that this disputed debt can further be resold to another debt-collector—perhaps through Verizon—without acknowledging the dispute, and this pattern of harassment without a judicial intervention will never cease.  An issue yet evading review not only to Huebner but to everyone of the least sophisticated consumers.

**IV. Judge Cogan's Memorandum Opinion present actual proof of the Judge's personal bias and prejudice to FDCPA suits with the Judge's personal displeasure to the majority attorneys suing under the FDCPA.  The Judge's impartiality to FDCPA cases is easily questioned by an objective observer, especially to this case, where Judge Cogan has a financial interest in iShares Russell 2000 Growth ETF, a company that owns over 500,000 shares of Encore Capital Group, the parent company of Midland. Reassignment of this FDCPA case would eliminate the appearance of injustice where the Judge is expected to have difficulty putting aside his previously expressed views demeaning FDCPA suits.**

34.     The goal in issuing recusal, "is to avoid not only partiality but also the appearance of partiality." *Ligon v. City of New York*, 736 F.3d 118, 123 (2nd Cir. 2013).  A recusal motion requires "an objective standard designed to promote public confidence in the impartiality of the judicial process." *Ligon* at id.  The recusal rules "functions as a critical internal check to ensure the just operation of the judiciary. Our Court, sitting *en banc*, has stated that there exists 'unusual circumstances where both for the judge's sake and the appearance of justice, an assignment to a

different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality'." *Ligon* at 123-124.  "[T]he test is not how a judge intended his remarks to be understood, but whether, as a result of the interviews or other extra-judicial statements, the appearance of impartiality might reasonably be questioned." *Ligon* at 127.

35.     "To reassign a case on remand, we need only find that the facts might reasonably cause an objective observer to question the judge's impartiality, or absent proof of personal bias requiring recusation [sic], that reassignment is advisable to preserve the appearance of justice. Even where there is reason to believe that a district judge would fairly conduct further proceedings on remand, 'in determining whether to reassign a case we consider not only whether a judge could be expected to have difficulty putting aside his previously expressed views, but also whether reassignment is advisable to preserve the appearance of justice.' Such a decision 'does not imply any personal criticism of the trial judge,' **and none is intended here** . . .  we ordered reassignment because 'portions of the transcript raise[d] the concern that certain comments could be viewed as rising beyond mere impatience or annoyance' even though there was no evidence that the trial judge made any inappropriate statements leading us to seriously doubt his impartiality'." *Ligon* at 128 (bold emphasis added).

36.     28 U.S.C. §144 provides that "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time." Id.

37.     This case was barely five months old; an objective observer viewing the record of this case will find a continuous hostility from Judge Cogan towards plaintiff and his counsel. The hostility pattern, which is discussed *infra* in detail, rages from negative remarks that reveal a personal bias and prejudice to plaintiff and his counsel, as well a deep-seated favoritism to harming attorneys who sue under the FDCPA and a deep-seated favoritism to debt collection defendants.  What is more troubling to an objective observer, Judge Cogan has a financial interest in iShares Russell 2000 Growth ETF ("iShares"), which is a company that owns over 500,000 shares of Encore Capital Group ("Encore"), the parent company of Midland.  (Exhibits E, J, K, and L). The extrajudicial remarks which appear as bias and prejudice to an objective observer coupled by Judge Cogan's personal investment in iShares require that Judge Cogan shall proceed no further herein, but for this case to be reassigned.

38.     It is unfortunate that an objective observer would notice that Judge Cogan has directed to plaintiff and his counsel his displeasure to FDCPA suits. In Judge Cogan's own words, "The majority of cases that I see under the [FDCPA] statute are brought by a handful of the same lawyers, based on complaints that read much more like legal briefs than complaints." (DE 16, p. 1). Never mind that this is the first FDCPA lawsuit in which the undersigned counsel Elie C. Poltorak or his firm Poltorak PC filed.  An objective observer would say that the presence of Judge Cogan's criticizing the plaintiff's counsel for conduct plaintiff's counsel is not responsible presents serious questions of Judge Cogan's personal bias and prejudice.  Even if plaintiff himself is an attorney, who focuses mostly on criminal law, and has represented in this court less than five FDCPA cases; an objective observer would notice the reality, plaintiff does not represent the majority of FDCPA cases.

