UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEVI HUEBNER on behalf of himself and all other similarly situated consumers,<br><br>                Plaintiff,<br><br>-against-<br><br>MIDLAND CREDIT MANAGEMENT, INC. and MIDLAND FUNDING LLC,<br><br>                Defendants. | CASE NO. 1:14-cv-06046-BMC<br><br>**LOCAL CIVIL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

      Defendants Midland Credit Management, Inc. ("MCM") and Midland Funding, LLC ("MF") (collectively, "Midland" or "Defendants"), by and through its undersigned counsel, respectfully submits this Local Civil Rule 56.1 Statement of Uncontested Material Facts in Support of Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

      **A. Plaintiff**

      1.     Plaintiff resides at 478 Malbone Street, Floor 1, Brooklyn, New York 11225-3200 ("Malbone Street Address"). Ex. A (Huebner Dep.) at 38:14-39:2.

      2.     Plaintiff is an attorney, admitted to the New York Bar in 2006. *Id.* at 6:25-8:3.

      **B. Plaintiff's Phone Service with Verizon**

      3.     At some point prior to 2010, Plaintiff received phone service from Verizon at the Malbone Street Address. *Id.* at 23:5-25.

      4.     Plaintiff discontinued his Verizon service prior to 2010 and changed phone service providers. *Id.* at 24:23-25:4.

5. After Plaintiff discontinued service with Verizon, he claims that his former Verizon line caused interference with his then-current phone line, but his new service provider was unable to remedy the problem. *Id.* at 25:14-26:3.

6. In 2010, Plaintiff switched back to Verizon phone service. *Id.* at 25:8-13. At that time, the phone number associated with Plaintiff's Verizon Account ended in 9815. *Id.*

7. Once Plaintiff returned to Verizon, Verizon "jerry-rigged the line," solving the interference issue. *Id.* at 30:17-31:4.

8. After this work was performed, Plaintiff received a bill from Verizon of approximately $131 for fixing the issue, which Verizon explained required it to perform wiring work inside the Malbone Street Address. *Id.* at 31:24-32:25.

9. Plaintiff claims that he called Verizon to dispute the charge. *Id.* at 34:13-25.

10. Plaintiff claims that Verizon told him they would remove the $131 charge from his invoice and that invoices Plaintiff later received indicated that the charge had been credited or removed. *Id.* at 35:6-18.

11. Plaintiff cannot locate any of the invoices reflecting the credit or provide any other documentation that the account was credited, simply asserting that Verizon told him over the phone that the $131 charge had been waived. *Id.* at 36:19-37:6.

**C. Purchase and Servicing of Plaintiff's former Verizon Account**

12. MF purchases debt and places the debts with MCM for servicing. Ex. B (Ross Dep.) at 12:4-22.

13. On July 22, 2013, MF purchased accounts from several Verizon entities, including from Verizon New York, Inc. *Id.* at 29:10-19; 32:11-22; Ex. C at Midland-014.

2

14. Verizon provided MF data regarding Plaintiff's Verizon account (the "Account"), reflecting that it was one of the accounts that MF purchased along with others from Verizon and that it was due and owing at the time of MF's purchase in the amount of $131.21. Ex. B at 54:24-56:7, 66:13-22; Ex. C at Midland-015.

15. MCM created a record reflecting the details of the Account from electronic records provided by the various Verizon entities to MF. Ex. B at 55:14-56:7; Ex. C at Midland-015.

16. The record reflects that the Account was issued in Plaintiff's name at the Malbone Street Address, is associated with Plaintiff's telephone number ending in 9815, and shows a last payment date of April 4, 2011. Ex. A at 25:10-13; Ex. B at 62:25-63:5; Ex. C at Midland-015.

17. MCM's records reflect that the balance due on the Account is $131.21. Ex. C at Midland-001-002, Midland-015.

18. On December 15, 2014, MCM produced to Plaintiff an initial collection letter ("the Initial Letter"), dated August 9, 2013, properly addressed to Plaintiff's at 478 Malbone St, Fl 1, Brooklyn, NY 11225-3200, demanding payment of $131.21. ECF 11-1; ECF 35 at ¶¶ 71-73; Ex. A at 38:14-39:2.

