**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

LEVI HUEBNER on behalf of himself and all
others similarly situated,

                       *Plaintiff,*

              v.

MIDLAND CREDIT MANAGEMENT,
INC., and MIDLAND FUNDING LLC,

                       *Defendants.*

)
)
)
)
)
)
)
)
)
)
)

**Case:   14-cv-6046 (BMC)**

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     PROCEDURAL HISTORY ..................................................................................... 2

III.    STATEMENT OF FACTS ....................................................................................... 2

IV.     STANDARD OF REVIEW...................................................................................... 7

V.      ARGUMENT.......................................................................................................... 9

        A.      Plaintiff Has Produced Competent Evidence That A Genuine Issue of
                Fact Exists Regarding Defendants' Failure to Request Deletion of Plaintiff's
                Account .................................................................................................... 12

        B.      Defendants Told Plaintiff That He Had No Dispute Even When He Clearly
                Attempted To Verbally Dispute His Debt, As Is His Fundamental Right........... 16

        C.      Defendants Made A False Representation To Plaintiff Via The Cessation Letter,
                Which Purported To Inform Plaintiff That His Account Was Deleted Even
                Though The Account Still Exists. .................................................................. 20

        D.      Under Second Circuit Law, Whether a Communication Made in Connection
                With The Collection of a Debt is a Question of Fact Not Appropriate For
                Summary Judgment. .................................................................................. 22

        E.      Defendants Attempted To Collect A Non-Existent Debt. ................................. 24

VI.     CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ..................................................................................... 8

*Amnesty Am. v. Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004) ........................................................................ 8

*Araujo v. Pennymac Loan Servs., L.L.C.*,
  No. 15-CV-00062 (DLI)(LB), 2015 U.S. Dist. LEXIS 128222
  (E.D.N.Y. Sept. 23, 2015) .......................................................................... 23

*Arizona v. California*,
  460 U.S. 605 (1983) ................................................................................... 15

*Bentley v. Great Lakes Collection Bureau*,
  6 F.3d 60 (2d Cir. 1993) .................................................................. 9, 11, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................. 7, 11

*Clomon v. Jackson*,
  988 F.2d 1314 (2d Cir. 1993) ................................................................ 8, 10

*DeSantis v. Comput. Credit, Inc.*,
  269 F.3d 159 (2d Cir. 2001) ............................................................ *passim*

*Diaz v. Residential Credit Solutions, Inc.*,
  965 F. Supp. 2d 249 (E.D.N.Y. 2013) ............................................ 8, 10, 11, 16

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ...................................................................... 14

*Fasten v. Zager*,
  49 F. Supp. 2d 144 (E.D.N.Y. 1999) .................................................. 9, 11, 16, 24

*Fritz v. Resurgent Capital Servs., LP*,
  955 F. Supp. 2d 163 (E.D.N.Y. 2013) ....................................................... 10

*Grden v. Leikin Ingber & Winters PC*,
  643 F.3d 169 (6th Cir. 2011) ..................................................................... 23

*Hahn v. Rocky Mt. Express Corp.*,
  No. 11 Civ. 8512 (LTS)(GWG), 2012 U.S. Dist. LEXIS 100466
  (S.D.N.Y. June 16, 2012) ..................................................................... 14, 16

*Hart v. FCI Lender Servs.*,
  797 F.3d 219 (2d Cir. Aug. 12, 2015) ........................................................ 22

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp.*
  (*In re Blackwood Assocs., L.P.*),
  153 F.3d 61 (2d Cir. 1998) ..................................................................... 7, 11

*Hooks v. Forman, Holt, Eliades & Ravin, L.L.C.*,
  717 F.3d 282 (2d Cir. 2013) ................................................................ *passim*

*Huebner v. Midland Credit Mgmt.*,
  85 F. Supp. 3d 672 (E.D.N.Y. Feb. 11, 2015) ...................................... 1, 5, 17, 19

*Huebner v. Midland Credit Mgmt.*,
  No. 14 Civ. 6046 (BMC), 2015 U.S. Dist. LEXIS 57535 (E.D.N.Y. May 1, 2015) ............. 19

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2004) ......................................................................... 8

*Ins. Group Comm. v. Denver & R.G.W.R. Co.*,
  329 U.S. 607 (1947) ............................................................................... 15

*Jacobson v. Healthcare Fin. Servs.*,
  516 F.3d 85 (2d Cir. 2008) ....................................................................... 10

*Lautman v. 2800 Coyle St. Owners Corp.*,
  No. 14-CV-1868 (ARR) (VVP), 2014 U.S. Dist. LEXIS 137454
  (E.D.N.Y. Sept. 26, 2014) .................................................................... 10, 21

*McLee v. Chrysler Corp.*,
  109 F.3d 130 (2d Cir. 1997) .................................................................... 8, 16

*Mihelis v. Network Commer. Serv.*,
  No. CV 11-2215 (WFK)(ARL), 2014 U.S. Dist. LEXIS 141180
  (E.D.N.Y. Aug. 8, 2014) ........................................................................ 9, 17

*Moore v. Diversified Collection Servs.*,
  843 F. Supp. 2d 280 (E.D.N.Y. 2012) ........................................................... 9, 24

*Russell v. Equifax A.R.S.*,
  74 F.3d 30 (2d Cir. 1996) .......................................................................... 10

*Savino v. Comput. Credit*,
  164 F.3d 81 (2d Cir. 1998) ........................................................................ 10

*Sykes v. Mel S. Harris & Assocs.*,
  780 F.3d 70 (2d Cir. Feb. 10, 2015) ............................................................... 9

*Tocco v. Real Time Resolutions, Inc.*,
  48 F.Supp.3d 535, 540 (S.D.N.Y. 2014 ............................................................ 22

*United States v. Gelb*,
  783 F. Supp. 748 (E.D.N.Y. 1991) .................................................................. 9

*Vincent v. Money Store*,
    736 F.3d 88 (2d Cir. 2013) ............................................................................... 22

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ........................................................................... 8, 16

*Wright v. Specialized Loan Servicing, L.L.C.*,
    No. No.: 1:14-cv-01587-JLT, 2014 U.S. Dist. LEXIS 147689
    (E.D. Cal. Oct. 16, 2014) ............................................................................... 25

*Wyler v. Computer Credit, Inc.*,
    2006 U.S. Dist. LEXIS 57766, at *34 (E.D.N.Y. 2006 ...................................8

Statutes

15 U.S.C. § 286 (2012) ............................................................................................ 9

15 U.S.C. § 1692 (2012) ................................................................................ *passim*

Other

Fed. R. Civ. P. 56(a) ........................................................................................ 7, 11

Fed. R. Civ. P. 56(c)(1) ......................................................................................... 8

## Other Authorities

S. Rep. No. 95-382, 95th Cong., 1st Sess. 3 (1977),
    *reprinted in* 1977 U.S.C.C.A.N. 1695, 1697) .......................................10

Plaintiff Levi Huebner ("Plaintiff"), by and through his undersigned counsel, on behalf of himself and all others similarly situated, respectfully submits this Memorandum of Law in Opposition to Defendants Midland Credit Management, Inc. ("MCM") and Midland Funding, LLC's ("MF") (MCM and MF collectively "Defendants") Motion for Summary Judgment ("Motion" or "Mot.").[1]

## I.      PRELIMINARY STATEMENT

"The right to dispute a debt is the most fundamental of those set forth in §1692g(a)" of the Fair Debt Collections Practices Act ("FDCPA"). *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 286 (2nd Cir. 2013). "The consumer's right to take the position, at least initially, that the debt is disputed does not depend on whether the consumer has a valid reason not to pay." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2nd Cir. 2001).