39.     The complaint in this action was filed on October 15, 2014.  (DE 1).  An objective

observer would notice that on the following day, Judge Cogan *sua sponte* blasted plaintiff and

counsel. (DE 10/16/2014).  By way of an Order to Show Cause, Judge Cogan criticized, the

complaint "is a legal brief," for citing case law holding that a consumer does not have to provide

a reason to dispute a debt.  Notwithstanding that FRCP Rule 15(a)(1) allows amending the

complaint within 21 days after service of the original complaint, an objective observer would

notice that Judge Cogan reduced that time to seven days.  As a result, on October 23, 2014,

plaintiff filed an Amended Complaint reducing the case law references.  (DE 3).

40.     A summons was yet to be issued, notwithstanding that FRCP Rule 4(m) provides

120 days to execute a summons, an objective observer would notice on November 4, 2014 Judge

Cogan's order scheduled an Initial Status Conference for December 16, 2014.   (DE 4).  Thus,

Judge Cogan effectively reduced plaintiff's 120-day time to execute the summons to less than

60-days from when the amended complaint was filed.  The objective observer would also notice

that on November 20, 2014 the Clerk of the Court issued the summons, (DE 6), and the plaintiff

abiding to the Court's schedule, without prior asking for adjournment, executed the summons on

December 1, 2014, (DE 8). An objective observer would also notice that plaintiff requested the

very first adjournment to the Initial Status Conference to give defendant a chance to appear,

which Judge Cogan granted.

41.     An objective observer would also notice that on December 15, 2014 defendant

filed its answer.  Yet, on January 2, 2015, when counsel for plaintiff requested an adjournment

till February 2015, due to being in Florida for therapy to cure a debilitating illness.  (DE 12).

While granting an adjournment to February 2, 2015, an objective observer would also notice that

Judge Cogan blasted plaintiff's counsel even if "[t]he Court is sympathetic to counsel's medical

disability, but the case has been pending for months and it does not appear that counsel is currently in a position to pursue it." (DE 01/02/2015).  Never mind that the complaint was only filed on October 15, 2014, and the answer to the amended complaint was only filed on December 15, 2014.  An objective observer would also notice that Judge Cogan went on to ridicule, "If counsel is not sufficiently able to do so prior to the adjourned conference date, he must consider whether he can effectively represent his client in this matter or whether plaintiff needs to obtain new counsel." (DE 01/02/2015).

42.     Even worse, on February 2, 2015, an objective observer would notice that when plaintiff's Counsel requested to appear by phone, due to the "extreme difficulty in traveling in a wheel chair in inclement weather, and difficulty in accessing the courthouse by wheel chair in inclement weather due to courthouse street closures, I must apologize to the Court and to counsel and inform you that I am unable to appear in person today."  While granting to appear by phone, an objective observer would see that Judge Cogan went on to ridicule counsel further "As noted in its prior Order, the Court remains concerned as to whether counsel can effectively represent his client if he cannot get to court" by wheel chair in inclement weather.  (DE 02/02/2015).

43.     An objective observer would also notice that this hostility has not settled yet.  At the Initial Status Conference, the Judge Cogan informed plaintiff's counsel that he already decided that if plaintiff has no phone recording of its phone call to Midland seeking to dispute the debt, then plaintiff has no case. Subsequently, Judge Cogan directed plaintiff to submit the phone recording by February 9, 2015, which plaintiff did.

44.     No discovery has been held in this case, and there is no motion to dismiss or for summary judgment filed.  Yet, an objective observer would also notice that two days later, on February 11, 2015, Judge Cogan issued the underlying Memorandum Opinion and Order to

Show Cause. In its opinion, Judge Cogan revealed its feeling to Federal Debt Collection

Protection Act ("FDCPA") cases that:

> "The majority of cases that I see under the statute are brought by a handful of the
> same lawyers, based on complaints that read much more like legal briefs than
> complaints. Frequently, these cases are brought on behalf of the same debtor-
> plaintiffs, who seize on the most technical alleged defects in collection notices or
> telephone communications, often raising claims of 'confusion' or 'deception'
> regarding practices as to which no one, not even the least sophisticated consumer,
> could reasonably be confused or misled. These cases are often brought for the non-
> salutary purpose of squeezing a nuisance settlement and a pittance of attorneys' fees
> out of a collection company, which it will often find cheaper to pay than to litigate.
> A cottage industry among limited players – plaintiffs' lawyers, debtors, and even
> defendants' lawyers – appears to be the primary progeny of the statute. (DE 16, ps.
> 1-2).