19. MCM's records reflect that the Initial Letter was mailed to Plaintiff at his address on or about August 8, 2013, and that it was not returned as undeliverable. Ex. C at Midland-003; ECF 35-5 at ¶ 3.

20. MCM furnished information regarding the Account to the major credit reporting agencies on September 25, 2013. MF does not report to the CRAs. ECF 35-5 at ¶ 4; Ex. B at 126:15-127:5; Ex. C at Midland-005.

**D. Plaintiff's Call to MCM**

21. On October 17, 2013, Plaintiff called MCM. ECF 35-5 at ¶ 5; Ex. C at Midland-002-003.

22. Plaintiff recorded the telephone conversation and provided a transcript of the conversation to the Court. ECF 35-2. Midland incorporates this transcript by reference.

23. MCM played Plaintiff a message stating, "This is an attempt to collect a debt. Any information obtained will be used for that purpose," then transferred him to an agent. *Id.* at 3:20-4:4.

24. Plaintiff verified his identity to the agent, and the agent disclosed the Account's original number, which was the Verizon telephone number associated with the Account (ending in 9815) and stated that the amount of the debt was $131.21. *Id.* at 4:9-7:3.

25. Plaintiff asked whether MCM issued a letter concerning the account, and the agent responded that MCM sent a letter to Plaintiff at his 478 Malbone Street, 1st Fl, Brooklyn, New York address. *Id.* at 7:4-13.

26. Plaintiff stated, "That's wonderful to hear," and inquired how he could dispute the debt. *Id.* at 7:14-22.

27. The agent transferred Plaintiff to an MCM department that handles disputes. *Id.* at 7:23-8:11.

28. Once connected with the dispute department, Plaintiff stated "Well, I want to know what do I have to do if I want to dispute the debt." *Id.* at 12:5-7.

29. The agent responded "Just advise me what your dispute is and I can see if I can assist you with that." *Id.* at 12:8-10.

4

30. Plaintiff asked, "How do I get it off my credit report," and the agent replied, "Well, we need to, you know, work with what your dispute is in order to remove it, sir. So why are you disputing?" *Id.* at 12:11-16.

31. Plaintiff responded "I don't understand. I just can't get it off my credit report?" to which the agent responded "No sir. We just can't delete an account because the consumer wants it deleted. We need to know why they want it deleted and what their dispute is. I can assist you with your dispute here, sir. *Id.* at 12:12-13:2.

32. Plaintiff stated "I don't understand. I can't get it off my credit card – my account without paying it?" *Id.* at 13:3-5.

33. The agent told Plaintiff "That's not what I said sir. I need to know what your dispute is before I can just delete it for you. So you are saying you want to dispute it. Why is it that you want to dispute it?" *Id.* at 13:6-12.

34. Plaintiff responded: "Because it is a nonexistent debt." *Id.* at 13:13-14.

35. The agent stated, "Okay. Can you elaborate as to what that means. Did you already pay it with Verizon? Did you never have Verizon? *Id.* at 13:16-19.

36. Plaintiff asked "Do you have a contact information" and stated "I don't understand what questions you are asking me." *Id.* at 13:19-25.

37. The agent stated "Sir, you called in to dispute the debt. I need to know why you are disputing. So I'm asking you questions …" and Plaintiff stated "I'm telling you it's a nonexistent debt." *Id.* at 14:2-7.

38. The agent stated "Okay, sir, but I don't know what that means. It is existent because it's here in our system, so why are you stating it's nonexistent"? *Id.* at 14:8-12.

5

39. Plaintiff stated "Because it is nonexistent. How am I supposed to tell you? I can't prove a negative. It is nonexistent." *Id.* at 14:14-16.

40. The agent stated "I don't know what that means. So I need you to elaborate so I can assist you with your dispute. Did you ever have Verizon?" *Id.* at 14:17-21.

41. Plaintiff responded that he did not "understand what you are saying" and asked "Do you have a contact that number?" *Id.* at 14:25-15:3.

42. The agent provided the extension number and asked "Did you want to move forward on your dispute?" to which Plaintiff responded "I told you I dispute it because it's a nonexistent debt. *Id.* at 15:14-16:4.

43. The agent stated "I don't understand, sir. But you haven't given me why you are disputing. You are just saying you are disputing. I need to know what you are disputing," to which Plaintiff responded "It's a nonexistent debt." *Id.* at 5-11.