By attempting to malign the Plaintiff,[2] Defendants, sophisticated national debt collections agencies, seek to deflect the Court's attention from Defendants' FDCPA violations. Even "a technical violation of the [FDCPA] is a violation." *Huebner v. Midland Credit Mgmt.*, 85 F.Supp.3d 672, 673 (E.D.N.Y. Feb. 11, 2015) (*Huebner I*). Plaintiff's claims are a fair and equitable exercise of his rights as a consumer and "violate[] no law or ethical precept." *Id.* Here, some things are clear. There is no dispute that: (1) Defendants ignored their own manuals and policies and never marked Mr. Huebner's account as disputed even though he verbally said he disputed the debt; (2) Defendants asked Plaintiff for a reason for his dispute; and (3) despite

---

[1]  Although Plaintiff believed he would be filing an affirmative Motion for Summary Judgment, after review of the evidence, Plaintiff states that there are numerous facts in dispute, and accordingly is only responding herein.

[2]  Defendants' claim that Plaintiff attempted to trick them into violating the FDCPA is baseless. (Mot. at 1). First, Plaintiff contacted Defendants only after Defendants called Plaintiff's home and spoke to his wife. He did not initiate the communication. Second, Plaintiff's allegations that Defendants require a reason in order to dispute a debt are clear policies contained in Defendants' manuals that are followed by Defendants' employees. Third, the act of notating Plaintiff's account as disputed (code 050) is entirely in Defendants' control and Defendants provide no reasonable explanation as to why Plaintiff's account was not so marked in direct contradiction to their own policies.

1

Defendants' testimony that Plaintiff's account was closed, Defendants' own internal documents show the account as marked open more than one year after it was allegedly closed. Because Defendants failed to adhere to actions required by the FDCPA and because genuine issues of fact exist regarding Defendants' actions, their Motion should be denied.

## II.   PROCEDURAL HISTORY

Plaintiff filed a Class Action Complaint in the United States District Court for the Eastern District of New York on October 15, 2014, alleging several violations of the FDCPA. ECF 1. After two prior amendments to add an additional defendant as well as new causes of action based on new facts and legal theories, on June 5, 2015, Plaintiff filed his Third Amended Class Action Complaint ("TAC") which is the operative Complaint.

## III.   STATEMENT OF FACTS[3]

Plaintiff resides in Brooklyn, New York. Ex. 1 at 38:14-39:2; PR56 ¶ 50. Defendants MCM and MF are a debt collector. ECF 36 ¶ 15; PR56 ¶ 57-58.

MF purchases debts and places the debts with MCM for servicing. Ex. 2[4] at 13:5-9; PR56 ¶ 56. When a consumer calls MCM to discuss a debt, MCM's policy is to ask "probing questions" of callers in order to determine what its next steps in servicing the account will be. Ex. 9 at Midland-028 (column 1A); Ex. 13 at Midland-300-01; PR56 ¶ 62.[5]

MCM asks consumers who wish to dispute a debt to provide information about the basis for the dispute. ECF 36 ¶¶ 10 n. 1, 142; PR56 ¶ 61. MCM has a formal procedure to ask the

---

[3]  Plaintiff incorporates by reference his Response to Defendant's Local Rule 56.1 Statement and Plaintiff's Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment (collectively, "PR56").

[4]  All exhibits hereafter marked as "Ex.".

[5]   For example, MCM's best practices/training policy states that "Probing 3rd Parties and Spouses" to gather information is an effective technique. Ex. 9 at Midland-034. Further, Sections 3.2 and 3.3 of MCM's Consumer Dispute Policy instructs MCM representatives to "ask the consumer to provide dispute information in writing," sometimes "along with supporting documentation." Ex. 10 at Midland-046-047; *see also* Ex. 13 at Midland-299 (a call script instructing employees to tell consumers to "send in your letter of dispute [before] we can get the investigation process started").

consumer for the reason to initiate a verbal dispute. Ex. 13 at Midland-296-303; PR56 ¶ 62. MCM's policy is to advise consumers to send their dispute in writing to MCM. Ex. 13 at Midland-297-98; PR56 ¶ 63. ("Use the following procedures for verbal disputes *inside* the validation period (timely dispute): 1. Advise the consumer to send their dispute in writing (this is required)…"); MCM sometimes demands "supporting documentation of their dispute" from consumers. Ex. 13 at Midland-298; PR56 ¶ 64.

MCM has promulgated a set of "warning codes" that its representatives use to determine how the MCM system will treat an account when the consumer does not immediately pay. Ex. 3 at 34:12-15; Ex. 8 at Midland-026; PR56 ¶ 75. Code 050 signifies that a consumer verbally disputes a debt. Ex.3 at 15:17-23; PR56 ¶ 75. Code 261 signifies that a consumer refuses to pay. Ex. 8 at Midland-026; Ex. 3 at 20:14-16; PR56 ¶ 75. Code 289 signifies that account has been closed and collections activity ceased. Ex.3 at 32:7-12; PR56 ¶ 75. These codes are not mutually exclusive; if a consumer verbally disputes the debt at one point in time and later discloses that he will refuse to pay the debt, his account information would appear on logs for both the 050 and 261 codes - information that remains in MCM's computer system. Ex.3 at 22:16-23; PR56 ¶ 75.

MCM's policy is to mark all verbal types of disputes with code 050. Ex. 3 at 15:17-23; PR56 ¶ 91. If a consumer says, "I dispute a debt," MCM marks that account with code 050. Ex. 3 at 34:24-35:1; PR56 ¶ 76. Further, all New York State and City residents who dispute a debt are to be coded 050. Ex. 8 at Midland-022; Ex. 9 at Midland-029; PR56 ¶ 76; Ex. 11 at Midland-053-54 (consumers residing in New York City "may dispute an account verbally or in writing, at any time and request verification of a debt, regardless of the validation period"); Ex. 12 at Midland-292; PR56 ¶ 76. In such cases, MCM "is required to honor the request." Midland-293; PR56 ¶ 76. Despite that policy, Ross testified that the procedure is sometimes circumvented if MCM issues

code 289 and deletes the consumer's account. Ex. 3 at 32:14-17; 31:17-21. Once code 050 is placed on an account, it remains unless the consumer tells MCM to remove the dispute. *Id*. at 41:25-42:2; PR56 ¶ 76.

On the other hand, accounts marked with code 261 are removed from an MCM representative's work queue because the consumer has expressed a refusal to pay the debt. Ex. 3 at 29:3-13; 34:12-15; PR56 ¶ 75. Unlike the 050 code, the 261 code does not indicate that a debt has been disputed and does not trigger MCM to mark the debt as disputed for purposes of credit reports. Ex. 3 at 40:13-22; 42:10-16; PR56 ¶ 75.