45.     An objective observer would also notice that Judge Cogan's negative derogatory

cottage industry calling of FDCPA cases is not based on any judicial reasoning.  The Supreme

Court in *Jerman v. Carlisle*, 559 U.S. 573 (2010) specifically rejected the derogatory calling of a

"cottage industry" for FDCPA cases.  The Supreme Court went on to say, the FDCPA contains

safeguards to abuse that actual damages will likely be *de minimis* or even zero." *Jerman v.

Carlisle*, 559 U.S. 573, 597 (2010).  Likewise, the Second Circuit reversed *Jacobson v.

Healthcare Financial Services, Inc.* 434 F. Supp.2d 133, 138 (E.D.N.Y. 2006)'s name calling of

FDCPA as a "cottage industry."  Instead, the Second Circuit held "the Act empowers district

courts to award 'additional damages' of up to $1,000 per consumer, 15 U.S.C. § 1692k(a)(2)(A),

and mandates the award of attorneys' fees to successful plaintiffs. . .  In order to prevail, it is not

necessary for a plaintiff to show that she herself was confused by the communication she

received; it is sufficient for a plaintiff to demonstrate that the least sophisticated consumer would

be confused.  In this way, the FDCPA enlists the efforts of sophisticated consumers like

Jacobson's 'private attorneys general' to aid their less sophisticated counterparts, who are

unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from

the deterrent effect of civil actions brought by others." *Jacobson v. Healthcare*, 516 F.3d 85, 91

(2nd Cir. 2008).  The Court's announcement of FDCPA prosecuting attorneys to being a cottage

industry is an insult to fellow members of this Court's bar.

46.     Notwithstanding that Judge Cogan acknowledged "Still, a technical violation of

the statute is a violation, and although the social utility of this industry may be questioned, this

technical use of the statute for economic gain violates no law or ethical precept."  An objective

observer would also notice that Judge Cogan *sua sponte* concluded without the benefit of

discovery, or a pleading by an adversary, a prejudicial fact that:

> "The instant case, however, goes beyond anything that the Court has seen. It
> represents a deliberate and transparent attempt by a sophisticated debtor to entrap a
> collection company into a technical violation. Even more problematically, plaintiff
> chose to bring this action even though there is a tape recording showing that the
> attempt at entrapment utterly failed. The collection company in this case did
> everything by the book, and yet has still found itself a defendant in an FDCPA
> action." (DE 16, p. 2).

An objective observer would say that Judge Cogan's concluding without a trial that the attempt

to lawfully dispute a disputed debt is "a deliberate and transparent attempt by a sophisticated

debtor to entrap a collection company into a technical violation" reveals a deep bias and

prejudice. Thus effectively killing any chance for Huebner to have a judicial and adversarial

review of the merits; further evidence of a deep-seated bias that requires recusal.

47.     Indeed, an objective observer would also say that Judge Cogan's decision without

a trial or adversarial pleading that Midland, "[t]he collection company in this case did everything

by the book," is rooted in a deep-seated favoritism to Encore; while at the same time, legalizing

Midland's deliberate lie of a cessation letter, when certainly Midland still continues the negative

reporting of the Nonexistent Debt on Huebner's Credit Report without communicating that the

disputed debt is disputed.

48.     An objective observer would also see that Judge Cogan did not hold back his negative feelings to this case, and revealed that "Plaintiff's complaint asserts that defendant violated the FDCPA during a phone conversation that took place on October 17, 2013 regarding a debt obligation originally owed to Verizon. (In the cases before me, unpaid cellular phone bills seem to be the most frequently used basis for claims by debtors and their lawyers who are regular players in this industry.)"  Never mind that the phone conversation itself, between Huebner and Midland, reveals the collection was for "a home telephone line that was activated by Verizon back in 2010 till 2011." (Exhibit A, p. 5).  This plain denotation of dehumanizing plaintiff and his counsel for other debtor's "unpaid cellular phone bills" upon which plaintiff bears no involvement; an objective observer will say reveals that Judge Cogan is so biased and prejudicial to FDCPA lawsuits that he has lost touch with how to handle the facts in FDCPA lawsuits.