44. The agent asked "[D]id you ever have Verizon service?" and Plaintiff stated, "You asked me, I told you. If you're telling me you are not going to take my dispute, that's fine. I'm just going to try to see if I can get more information". *Id.* at 16:22-17:6. The agent responded, "I am trying to help you with your dispute, sir, but you are not really helping me help you." *Id.* at 17:7-9.

**E. MCM's Actions After Receiving Plaintiff's Call**

45. MCM's records reflect that on October 17, 2013, MCM closed the Account, ceased all collection activity, and coded the Account as closed. Ex. B at 131:15-132:20; Ex. C at Midland-002 to -003.

46. MCM's records reflect that MCM began the process to transmit a request to the three major credit reporting agencies (Experian, Equifax and TransUnion – the "CRAs") to

delete the information it had reported regarding the Account on October 17, 2013. Ex. B at 131:8-132:6; Ex. C at Midland-002 to -003.

47. MCM's records reflect that its first deletion request was transmitted to the CRAs on October 23, 2013, completing the deletion request process. Ex. B at 131:20-132:20; Ex. C at Midland-005; ECF 35-5 at ¶ 9.

48. MCM's records reflect that it transmitted duplicate requests for deletion of the Account to the three major credit reporting agencies on November 19, 2013, December 17, 2013, and January 16, 2014. It is MCM's practice to issue duplicate requests for deletion to the credit reporting agencies to ensure that the agencies process the request for deletion. MCM's records reflect no later reporting activity. Ex. C at Midland-005; ECF 35-5 at ¶¶ 9-10.

49. On December 15, 2014, MCM produced a letter to Plaintiff ("the Deletion Letter") dated October 17, 2013, advising Plaintiff that MCM ceased collections and instructed the CRAs to delete the information MCM had reported regarding the Account from Plaintiff's credit file. ECF 35 ¶¶ 76-77, 79-80; ECF 11-2.

50. The Deletion Letter, dated October 17, 2013, is properly addressed to Plaintiff at 478 Malbone St, Fl 1, Brooklyn, NY 11225-3200. ECF 11-2.

51. MCM's records reflect that the Deletion Letter was mailed to Plaintiff and was not returned as undeliverable. ECF 35-5 at ¶ 8; Ex. C at Midland-002.

**F. Plaintiff's CreditCheck Total Documents**

52. Plaintiff has not produced a credit report issued by one of the three main consumer reporting agencies, Equifax, Experian and TransUnion. Ex. A at 129:20-130:14, 131:16-132:3, 136:9-25, 234:5-235:2.

7

53.     Instead of providing a credit report issued directly from a CRA, Plaintiff has produced redacted documents titled "CreditCheck Total." When asked to produce any copy of his credit report in his possession or control, Plaintiff produced only copies of his CreditCheck Total documents. ECF 35-3; Plaintiff's Response to MCM's Request for Production No. 20.

54.     Plaintiff's CreditCheck Total monitoring reports "Terms and Conditions" states, under "FCRA Disclosures," that "[t]he credit report you are requesting from [CreditCheck] is not intended to constitute the disclosure of Experian information required by the FCRA or similar laws.  Experian's National Consumer Assistance Center provides a proprietary consumer disclosure that is different from the consumer credit report provided by [CreditCheck]. The disclosure report must be obtained directly from Experian by going to [Experian's website] or by calling [Experian's toll-free number].… Although comprehensive, the credit reports from each of the three national credit reporting companies that are available from [CreditCheck] may not have the same information as a credit report obtained directly from the three national credit reporting companies or through the central source." Ex. D.

55.     When questioned at his deposition, Plaintiff was unable to provide a cogent explanation of the information found in the CreditCheck documents. Ex. A 130:2-136:25.

|  | Respectfully submitted, |
|---|---|
| Dated: New York, New York<br>December 1, 2015 | **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN** |
|  | By: /s/     Matthew B. Johnson<br>Matthew B. Johnson (MJ 1622)<br>*Attorneys for Defendants Midland Credit Management, Inc. and Midland Funding, LLC*<br>88 Pine Street, 21st Floor<br>New York, New York 10005<br>(212) 376-6433<br>MBJohnson@mdwcg.com |