Code 289 signifies that the debt has been resolved and the account will be closed, ceasing collections efforts. *Id*. at 32:7-12; PR56 ¶ 75. When code 289 is issued, the account is no longer available for collection activity, and MCM is supposed to send information to credit reporting agencies ("CRAs") to remove the account from their records. *Id*. at 37:14-37:24; 44:22-45:2; PR56 ¶ 75; Ex. 21. An account would not be marked 050 and 289 at the same time unless MCM's representative added both codes. *Id*. at 39:25-40:2; PR56 ¶ 75.

Prior to 2010, Plaintiff received landline telephone service from Verizon at his home. Ex. 1 at 23:5-25; PR56 ¶ 3. Plaintiff discontinued his Verizon service prior to 2010 and changed service providers. Ex. 1 at 24:23-25:4; PR56 ¶ 4. After Plaintiff discontinued Verizon service, Verizon wiring located outside Plaintiff's home interfered with his new service, but his new service provider could not remedy the problem. Ex. 1 at 25:14-26:3; PR56 ¶ 5. Plaintiff thus resumed service with Verizon to fix the interference. Ex. 1 at 25:8-13; PR56 ¶ 6. Verizon performed wiring work outside Plaintiff's home to fix the interference and billed Plaintiff $131.21. Ex. 1 at 30:17-31:4, 31:24-32:25; PR56 ¶¶ 7, 8. Upon Plaintiff's dispute, Verizon told him that they would

remove the charge from his invoice. Ex. 1 at 32:5-12; 34:13-25; 35:6-18; 36:19-37:6; PR56 ¶¶ 9-11.

On July 22, 2013, MF purchased Plaintiff's account from Verizon in the amount of $131.21. Ex.2 at 29:10-19; 32:11-22; 54:24-56:7, 66:13-22; Ex. 6 at Midland-014-15; PR56 ¶¶ 13-14. MCM claims that on or about August 8, 2013, MCM mailed Plaintiff an initial collection letter (the "Initial Letter"), demanding payment of $131.21. Ex. 2 at 38:14-39:2; PR56 ¶¶ 18-19. Plaintiff never received any such letter at his home. Ex. 1 at 39:3-5.

MCM attempted to reach Plaintiff by telephone on September 17, 2013, and again on October 11, 2013. Ex. 5 at Midland-003; PR56 ¶ 21. On October 17, 2013, after prior attempts to reach MCM, Plaintiff returned MCM's call and spoke to MCM representative Emma Elliott. Ex. 5 at Midland-002-003; PR56 ¶ 21. Though Elliot told Plaintiff that "you called in to dispute the debt," MCM's records confirm that Plaintiff was returning prior MCM calls. Ex. 5 at Midland-002-04; PR56 ¶ 70.

Plaintiff provided a transcript of the October 17 call to the Court. PR56 ¶ 22; Ex. 20. In the call, Plaintiff disputed the Verizon debt. *See Huebner I*, 85 F.Supp.3d at 675-79; Ex. 20; PR56 ¶¶ 20, 21, 26-44, 66-72 (Plaintiff told Elliott that "I want to dispute the debt," and "I told you I dispute it because it's a nonexistent debt."). Elliott told Plaintiff that the alleged debt "is existent because it's here in our system." PR56 ¶¶ 92; Ex. 20. MCM did not mark Plaintiff's account as disputed, despite MCM's policy to mark all verbal disputes, and all New York disputes, with code 050. PR56 ¶¶ 75, 91; Ex. 3 at 15:17-23; 17:3-6; 19:6-8.

MCM keeps notes on individual accounts, including Plaintiff's, with shorthand bits of information about each account. Ex. 5 at Midland-002-04; Ex. 3 at 28:10; PR56 ¶ 62. MCM's records indicate that Plaintiff's account was marked with code 261 (refusal to pay) on October 11,

2013, **prior** to his first telephone call with MCM six days later. Ex. 3 at 27:2-8; PR56 ¶ 21. Nothing in MCM's account notes indicates that Plaintiff refused to pay the debt on that date. Ex. 5 at Midland-002-04; Ex. 3 at 28:19-24; PR56 ¶ 74. Plaintiff's first verbal communication with MCM, took place on October 17, 2013, six days after his account had been marked to indicate a refusal to pay. Ex. 5 at Midland-003; PR56 ¶ 21. Ross testified that she believed this was because an MCM employee had tried, but failed to reach Plaintiff via telephone, then removed his account from his or her work queue. Ex. 3 at 31:8-11. However, there is nothing in Defendant's manuals to suggest that the 261 code is used for that purpose. When Plaintiff spoke with Elliott on October 17, 2013, and verbally disputed the debt, she then marked his account with a second code, 289, which allegedly closed the account and ceased collection activity. Ex. 3 at 31:12-32:1; PR56 ¶ 79.

Defendants claim that upon the conclusion of the October 17 call, MCM mailed Plaintiff a letter (the "Cessation Letter"), informing him that it had ceased collections and that MCM instructed the CRAs to delete MCM's tradeline concerning Plaintiff's account. Ex. 5 at Midland-002; PR56 ¶¶ 49-51. However, MCM's records show that the last letter issued to Plaintiff was on **August 8, 2013**; there is no evidence that the Cessation Letter was actually transmitted on October 17, 2013. Ex. 5 at Midland-002 ("Last Ltr: 08/09/2013."); PR56 ¶ 98. Besides the representation of the Cessation Letter as the alleged deletion mechanism, no evidence that MCM deleted the alleged Verizon debt attributed to Plaintiff exists.

In response to Defendants' claim that Plaintiff's account was deleted, Plaintiff has produced a summary credit report from CreditCheck Total (the "CreditCheck Report") to show that the alleged debt still exists in his account as of April 23, 2015. Ex. 15; PR56 ¶ 53.

Despite Defendants' testimony that Plaintiff's account was closed on October 17, 2013, as of October 31, 2014 MCM's records claim that Plaintiff still owes $131.21 for the alleged Verizon

debt attributed to Plaintiff. Ex. 5 at Midland-003-04; PR56 ¶ 87. MCM's records represent that the account status of the alleged Verizon debt attributed to Plaintiff is "open." Ex. 4 at Midland-001 ("Open/Closed: **O**"); PR56 ¶ 97. *See also* ECF 36 ¶ 24 ("Midland denies that the debt is an 'alleged' debt obligation owed by Plaintiff, as it is valid and delinquent debt obligation owed by Plaintiff").

The TAC alleges that Defendants violated 15 U.S.C. § 1692e(8) by demanding that Plaintiff explain why he disputed the debt. TAC ¶¶ 55-65; 134-52. The TAC alleges that asking such questions also violates 15 U.S.C. § 1692e(10), which prohibits the use of false and deceptive means in connection with debt collection. TAC ¶¶ 145-53. The TAC also alleges that Defendants violated 15 U.S.C. §§ 1692e(2)(A), 1692e(5) and 1692e(10) by sending Plaintiff a letter that misrepresented the legal status of the alleged debt and by continuing to report the status of Plaintiff's debt to third parties without communicating that the debt was disputed. TAC ¶¶ 76-80, 155-58, 182-84. Plaintiff also asserts violations of 15 U.S.C. §§ 1692e(2)(A), 1692e(8) and 1692e(10), complaining that Defendants falsely represented the status of Plaintiff's debt by asserting the debt was valid (*id.* at ¶¶ 81-96, 159-166, 169-177) and that Defendants attempted and continue to attempt to collect a nonexistent debt (*id.* at ¶¶ 178-181).