49.     An objective observer will also notice and rightfully conclude of the overall history of this case fueled by the negative comments of Judge Cogan is an out of touch approach by Judge Cogan's misgivings. Instead of reviewing all the facts in the light most favorable to plaintiff, here without discovery and without a trial Judge Cogan decided as a matter of fact in the light most favorable to defendant, all based on what the defendant said or did not say at the Initial Status Conference:

> "The parties appeared before the Court for an Initial Status Conference. At that conference, defense counsel explained that plaintiff had, in fact, been allowed to dispute his debt verbally. Indeed, according to defense counsel, immediately after the phone call between the parties, defendant issued a letter to plaintiff advising him that defendant was ceasing its collection efforts and was requesting the deletion of the item from plaintiff's credit reports. Thus, defendant argued that plaintiff was on notice that his verbal dispute – the one he alleges defendant refused to accept – resulted in an actual cessation of collection activity." (DE 16, p. 3).

50.     The only explanation an objective observer would have for this overall hostility is Judge Cogan's Financial Disclosure, which reveals that he carries a financial interest in iShares Russell 2000 Growth ETF, a company that owns over 500,000 shares of Encore Capital Group, the parent company of Midland.  Given that this lawsuit is a Class Action, which means if plaintiff can successfully show that Midland has refused to accept the dispute of other consumers, Encore's stock may be adversely impacted; a risk that an objective observer would say would affect Judge Cogan's iShares account.  An objective observer would say that the risk, whether substantial or marginal, clouds Judge Cogan's perspective.

51.     Given that Judge Cogan's expression of displeasure to the majority attorneys suing under the FDCPA cause an objective observer to question the Judge's impartiality to FDCPA cases, where Judge Cogan is expected to have difficulty putting aside his previously expressed views demeaning FDCPA suits, and where Judge Cogan has a financial interest in iShares the company who owns over 500,000 shares of Encore; thus without reassignment of this case, justice is impossible.  Therefore, to preserve the appearance of justice, there is no other adequate remedy at law but pursuant to 28 U.S.C. §144 but for Judge Cogan to vacate the Memorandum Opinion, proceed no further, and for this case to be reassigned to a neutral justice.

## CONCLUSION

**WHEREFORE,** Levi Huebner through Counsel respectfully requests the Court enter an Order:

(a) Pursuant to FRCP Rule 60(b)(1), (3), and (6) vacating the Court's Memorandum
     Opinion and Order to Show Cause; and

(b) Declining to impose any sanction on plaintiff or counsel; and

(c) Declining to decide this case *sua sponte* without discovery and summary judgment;

(d) Reassigning this case pursuant to 28 U.S.C. §144 to another judge.

*In the alternative*, if any portion of the foregoing request for relief is denied, Levi
     Huebner through Counsel respectfully requests from the Court to enter an order:

(e) Directing Levi Huebner to amend the complaint further to correct any presumed deficiency; and/or

(f) Granting leave to appeal before the entry of a judgment or any sanction; and/or

(g) Together with other relief the Court sees fit as just and reasonable under the circumstances.

## **VERIFICATION**

I Elie C. Poltorak verify pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, that I conducted a reasonable inquiry to the facts and laws stated in the foregoing pleading, and certify in good faith that under the circumstances:

1. The factual allegations stated in the foregoing related to myself and Levi Huebner are true to the best of my knowledge.

2. The factual allegations stated in the foregoing related to the defendant is made to the best of my knowledge by familiarity of the facts and statements defendant or its agents made, while reserving the right to verify its veracity or dispute them.

3. The cited laws were read from Lois Law, LexisNexis, West Law, or Ravel Law.

4. Signed as an affidavit for purposes of 28 U.S.C. § 144.

Dated: Brooklyn, NY
        March 18, 2015

Respectfully submitted,

**POLTORAK PC**

/s/ Elie C. Poltorak

_____

By: Elie C. Poltorak

668 Crown Street
Brooklyn, NY 11233
Tel: (718) 943-8815
Email: elie@poltoraklaw.com

*Attorneys for Plaintiff*

Page 27

# 14-cv-6046 (BMC)

## United States District Court
## Eastern District of New York

LEVI HUEBNER on behalf of himself and all others similarly situated,

*Plaintiff,*

- against -

MIDLAND CREDIT MANAGEMENT, INC.,

*Defendant.*

### PLAINTIFF'S RESPONSE WITH MEMORANDUM

*By*: Elie C. Poltorak
**POLTORAK PC**,
Attorneys for plaintiff
668 Crown Street
Brooklyn, NY 11233
Tel: (718) 943-8815
Email: elie@poltoraklaw.com