## IV.  <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.)*, 153 F.3d 61, 67 (2nd Cir. 1998); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the burden of showing that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2nd Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record…or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2nd Cir. 2004) (internal citation omitted); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2nd Cir. 1997) ("In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.").

To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2nd Cir. 2000) (internal citation omitted). Importantly, a plaintiff's response to a debt collector's efforts is not determinative of whether there has been a violation of the FDCPA. *See Diaz v. Residential Credit Solutions, Inc.*, 965 F.Supp.2d 249, 255 (E.D.N.Y. 2014). "Rather, the issue is an objective one: namely, whether the language of the letter would mislead the least sophisticated consumer." *Diaz, id.* (quoting *Wyler v. Computer Credit, Inc.*, 2006 U.S. Dist. LEXIS 57766, at *34 (E.D.N.Y. 2006)); *see also Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir. 1993) (the least sophisticated consumer standard applies to whether 15 U.S.C. §1692e has been violated). Open questions of fact

are for the trier of fact to decide and are not properly resolved at the summary judgment stage. *U.S. v. Gelb*, 783 F. Supp. 748, 754, 756 (E.D.N.Y. 1991).

## V.       **ARGUMENT**

The FDCPA was enacted to eliminate abusive debt collection practices by debt collectors. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2nd Cir. Feb. 10, 2015); 15 U.S.C. §1692e. The right to dispute a debt is the "most fundamental" right debtors have under the FDCPA. *Hooks*, 717 F.3d at 286. Included in this right is the right to dispute a debt verbally. 15 U.S.C. §1692g(a)(3); *Hooks*, *id.,* at 286 (holding that §1692g(a)(3) does not impose a writing requirement on a debtor because "[t]he right to dispute a debt is the most fundamental of those set forth in §1692g(a), and it was reasonable to ensure that it could be exercised by consumer debtors who may have some difficulty with making a timely written challenge…Debtors can protect certain basic rights through an oral dispute..."); *see also*, *Mihelis v. Network Commer. Serv.*, 2014 U.S. Dist. LEXIS 141180, at *6 (E.D.N.Y. 2014). "[T]he FDCPA is a strict liability statute and, therefore, does not require a showing of intentional conduct on the part of a debt collector." *Fasten v. Zager*, 49 F.Supp.2d 144, 148 (E.D.N.Y. 1999). "[L]iability under the FDCPA can be established irrespective of whether the presumed debtor owes the debt in question." *Sykes*, 780 F.3d at 83; s*ee also*, *Moore v. Diversified Collection Services, Inc.*, 843 F.Supp.2d 280, 284 (E.D.N.Y. 2012) ("Because FDCPA is a strict liability statute, a plaintiff need not show that the debt collector intended to deceive in order to prevail on a claim that a communication is misleading."); *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 63 (2nd Cir. 1993) ([t]he FDCPA is a strict liability statute…").

The FDCPA prohibits false or misleading statements made in the collection of a debt. 15 U.S.C. §1692e. Second Circuit courts analyze whether a statement is false or misleading by

determining whether a statement would deceive the "least sophisticated consumer." *Diaz*, 965 F.Supp.2d at 255; *see also Clomon*, 988 F.2d at 1318 (holding that the least sophisticated consumer standard applies to whether 15 U.S.C. §1692e has been violated). "This least-sophisticated-consumer standard best effectuates the [FDCPA's] purpose of limiting the 'suffering and anguish' often inflicted by independent debt collectors." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 34 (2nd Cir. 1996) (quoting S. Rep. No. 95-382, 95th Cong., 1st Sess. 3 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1697). A statement must be materially misleading to be actionable. *Fritz v. Resurgent Capital Servs., LP*, 955 F.Supp.2d 163, 170 (E.D.N.Y. 2013). Statements are material if, *inter alia*, they would impair the consumer's ability to challenge the debt. *Lautman v. 2800 Coyle St. Owners Corp.*, 2014 U.S. Dist. LEXIS 137454, at *34 (E.D.N.Y. 2014) (internal citation omitted).

Under the least sophisticated consumer standard, a debt collector that overshadows or contradicts language informing consumers of the right to validate the debt violates the FDCPA. *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 90 (2nd Cir. 2008). A debt collector that **leads the least sophisticated consumer to be uncertain whether he had any right to dispute the debt at all violates the FDCPA.** *Id.* at 91 (emphasis added); *see also Savino v. Computer Credit, Inc.*, 164 F.3d 81, 85-86 (2nd Cir. 1998) (demanding payment without also explaining that the demand did not override the consumer's right to seek validation of his debt violates the FDCPA). The consumer's right to dispute the debt does not depend on whether he has a valid reason not to pay. *DeSantis*, 269 F.3d at 162 ("[R]egardless of the absence of a valid reason for nonpayment, the collector is obligated by the Act to cease collection, pending verification, if it receives the consumer's written notification of 'dispute,' and the Act requires the collector to notify the consumer of the collector's obligation to obtain verification upon receipt of such notice.").

The Court need only find proof of a single violation of the FDCPA to establish civil liability against the debt collector. *Diaz*, 965 F.Supp.2d at 256; *Bentley*, 6 F.3d at 62 ("a single violation of section 1692e is sufficient to establish civil liability under the FDCPA"); *Fasten*, 49 F.Supp.2d at 148 (same).

Defendants attempt to impute a greater sense of obligation to Plaintiff because he is an attorney (*see, e.g.,* Mot. at 2), but Plaintiff's occupation does not alter Defendants' obligations under the FDCPA. No matter how many times Defendants refer to Plaintiff as a lawyer, the "least sophisticated consumer" standard is an objective standard that does not consider attributes of an individual debtor. Defendants have themselves admitted this. Mot. at 11; *see also Fasten*, 49 F.Supp.2d at 148 (The FDCPA "is aimed at protecting consumers in general from abusive debt collection practices and the test is how the least sophisticated consumer – one not having the astuteness of a 'Philadelphia lawyer' or even the sophistication of the average, everyday, common consumer – understands the notice he or she receives.").

Plaintiff's evidence adduced in discovery demonstrates numerous FDCPA violations by Defendants that, at the very least, present the Court with a genuine disputes of material fact, preventing Defendants from being entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Harvis Trien & Beck*, 153 F.3d at 67; *Celotex*, 477 U.S. at 322. As discussed below, these claims stem from, *inter alia*: (1) Defendants' improper asking of probing questions of Plaintiff (and class members); (2) Defendants' failure to close Plaintiff's account, resulting in the continued open status of his alleged debt despite Defendants' representations to Plaintiff that his account would be closed; (3) Defendants' attendant failure to abide by their own internal policies to code Plaintiff's account by the procedure that would have triggered FDCPA-mandated protections to his credit information; (4) Defendants' refusal to acknowledge Plaintiff's dispute of

an alleged debt; (5) Defendants' baseless requirement that Plaintiff provide a reason for his dispute, despite the precise opposite holding in Second Circuit case law; and (6) Defendants' false statements that misrepresented the legal status of his debt to third parties. Plaintiff will address each of these theories in turn, below.

### A. Plaintiff Has Produced Competent Evidence That A Genuine Issue of Fact Exists Regarding Defendants' Failure to Request Deletion of Plaintiff's Account

The right for a consumer to dispute a debt is the "most fundamental" right provided to consumers by the FDCPA. *Hooks*, 717 F.3d at 286. Defendants are prohibited from "communicating or threatening to communicate to any person credit information which is known…to be false, **including the failure to communicate that a disputed debt is disputed**." 15 U.S.C. §1692e(8) (emphasis added).

Defendants failed to communicate that Plaintiff had disputed the alleged debt when they transmitted information about the status of the alleged debt to third party credit reporting agencies ("CRAs"), violating the FDCPA. Two discrepancies from Defendants' treatment of Plaintiff's account become apparent upon review of the account notes. *See* Ex. 5 at Midland-002-04.

First, Defendant MCM marked Plaintiff's account with code 261 on October 11, 2013 – six days *before* Plaintiff first spoke with MCM employee Elliott about his dispute. *See, supra*, at p. 5-6; Ex. 5 at Midland-003; PR56 ¶ 21. Incredibly, Defendants determined that Plaintiff refused to pay his alleged debt prior to ever speaking to him, even though code 261 is used when a consumer tells an MCM representative that he is not going to pay. Ex. 3 at 34:6-15; PR56 ¶ 75. When questioned about this discrepancy, Ross testified that MCM employees sometimes mark consumers' accounts as code 261 simply to remove those accounts from their work queues, even though the code is meant for consumers who refuse to pay and no notation exists to discern between the two categories. *Id*. at 29:3-9. Accordingly, Ross testified that nothing in Plaintiff's

account can show why it was marked as code 261. *Id*. at 31:4-8. However, pursuant to Defendants' numerous policy manuals, if a consumer says, as Plaintiff did, "I dispute a debt," that account must be marked 050, indicating a dispute. *Id*. at 34:24-35:1; *see also, e.g.,* Ex. 10 at Midland-046-47; Ex. 13 at Midland-297-98. PR56 ¶ 76. Code 050, among other things and unlike code 261, triggers Defendants' system to notify third parties, such as CRAs, that a consumer has disputed his debt. PR56 ¶ 75; Ex. 13 at Midland-298. This trigger exists because debt collectors are required by 15 U.S.C. §1692e(8) to communicate that a disputed debt has been disputed when they communicate any other information about the consumer's account to a third party. *Id.* By not coding Plaintiff's account as 050, Defendants circumvented the systems in place to ensure FDCPA compliance.

Second, when Plaintiff spoke to MCM employee Elliott, he clearly stated he was disputing the debt. Ex. 20; PR56 ¶ 77-79. Defendants' policy is to mark all verbal disputes with the 050 code. Ex. 8 at Midland-026; Ex.3 at 34:24-35:1; PR56 ¶ 75. Defendants have comprehensive policies to mark all disputes emanating from consumers in New York State and New York City with code 050. Ex. 8 at Midland-022; Ex. 9 at Midland-028-29; Ex. 11 at Midland-053-54; Ex. 12 at Midland-292-93. PR56 ¶ 76. Yet, despite the unambiguous statement from Plaintiff that he wished to dispute the debt, his account was never coded 050 – it was instead marked with code 289, which purports to close the account. Ex. 7 at Midland-016; Ex. 3 at 37:14-37:24. PR56 ¶¶ 75, 79. Code 289 does not trigger the same third-party notification obligations raised by a verbal dispute. Defendants now seek to use that distinction as a shield from liability from its failure to follow its own policies and the law; however, Plaintiff had an absolute right to dispute his alleged debt and trigger the protections that flow therefrom under the FDCPA, including communicating that a disputed debt is disputed. Defendants violated the FDCPA by not doing so when they transmitted Plaintiff's data (without indicating it was disputed) to the CRAs.

Taken together, Defendants' choice to mark Plaintiff's account as 261 and 289 rather than 050 reflects two decisions: by not marking Plaintiff's account as 050, it failed to activate the protocols in order to communicate to third party CRAs that Plaintiff had disputed his debt, replacing it instead with a procedure to delete his account and cease collection activity. Even though Defendants argue vociferously that they have ceased collection, and that doing so alleviates their FDCPA obligations (*see, e.g.,* Mot. at 2, 4, 7, 9, 14), Plaintiff's account remains open, robbing him both of the protections of §1692e(8) and of the relief afforded by the deletion of his alleged debt. Ex. 4 at Midland-001 ("Open/Closed: **O**"); PR56 ¶ 97. Accordingly, Defendants have forced Plaintiff to turn to the Court to affirm and protect his consumer rights.

In factual support of illustrating that the alleged debt had been reported without the attendant dispute, and that the debt had been communicated to third parties, Plaintiff furnished the CreditCheck Report. Ex. 15; PR56 ¶ 99. For purposes of defeating a motion for summary judgment, the CreditCheck Report is competent evidence for the Court's review. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2nd Cir. 2010) (evidence outside the pleadings not appropriate for a 12(b)(6) motion but acceptable on summary judgment); *see also Hahn v. Rocky Mt. Express Corp.*, 2012 U.S. Dist. LEXIS 100466, at *4-5 (S.D.N.Y. June 16, 2012) ("When deciding a motion to dismiss, the Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. Evidence outside these parameters may be introduced in connection with a motion for summary judgment."). The CreditCheck Report is a document created and controlled by a third party service provider, with an externally verifiable date of issuance not controlled by Plaintiff himself.

14

Other evidence as to challenge whether Defendants actually deleted the alleged debt as of October 17, 2013, also exists. On four later dates (October 23, 2013, November 19, 2013, December 17, 2013, and January 16, 2014), MCM communicated to the CRAs that Plaintiff's "HDCBAL" is $131.00 and "HDPDUE" is $131.00. *See* Ex. 18 at Midland-287; *see also* Midland-290 (defining "HDCBAL" as "current balance" and "HDPDUE" as "past due amount."); PR56 ¶ 96. In other words, MCM did not transmit a request to delete the information it had reported regarding Plaintiff's account on October 17, 2013. Instead, Defendants informed the third party CRAs that Plaintiff owed them $131 without also communicating the dispute.

Defendants argue that MCM "promptly requested deletion of its reported information." Mot. at 6. Stating that this finding is the law of the case, Defendants urge the Court not to revisit the question and allow them to wash their hands of liability based on "the CRA's [sic] failure to honor MCM's deletion request." Mot. at 10. However, the law of the case doctrine is discretionary, not mandatory, and the Court may revisit any open question when the plaintiff provides a cogent or compelling reason to do so. *See, e.g., Arizona v. California*, 460 U.S. 605, 618 (1983).[6] Second, Defendants' argument attempts to reposition the Court's focus on actions of the CRAs in an effort to hide Defendants' failure to meet their obligation under 15 U.S.C. §1692e(8) to report Plaintiff's debt as disputed. Plaintiff's furnishing of the CreditCheck Report is another illustration that Defendants never actually deleted his account, despite their claims to the contrary. The information provided by the CreditCheck Report as well as Defendants' contradictory documents create a genuine issue of material fact for the trier of fact to decide and, when construed in the light most

---

[6] Additionally, the law of the case doctrine generally controls the relationship between a trial court and an appellate court. *See Insurance Group Comm. v. Denver & Rio Grande W. R.R.*, 329 U.S. 607, 612 (1947) (under law of the case, a trial court cannot consider on remand an issue decided by an appellate court). The Court is not bound by law of the case here because the case has not gone under appeal.

favorable to Plaintiff, is competent evidence to defeat Defendants' Motion. *Hahn*, 2012 U.S. Dist. LEXIS 100466, at *4-5; *Weinstock*, 224 F.3d at 41; *McLee*; 109 F.3d at 134.

The practical effect of Defendants' abrogation of its duty to communicate that Plaintiff's disputed debt was disputed was that Plaintiff's credit report still reflects an open balance stemming from the alleged Verizon debt, and that Defendants still claim that Plaintiff's debt is valid and owing. Ex. 4 at Midland-001 ("Open/Closed: **O**"); PR56 ¶ 97. Pursuant to §1692e(8), Defendants were not permitted to transmit any credit information about the alleged debt to CRAs without also reporting that Plaintiff was disputing the debt. *See Hooks*, 717 F.3d at 285 ("[O]nce a debt has been disputed, a debt collector cannot communicate the debtor consumer's credit information to others without disclosing the dispute."). Defendants have conceded that they reported Plaintiff's credit information to CRAs. Ex. 15 at 1-4; PR56 ¶ 20 ("…in its Certification to the Court, MCM certified, 'MCM reports information to the CRAs on MF's behalf. If MF appears on Plaintiff's CreditCheck Total document, it is because MCM reported that Plaintiff owed a debt owned by MF.'"). Yet Defendants reported this information about Plaintiff's account to CRAs without disclosing that he had disputed the debt – a clear violation of §1692e(8). Since a single violation of the FDCPA is sufficient to establish civil liability against the debt collector, *Diaz*, 965 F.Supp.2d at 256; *Bentley*, 6 F.3d at 62; *Fasten*, 49 F.Supp.2d at 148, Defendants' failure to communicate that Plaintiff's debt was disputed is itself sufficient to defeat Defendants' Motion.

### B. Defendants Told Plaintiff That He Had No Dispute Even When He Clearly Attempted To Verbally Dispute His Debt, As Is His Fundamental Right.

Again, the consumer's right to dispute a debt is the most fundamental right the FDCPA provides. *Hooks*, 717 F.3d at 286. In addition to the prohibitions of §1692e(8), Defendants are also barred from using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *Id.* at §1692e(10). Defendants' refusal of

16

Plaintiff's attempt to dispute his alleged debt centered on the materially false and misleading statement that Plaintiff needed to provide a reason for his dispute and violated the FDCPA. Plaintiff clearly disputed the alleged Verizon debt when he spoke to Defendants on October 17, 2013, yet his account was never marked as disputed. *See, supra*, p. 5-6 (Plaintiff disputed the account by telling Elliott that "I want to dispute the debt," and "I told you I dispute it because it's a nonexistent debt."); *see also Huebner I*, 85 F.Supp.3d at 677-78; PR56 ¶¶ 21, 26-44, 66-73; Ex. 3 at 19:21-24; Ex. 7 at Midland-016.

Defendants violate the FDCPA every day when they carry out their scheme to challenge consumers (Class members) who wish to dispute a debt. Defendants' policies instruct their employees to ask "probing questions" of any consumers who disputes a debt. PR56 ¶ 61. *See* Ex. 20 (Elliott demanded a reason for Plaintiff's dispute at least three separate times, asking Plaintiff "I need to know why you're disputing" and "it's here in our system so why are you stating it's nonexistent?"); *see also* Ex. 13 at Midland-299-301 (listing a series of scenarios, questions and related notes MCM employees should use when handling account disputes); Ex. 9 at Midland-028 (column 1A). PR56 ¶¶ 62, 67-72.[7] With such policies, the idea that a consumer could somehow entrap Defendants into an FDCPA violation is logically impossible; rather than accept a dispute as required by 15 U.S.C. §1692g, Defendants systemically and illegally respond to a disputed debt by asking detailed questions and gathering more information to evaluate the nature of the consumer's dispute. Elliott's questioning was inappropriate under Defendants' other, contradictory policies requiring consumers who verbally dispute their debts as well as consumers

---

[7] Among the list of "Probing Questions for Verbal Disputes" is a "general" question where Defendants instruct their employees to ask, "What exactly are you disputing?" *See* Ex. 13 at Midland-300. Defendants also instruct their employees to tell consumers to "send in your letter of dispute and then we can get the investigation started," Ex. 13 at Midland-299, implying that a written dispute is required even though *Hooks and Mihelis* unambiguously hold otherwise. *Hooks*, 717 F.3d at 286 ("Debtors can protect certain basic rights through an oral dispute."); *Mihelis*, 2014 U.S. Dist. LEXIS 141180, at *6 (imposing a writing requirement violates the FDCPA because §1692g(a)(3) allows consumers to dispute the validity of their debt in ways other than writing).

who are New York residents to be logged immediately under code 050. *See, e.g.,* Ex. 12 at Midland-292 (for "all account disputes" in New York, "code as 050, and document"); PR56 ¶ 76. Instead, Defendants ignored their own policy when Plaintiff's account was coded 261 and 289 rather than 050.

Insisting that Plaintiff's debt was valid "because it's here in our system" misleads the least sophisticated consumer to believe that the dispute would not be honored without a valid reason. This is not the validation procedure that the FDCPA requires; in fact, "the consumer's right to dispute the debt does not depend on whether the consumer has a valid reason not to pay." *DeSantis*, 269 F.3d at 162; *see also* 15 U.S.C. 1692g. Defendants' representation that Plaintiff's alleged debt was valid merely because it was present in MCM's system and thereby attempting to coerce him into paying a disputed debt violated Plaintiff's fundamental right to dispute that debt. MCM's statement to Plaintiff that his debt existed because "it's here in our system" violated 15 U.S.C. §1692e(10) by misrepresenting the legal status of the alleged debt.

Further, Elliott's statement on the October 17 call that Plaintiff called to dispute a debt, and therefore had to provide a reason for his dispute mischaracterizes the nature of Plaintiff's relationship with Defendants. *See* Ex. 20 at *14 ("Sir, you called in to dispute the debt, I need to know why you're disputing. So I'm asking you questions..."). PR56 ¶ 70. Defendants purchased Plaintiff's account from Verizon and initiated contact with him through telephone calls in September and October 2013. *See, supra,* p. 5. Though Plaintiff was the caller on that particular day, he was merely responding to prior calls from Defendants over the previous period of time. Nevertheless, whether Plaintiff was the caller or the respondent does not change the simple fact that Plaintiff had the right to dispute the alleged debt without facing interrogation from Defendants.

Accordingly, Defendants violated the FDCPA when they impaired his rightful attempt to dispute the alleged debt.

Defendants rely on this Court's opinion in *Huebner I*, wherein the Court held that Defendants' representative "wanted a smidgen of detail about the dispute." *Huebner I*, 85 F.Supp.3d at 675; Mot. at 12. However, Defendants ignore this Court's subsequent Order, in which the Court acknowledged that new allegations raised by Plaintiff, "would have materially changed the posture of this case" had they been raised earlier. *Huebner v. Midland Credit Mgmt.*, 2015 U.S. Dist. LEXIS 57535, at *19 (E.D.N.Y. May 1, 2015) (*Huebner II*). *See also, id.*, at *4 (acknowledging that *Huebner I* "was based on only a partial view of the facts (and it appears now that it was)…). Respectfully, Plaintiff submits that *DeSantis* alleviates Plaintiff from caving to Defendants' "probing questions," and, in fact, that Defendants' probing questions are illegal insofar as they try to curtail Plaintiff's fundamental right to dispute his debt by intimating that Plaintiff needed a valid reason to dispute a debt.[8]

Defendants argue that no violation of §1692e occurred because Elliott's questions to Plaintiff "in no way impaired his ability to challenge the debt or suggested that MCM would fail to update its tradeline" with the CRAs. Mot. at 12. However, the uncontroverted evidence paints quite a different picture: when Plaintiff attempted to dispute his debt, MCM's representative told him that he had no valid dispute because he did not answer her questions about the debt or his Verizon account history – even though, under *DeSantis*, Plaintiff needed no valid reason to exercise his fundamental right to dispute the debt, and even though Defendants put him on notice

---

[8] It is also worth noting that Plaintiff *did* provide a reason to dispute the alleged debt: that it was a nonexistent debt. *See supra*, p. 5; *see* Argument ¶E, *infra*. Similar reasons listed in MCM's policies regarding the 050 code include disputes because the balance on the debt is incorrect, a result of fraud, or simply "other." *See* Ex. 9 at Midland-028. Plaintiff was under no obligation to provide a valid reason, or, indeed any reason at all for his dispute. *See DeSantis*, 269 F.3d at 162. But he furnished one anyway. The FDCPA requires that Defendants honor it.

that any information he provided to Defendants would be used against him. *DeSantis*, 269 F.3d at 162; *see also supra*, at p. 5-6; PR56 ¶ 67-72. Yet, he was explicitly told that his dispute had been rejected because the reason he provided – that the debt was nonexistent – was insufficient for Defendants to follow their validation obligations. Ex. 20, at *16; PR56 ¶ 95 ("Okay, sir, but that's not a dispute."). Under the least sophisticated consumer test, Defendants made a false and misleading representation to Plaintiff that he had to provide a satisfactory reason to Defendants in order to dispute his debt, which violates 15 U.S.C. §1692e(10).

### C. Defendants Made A False Representation To Plaintiff Via The Cessation Letter, Which Purported To Inform Plaintiff That His Account Was Deleted Even Though The Account Still Exists.

The FDCPA prohibits the false representation of the character, amount or legal status of any debt. 15 U.S.C. §1692e(2)(A). It also prohibits any threat to take any action that cannot legally be taken or that is not intended to be taken. *Id.* at §1692e(5). Further, as discussed *supra*, false representations in attempts to collect a debt are likewise forbidden. *Id.* at §1692e(10). Defendants violated the FDCPA when they falsely represented to Plaintiff via the Cessation Letter that his account had been deleted and the legal status of the alleged debt was no longer due and owing, even though the account remains open.

Upon the conclusion of Plaintiff's call with Defendants on October 17, 2013, Defendants allegedly issued a Cessation Letter to Plaintiff that informed him his account would be deleted and collection efforts would cease. Ex. 5 at Midland-002; Ex. 21; PR56 ¶¶ 80-86. Plaintiff alleged in the TAC that Defendants violated multiple provisions of the FDCPA through the Cessation Letter because, while the Cessation Letter gives the appearance the Defendants deleted the alleged debt and Plaintiff's tradeline, Defendants had not actually "instructed" the CRAs to take any action with regard to Plaintiff's account. Further, because the debt is still due and owing according to the CRAs – and, indeed, by Defendants' own Answer in this case (ECF 36 ¶ 24) – Plaintiff alleged

that Defendants are still in communication with the CRAs and that discrepancies existed in the timing of when Defendants claimed they sent notification to Plaintiff and the CRAs and when action on Plaintiff's account occurred. Ex. 4 at Midland -001 ("Open/Closed: **O**"); PR56 ¶ 97.

Defendants' representation in the Cessation Letter that Plaintiff's account had been deleted was material because it suggested he need not pay the alleged Verizon debt and that he would not suffer any harm nor would he ever have to pay the alleged debt in the future, because the alleged debt had been cleared and any obligation for Plaintiff to pay had been eliminated. *See Lautman*, 2014 U.S. Dist. LEXIS 137454, at *34 (representations are material "if they influence a consumer's decision to pay a debt.").[9] Accordingly, the Cessation Letter influenced Plaintiff not to take any further action regarding the alleged Verizon debt. However, as of October 31, 2014, MCM's records still represent that the account status of the alleged Verizon debt attributed to Plaintiff was "open." Ex. 4 at Midland-001 ("Open/Closed: **O**"); ECF 36 ¶ 24; PR56 ¶ 97.

Defendants argue that the time it took the CRAs to process their deletion request could not have had "any influence on Plaintiff's already-formed decision not to pay the Account." Mot. at 14. However, Plaintiff wished merely to dispute the debt; Defendants cannot now use their choice to issue code 289 and delete the debt against him, particularly because *the debt was never deleted.* Additionally, as discussed *supra*, Defendants' choice to delete Plaintiff's account and its failure to acknowledge Plaintiff's dispute of his debt had the practical effect of creating reliance by Plaintiff that Defendants would actually see the deletion of the debt through. It is uncontroverted that Defendants failed to delete the debt (Ex. 4 at Midland-001 ("Open/Closed: **O**"); ECF 36 ¶ 24; PR56 ¶ 97), but Defendants' representation to Plaintiff that the debt had been deleted falsely

---

[9] A clear contradiction arises from Defendants' arguments: on one hand, Plaintiff's account was allegedly deleted entirely, mooting any FDCPA obligations they had to Plaintiff. But on the other, his debt is still due and owing even though Defendants did not bother to provide FDCPA-mandated protections to Plaintiff. Defendants arguably cannot have it either way, but they certainly cannot have it both ways.

represented the legal status of the debt, violating 15 U.S.C. §1692e(2)(A). Whether Defendants actually intended to take the action of deleting the debt is a question of fact that cannot be resolved on a motion for summary judgment. So, too, is whether this is yet another attempt by Defendants to re-route Plaintiff's account through their system in an attempt to disregard his dispute and eventually force him to pay.

### D. Under Second Circuit Law, Whether a Communication Made in Connection With The Collection of a Debt is a Question of Fact Not Appropriate For Summary Judgment.

Section 1692e of the FDCPA applies to communications made "in connection with the collection of any debt." 15 U.S.C. § 1692e. "[W]hether a communication is 'in connection with the collection of [a] debt' is a question of fact to be determined by reference to an objective standard." *Hart v. FCI Lender Servs.*, 797 F.3d 219, 225 (2nd Cir. Aug. 12, 2015) ("Such an inquiry is consistent with the FDCPA's goal of protecting consumers: if a consumer receiving a letter could reasonably understand it to be a communication in connection with the collection of a debt, then the consumer is entitled to the protections Congress has mandated for such communications."); *see also Vincent v. The Money Store*, 736 F.3d 88, 98 (2nd Cir. 2013) (the FDCPA is "remedial in nature, [and] its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated."). In *Hart*, the Second Circuit established a broad definition of "in connection with," stating that "'in connection with' is synonymous with the phrases 'related to,' 'associated with,' and 'with respect to,' and does not necessitate any inducement element. *Hart,* 797 F.3d at 226 (citing *Tocco v. Real Time Resolutions, Inc.*, 48 F.Supp.3d 535, 540 (S.D.N.Y. 2014)).

Under the *Hart* standard, the Cessation Letter is a communication made in connection with the collection of a debt for purposes of §1692e. The least sophisticated consumer would interpret the Cessation Letter as a final and binding statement of Defendants' position on Plaintiff's debt –

that it was no longer due and owing because the account had been deleted. As such, the Cessation Letter was entirely "related to" and "associated with" Defendants' attempted collection of Plaintiff's alleged debt. Under Second Circuit law, this means the Cessation Letter was a communication made in connection with the collection of a debt, and Defendants were therefore required not to make any false or misleading statements in it. Because Plaintiff's account is still shown as open and Defendants still claim his debt obligation is valid and owing, Ex. 4 at Midland-001 ("Open/Closed: **O**"); PR56 ¶ 97; ECF 36 ¶ 24, the Cessation Letter clearly contains a false representation that was material in that it induced Plaintiff not to follow up on the payment or alternate discharge of his alleged debt.

Defendants proffer a nonbinding Sixth Circuit case, *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011), for the proposition that communications, to be in connection with the collection of a debt, must have the "animating purpose…to induce payment by the debtor." *Id.*; Mot. at 14. But *Grden* is not the law in this Circuit. Defendants also cite *Araujo v. Pennymac Loan Servs., LLC*, 2015 U.S. Dist. LEXIS 128222 (E.D.N.Y. Sept. 23, 2015) (citing *Grden*) (Mot. at 14), but the facts of *Araujo* are distinct from the case at bar. *See Araujo, id.,* at *8 (holding that the FDCPA does not apply to "a debt collector's ministerial response to a consumer inquiry" because such communication is not made in connection with the collection of a debt). On the contrary, Defendants issued the Cessation Letter in direct reaction to their communication with Plaintiff about the alleged debt, not as a mere "ministerial response."

Accordingly, the Cessation Letter is a communication made in connection with the collection of a debt for purposes of §1692e because the least sophisticated consumer would interpret the Cessation Letter as a final and binding statement of Defendants' position on Plaintiff's debt – that it was no longer due and owing because the account had been deleted. Ex. 21; PR56 ¶¶

80-86. Under Second Circuit law, this means Defendants were required not to make any false or misleading statements within it. Because Plaintiff's account is still open, Ex. 4 at Midland-001 ("Open/Closed: **O**"); ECF 36 ¶ 24; PR56 ¶ 97, the Cessation Letter clearly contains a false representation that was material because it induced Plaintiff not to follow up on the payment or alternate discharge of his alleged debt. That false representation violates §1692e, and as such Defendants' Motion should be denied.

### E.    Defendants Attempted To Collect A Non-Existent Debt.

Defendants violated 15 U.S.C. §§1692e(8) and 1692e(10) by attempting to collect a non-existent debt. The basis for Plaintiff's dispute stems from the original phone line work Verizon performed in 2011. Ex. 1 at 25:16-39:5. PR 56 ¶ 5. Defendants argue that the work Verizon performed occurred in Plaintiff's home, justifying the bill later sent to him for the services. Mot. at 2.  However, Plaintiff's testimony states the opposite: that the work was performed on telephone lines *outside* his home, and accordingly Verizon stated to Plaintiff that the work would not be charged to him. PR56 ¶ 10; Ex. 1 at 32:5-12. Nevertheless, Plaintiff received a bill for the Verizon work for approximately $131. PR56 ¶ 8; Ex. 1 at 32:13-25. Upon reporting the improper bill to Verizon, Plaintiff was told that the charge would be removed within 60 to 90 days. Ex. 1. at 35:2-12. Accordingly, Plaintiff was not obligated to pay the alleged debt, but the nonpayment eventually led to Defendants' collection efforts when they purchased the debt from Verizon on July 22, 2013. *See* Mot. at 16. Defendants' mere acquisition of the alleged debt does not convert an invalid debt to a valid one.

Plaintiff need not show "intentional conduct on the part of a debt collector." *Fasten*, 49 F.Supp.2d at 148 ("[T]he FDCPA is a strict liability statute and, therefore, does not require a showing of intentional conduct on the part of a debt collector."); *Moore*, 843 F.Supp.2d at 284 ("plaintiff need not show that the debt collector intended to deceive in order to prevail on a claim

that a communication is misleading."). Flailing to change the standard of law and heap additional burdens of proof onto Plaintiff, Defendants cite to a California case, *Wright v. Specialized Loan Serv.*, 2014 U.S. Dist. LEXIS 147689 (E.D. Cal. 2014), for the proposition that liability under §1692e(8) can only be established where the plaintiff can show that the "defendant knew or should have known the information it was communicating to be false." *Wright*, *id.*, at *11; Mot. at 11, 16. *Wright* is not the law in the Second Circuit or this District. *Fasten* and *Moore* are, and accordingly Plaintiff need not show intent to deceive by Defendant in its false representation that the Verizon debt was due and owing. Instead, as he has, Plaintiff need only allege sufficient facts to support his claim. Defendants' Motion should be denied.

## VI.      <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Levi Huebner, on behalf of himself and all others similarly situated, respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment.

Dated: January 15, 2016

Respectfully submitted,

**POMERANTZ LLP**

By: *<u>/s/ Gustavo F. Bruckner</u>*

Gustavo F. Bruckner
600 Third Avenue
New York, NY 10016
T: (212) 661-1100
F: (212) 661-8665
gfbruckner@pomlaw.com

Jayne A. Goldstein (pro hac vice)
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
T: 561-270-0795
F: 954-315-3454
jagoldstein@pomlaw.com

Perry Gattegno (pro hac vice)
10 S LaSalle, Suite 3505
Chicago, IL 60603
T: (312) 377-1181
F: (312) 377-1184
pgattegno@pomlaw.com

**POLTORAK P.C.**

Jacob T. Fogel, Esq.
26 Court Street, Suite 908
Brooklyn, NY 11242
T: (718) 855-4792
F: (718) 228-9272
jayfogel@att.net

*Attorneys for Plaintiff Levi Huebner and the Putative Class*