```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
LEVI HUEBNER on behalf of himself and all                   :
other similarly situated customers,                         :
                                                            :   MEMORANDUM DECISION
                                       Plaintiff,           :   & ORDER
                                                            :
              - against -                                   :   14 Civ. 6046 (BMC)
                                                            :
MIDLAND CREDIT MANAGEMENT, INC.                             :
and MIDLAND FUNDING LLC,                                    :
                                                            :
                                       Defendant.           :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Before me is the motion of Midland Credit Management, Inc. ("MCM") and Midland Funding, LLC's ("MF") (collectively, "defendant") for summary judgment, as well as plaintiff's motion for class certification. Plaintiff alleges that defendant violated the Fair Debt Collection Practices Act ("FDCPA") by attempting to collect a $131 debt plaintiff allegedly owed Verizon. Plaintiff argues that defendant's attempt to seek an explanation from him when it marked his debt as disputed, as well as its failure to report his debt as disputed, were both illegal. However, the undisputed facts show defendant did nothing wrong in attempting to collect this debt, even though, as I have explained in a prior decision, plaintiff attempted to entrap it into committing an FDCPA violation, and that defendant did report the debt as disputed. For those reasons, defendant's motion for summary judgment is granted. Moreover, even if there were issues of fact, I would deny class certification.

## BACKGROUND

In 2010, plaintiff switched his phone service to Verizon. He previously had Verizon service but had changed to another carrier. As a result of his reversion to Verizon, it performed

some work on plaintiff's phone line to ensure he had adequate service. Verizon billed him a $131 fee for that work. Plaintiff advised Verizon that he should not have been charged this fee and he never paid the bill.

MCM and MF acquired the debt from Verizon in July 2013. MF purchased the debt and placed it with MCM for servicing.[1] The account reflected that plaintiff owed Verizon $131.21.

Defendant's records prove that it sent plaintiff an initial collection letter, dated August 9, 2013, demanding payment for the debt, which was not returned as undeliverable. Plaintiff asserts that he never received this letter until it was produced in discovery, but although there is a factual dispute as to whether plaintiff received the letter, plaintiff cannot genuinely dispute that it was sent.

MCM uses a set of codes to determine how the company will handle an account when a consumer declines or fails to pay. Code 050 is used to document verbal disputes on an account; code 261 indicates a refusal to pay; and code 289 deletes the account, removes it from collection activity, and sends an update to each of the three major Credit Reporting Agencies – TransUnion, Experian, and Equifax (collectively, the "CRAs"). It was also MCM's procedure to label all disputes for accounts located in New York with a 050 code.

On October 17, 2013, plaintiff called MCM. Plaintiff set up a tape recorder before making the call and recorded the entire call. The call is set forth *in haec verba* and discussed at length in an earlier decision that I wrote in this case, Huebner v. Midland Credit Management, Inc., 85 F. Supp. 3d 672, 675-76 (E.D.N.Y. 2015), imposing a sanction on plaintiff, and I will not detail that call again. But to summarize, plaintiff asked what he had to do to dispute the debt; the agent asked him what the dispute was; and plaintiff repeatedly refused to describe it. However,

---

[1] Plaintiff purports to contest this fact but there is no evidence on which a reasonable jury could find otherwise. Nor is it material which of the two affiliated defendants owned the debt.

plaintiff's refusals were sufficiently indirect and oblique that each one caused the collection agent to ask another question in an effort to find out what the problem was with the debt.[2] Plaintiff consistently evaded the questions.

Defendant's records of plaintiff's account contain the agent's notes of the call, and show that she marked the account as "deleted" following the call.  Defendant's records also establish that on the same day, following the call, it sent plaintiff a letter advising him that it had ceased collection efforts and had instructed the CRAs to delete the information MCM had reported regarding the account.  The letter stated, in part:

> Based on the information provided to us, we have instructed the three major credit reporting agencies to delete the above-referenced MCM account from your credit file.  Please be advised, our credit reporting does not affect any credit reporting of this account by the original creditor.
>
> If you have questions regarding your credit report being updated, you may contact the credit reporting agencies in writing or by calling:

| Equifax/CBI PO Box 740241 Atlanta GA 30374-0241 (800) 685 - 1111 www.equifax.com | Experian PO Box 2002 Allen, TX 75013 (888) 397 - 3742 www.experian.com/reportaccess | Trans Union PO Box 2000 Chester, PA 19022 (800) 916 - 8800 www.transunion.com |
|---|---|---|

> Please feel free to contact us at (800) 825-8131 extension 32980, should you have any questions.

Defendant's internal procedures recognize the options allowed under the FDCPA when it determines that a debt is disputed.  Defendant can simply mark and report the debt to the CRAs as disputed, and either leave it in that category or attempt to confirm the validity of the debt and, if it can confirm validity, proceed with collection efforts.  Alternatively, upon marking the debt

---

[2] For example, after plaintiff answered that the debt was "non-existent," the agent asked him "did you already pay it with Verizon?  Did you never have Verizon?," to which he responded, "Do you have a contact information?," and went on to continue to evade the agent's efforts to ascertain the problem.

3

as disputed, defendant can simply delete it, which it will presumably do if it determines that the debt is not worth the trouble of pursuing.

The records show that following the call, defendant coded the account as "289," which, as explained above, meant that the account was disputed and deleted. There is no genuine dispute that within six days after the call, defendant sent multiple requests to Experian, TransUnion, and Equifax, starting on October 23, 2013, asking them to delete the item in question. These requests were reiterated on a monthly basis three times thereafter pursuant to defendant's policy of issuing repeated requests to the CRAs to increase the likelihood that the agencies will comply with requests for deletion.

Plaintiff has failed to produce a credit report from any of the three CRAs showing that, following his telephone call with defendant, his Verizon debt continued to appear, even though those companies are required to produce his credit reports to him on demand. In their place, he has proffered a report from a company called "CreditCheck Total," which is apparently a subsidiary of Experian. This is a commercial subscription service made available to consumers which purports to summarize the reports of the three CRAs, and additionally provide a putative FICO score, all for a fee. Although plaintiff's report from CreditCheck Total continues to show the Verizon debt, it also contains a disclaimer making it clear that it is not to be relied upon as a report from the three recognized CRAs:

> [T]he credit report you are requesting from [CreditCheck] is not intended to constitute the disclosure of Experian information required by the [Fair Credit Reporting Act] or similar laws. Experian's National Consumer Assistance Center provides a proprietary consumer disclosure that is different from the consumer credit report provided by [CreditCheck] . . . . Although comprehensive, the credit reports from each of the three national credit reporting companies that are available from [CreditCheck] may not have the same information as a credit report obtained directly from the three national [CRAs].

## DISCUSSION

4

I.  SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York, 593 F.3d 196, 200 (2d Cir. 2010) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)). On a motion for summary judgment, it is not for the court to weigh the evidence, assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried. See United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994). The record must be construed in the light most favorable to plaintiff, Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102 (2d Cir. 2013), but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505 (1986). Further, "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007).

Plaintiff claims defendant committed four overlapping violations of the FDCPA, all of which stem from a statutory provision that prohibits the use of false or misleading representations in connection with the collection of a debt. First, he contends that defendant violated 15 U.S.C. § 1692e(8) by failing to report to the CRAs that his debt was disputed. Second, he argues that defendant violated § 1692e(10), by falsely representing that he needed to give a reason for his dispute and attempting to obtain more information from him. Third, he contends that the deletion letter, which stated the CRAs had been notified and told to delete the

debt, violated § 1692e(2)(A), which prohibits false representations of the character or legal status of a debt, and § 1692e(5), because defendant had not properly notified the CRAs that the debt was disputed.  Included in this third claim is also an allegation that by representing that the debt had been reported as disputed, defendant violated § 1692e(10).  Finally, plaintiff asserts that defendant violated § 1692e(2)(A) because it falsely represented to him that he had a valid debt owed to Verizon and then it attempted to collect upon that debt by making false representations about the validity of that debt under §§ 1692e(8),(10).

Even construing the facts most favorably to him (like assuming he never received either of the two mailings that defendant sent him), and applying the "least sophisticated consumer" standard (although plaintiff is a lawyer and anything but an unsophisticated consumer), see, e.g., Clomon v. Jackson, 988 F.2d 1314, 1318-19 (2d Cir. 1993), I cannot see a genuine issue of fact as to any of them.  Defendant did exactly what it was supposed to do under the FDCPA.  Indeed, defendant undertook this action even though any reasonable reading of plaintiff's recorded call shows that he was trying to trick defendant into *not* complying with the FDCPA.  Defendant failed to take the bait and allowed him to dispute his debt; it then stopped collecting on the debt and notified the CRAs.

    **A.  Violation of 15 U.S.C. § 1692e(8)**

It is a violation of the FDCPA to communicate "credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).  There is insufficient evidence in this record upon which a reasonable jury could find that, once plaintiff gave it notice of the dispute, defendant failed to communicate that to the CRAs.  Defendant's regularly-kept business records clearly show that within six days of plaintiff's telephone call, it contacted each of the three agencies and reported

the debt as disputed. Indeed, defendant repeated the notice three times. That is more than the law required it to do. In addition, despite plaintiff's denial of receipt, the records indicate clearly that defendant notified plaintiff of its communication with the CRAs, whether plaintiff received it or not.[3]

Plaintiff's answer to this is to speculate that defendant's records are not what they purport to be, or that the records do not reflect what actually occurred. There are two main pillars upon which this argument rests. The first is the CreditCheck Total report, which continues to list the debt. But it specifically disclaims accuracy in the manner required under the FDCPA. In addition, nothing in the FDCPA required defendant to report the dispute to CreditCheck Total.[4] Nor has plaintiff produced any evidence showing that Experian, TransUnion, or Equifax continued to report his Verizon debt.

More fundamentally, even if the CRAs had continued to report the debt, it would not prove that defendant failed to communicate the dispute. Defendant is not a guarantor of the CRAs' compliance with its request, and it obviously has no control over the CRAs. Thus, if a jury were to conclude that defendant did not mark the debt as disputed because CreditCheck Total continued to list it, I would have to set that verdict aside as speculative and unreasonable.

Plaintiff also contends that there is an issue of fact as to whether defendant really advised the CRAs to delete the account, because the request for deletion also notes that there is a "current balance" and "past due amount" of $131. Apparently, plaintiff believes that when a consumer

---

[3] Plaintiff points to a record from MCM that reflects the "last ltr" was on 8/9/2013, but that same record contains a notation stating that the deletion letter was sent 10/17/2013.

[4] Under the FDCPA, if defendant continued to report plaintiff's debt to the CRAs, it would have been required to report that debt as disputed. Defendant, instead, asked the CRAs to delete their account. Because CreditCheck is not a credit reporting agency – it is a data compilation service – defendant had no independent reporting obligation to it.

disputes an account, it exonerates him from the liability, and therefore defendant should have advised the CRAs that there was a zero balance on this account.

That would be a fine kettle of fish indeed. It would obviate the need for the bankruptcy courts, as it would allow a debtor to eliminate debts simply by demanding their deletion by creditors and collection companies. It would obviously turn the consumer credit markets upside down. But that is not the intent of the FDCPA. Rather, the purpose of the FDCPA, *inter alia*, is to place a halt, whether temporary or permanent, on collection efforts once a debtor alleges that a debt is not valid. It is not a device whereby a debtor can force a collection company to write down his debt to zero. It does not wipe out the debt. The collection company has to maintain the ability to, at least, file a proof of claim in bankruptcy if the debtor later seeks bankruptcy protection, as some do.

The second pillar of plaintiff's argument is to mischaracterize defendant's records and record keeping procedures in several respects. Plaintiff asserts that because his account, following his call, was marked "289" instead of "050," defendant did not, in fact, mark the debt as disputed. That argument ignores the unrebutted testimony of defendant's Rule 30(b)(6) witness, who testified quite clearly that the 050 code is merely a subset of the 289 code. In other words, a 050 code leaves defendant free to investigate the debt and, depending on the results of the investigation, to restore the account to undisputed status. A 289 code, in contrast, identifies a disputed account as to which no further action is going to be taken. As the witness testified, and as the documents confirm, a 289 code is the next step beyond a 050 code, and can be used to signify that no further collection activity should be taken. Defendant in this instance simply skipped the 050-code stage, probably because it was so obvious from the evasive responses that plaintiff gave to the collection agent in his telephone call, that this $131 account was going to be

more trouble than it was worth. Defendant's actions following the call – contacting plaintiff and the CRAs and notifying them that the debt was deleted – were completely consistent with the unrebutted testimony.[5]

No matter how plaintiff tries to torture it, the undisputed record shows that following his telephone call, defendant took no further action to collect his debt; it notified him that it was deleting it; and it notified the CRAs to the same effect. That is all that the law required it to do.

### B.  Violation of 15 U.S.C. § 1692e(10)

Plaintiff argues that defendant violated section 1692e(10) of the FDCPA by asking too many questions of him when he called to dispute his debt. Section 1692e(10) prohibits a debt collector from using "any false representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. § 1692e(10). The right to dispute a debt is one of the most fundamental rights set forth under the provision of the FDCPA addressing the validation of debts. See 15 U.S.C. § 1692g(a); Hooks v. Forman, Holt, Eliades & Ravin, LLC, 717 F.3d 282, 286 (2d Cir. 2013). Plaintiff's argument appears to be that by asking these questions, the least sophisticated consumer could have been deceived into believing that he had to provide defendant with a valid reason to dispute his debt.

Defendant's policies instruct its employees to ask follow-up questions when a consumer advises that he is disputing his debt. I see no problem with that under the law at all. There is nothing unreasonable about allowing a debt collector to ask an individual to explain why he is disputing his debt, as long as it does not interfere with an individual's ability to dispute that debt.

---

[5] Plaintiff raises two other points that are immaterial and therefore warrant little comment. He first complains that prior to his call, his account was coded "261" – refusal to pay – even though he had not refused. Defendant had attempted to contact him at least six times without success, so there seems to have been a basis for a "refusal to pay" code, but, in any event, it is immaterial how defendant classified his account before he contacted them.

Second, plaintiff contends that one of defendant's documents showed his account as "open." He nowhere explains the provenance or even the date of this document. In any event, defendant's Rule 30(b)(6) witness made it clear that in defendant's internal terminology, "open" does not mean "undeleted" and "closed" does not mean "deleted."

Asking follow-up questions enables the debt collector to focus its investigation on what the problem is with the debt, rather than shooting in the dark. It might even allow the collection agency to resolve the dispute on the spot. If the consumer answers the question by saying, "I only owe $120, not $131," the collection agent might well say, "fine, we'll take it." Problem solved.

There may come a point in a verbal exchange where a debt collector is intentionally browbeating a consumer to deter him from disputing his debt. It also might arguably be the case that if a consumer states, "I want to dispute the debt, and I decline to tell you why," the collector might have to stop asking questions and just mark the debt as disputed (although plaintiff has cited no case so holding). But nothing resembling either of those scenarios happened here. Rather, the transcript is quite clear that it was plaintiff who was bobbing and weaving, evading the questions and harassing the collection agent, who was just trying to do her job, find out what the problem was, and perhaps even resolve the dispute. Plaintiff's evasiveness, his cat-and-mouse approach, virtually begged for follow-up questions because instead of just refusing to state what the problem was, plaintiff answered with non-sequiturs and put his own questions to her, all in a very obvious attempt to get her to say something improper. I commend the transcript, see Huebner, 85 F. Supp. 3d at 675-79, to anyone who wants to form their own judgment as to who was the victim and who was the victimizer in this exchange.

What plaintiff did is not what the least sophisticated consumer would do, because the least sophisticated consumer would not be an experienced FDCPA lawyer trying to manufacture an FDCPA claim.[6] He would not say that he is disputing the debt "because the debt is non-

---

[6] Plaintiff served as plaintiff's counsel in Setton v. Cohen Hurkin Ehrenfeld Pomerantz & Tenenbum, LLP, No. 12 Civ. 4102, 2014 WL 4724704 (E.D.N.Y. Sept. 22, 2014). In that case, the plaintiffs alleged that the defendant never sent the notice at issue. However, the defendant provided ample evidence of service, including an affidavit

existent," leaving the agent clueless. Rather, when asked why he wanted to dispute the claim, the least sophisticated consumer would simply say, "Verizon didn't tell me they were going to charge me reinstituting service, and when they charged me, I refused to pay." The truth seldom requires any sophistication.

Nothing in MCM's policies, or the phone call with plaintiff, prevented plaintiff from disputing the debt. As I held in an earlier opinion in this case, "[t]he fact that defendant's representative wanted a smidgen of detail about the dispute, when plaintiff was being obviously and intentionally vague, does not amount to a statutory violation." Huebner, 85 F. Supp. 3d at 675. Defendant still marked the account as deleted and requested that the CRAs delete its reported information. Defendant's representative did not say she would not accept plaintiff's debt dispute. Her questions to plaintiff did not violate the FDCPA.

Finally, and relatedly, plaintiff contends that the October 17, 2013 letter, in which defendant advised him that it was ceasing collection efforts and reporting the debt as deleted to the CRAs, was a false representation under §§ 1692e(2)(A) and 1692e(10) because, in fact, it did not cease collection efforts and did not advise the CRAs to delete the debt. Since, as discussed above, the record demonstrates that defendant properly notified the CRAs that plaintiff's debt was disputed and ceased collection activities, this claim fails.[7]

### C. Collection of a Non-Existent & Non-Validated Debt

---

reflecting that a process server left two copies of the notice at issue at the plaintiffs' residence and two certified mail receipts mailed on the same day to plaintiffs' address.

[7] Defendant argues that the deletion letter was not a "communication in connection with the collection of a debt" as defined by § 1692e of the FDCPA. The Second Circuit has not taken a position on whether a communication "in connection with a debt" must be designed to induce the consumer's payment in order for the communication to be covered. See Hart v. FCI Lender Servs., Inc., 797 F.3d 219, 225-26 (2d Cir. 2015). Instead, it has held that courts should apply an objective standard "with an eye towards a consumer's understanding" of the communication. Id. at 225. I need not reach this issue because I find that, even assuming this letter was a communication in connection with the collection of a debt (as the second page of the letter states it is), it does not violate any provision of § 1692e.

It is a violation of the FDCPA to falsely represent the legal status of a debt. See 15 U.S.C. § 1692e(2)(a). The FDCPA also sets forth a detailed procedure for disputing the validity of a debt. See 15 U.S.C. § 1692g(a). As long as a debt collector has included appropriate language notifying an individual about the debt validation procedure under the FDCPA, the allegation that a debt is invalid cannot alone constitute the basis for an FDCPA claim. See Bleich v. Revenue Maximization Grp., Inc., 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002). Additionally, the FDCPA does not impose a duty upon a debt collector to independently investigate the validity of a debt. See Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1174 (9th Cir. 2006). A plaintiff's self-serving statements about the validity of his debt, without direct or circumstantial evidence to support them, cannot defeat a motion for summary judgment. See Llewellyn v. Asset Acceptance, LLC, No. 14 Civ. 411, 2015 WL 6503893, at *2 (S.D.N.Y. Oct. 26, 2015) (internal citations omitted).

Plaintiff's final claim is that defendant violated the FDCPA because it represented that plaintiff had a valid outstanding debt with Verizon and it attempted to collect upon that debt before verifying it was valid. Plaintiff further argues that because he had disputed the debt with debt collectors retained by Verizon prior to the sale of his debt to defendant, which I assume he did, knowledge of that dispute should be imputed to it.

Defendant did not violate the FDCPA by attempting to collect on the debt prior to verifying it. Defendant bought the debt from Verizon which represented that plaintiff owed it $131.21. Defendant's initial letter to plaintiff, even assuming plaintiff never received it, provided adequate notice of how to dispute his debt; that is all defendant had to do. And once plaintiff disputed the debt, defendant was placed on notice that it either needed to cease collection or verify the debt. Defendant had no obligation to independently investigate the debt

prior to beginning collection, and there is no reason that plaintiff's prior dispute of the debt with Verizon's debt collectors should have been known to it.

## II. CLASS CERTIFICATION

Even if I were not granting defendant's motion for summary judgment, I would deny plaintiff's motion for class certification because he has failed to satisfy the requirements of Rule 23. Rule 23(a) of the Federal Rules of Civil Procedure requires that any proposed class action: "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Myers v. Hertz Corp., 624 F.2d 537, 547 (2d Cir. 2010). In addition, Rule 23(a) contains an implied requirement that the class must be ascertainable. Vu v. Diversified Collection Servs., Inc., 293 F.R.D. 343, 355 (E.D.N.Y. 2013).

In addition to satisfying each of the four prerequisites listed in Rule 23(a), a party seeking class certification must satisfy one of the subsections of Rule 23(b). Plaintiff seeks to certify a class pursuant to subsection 23(b)(3) and therefore must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods," for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

Plaintiff has proposed either a nationwide or New York-only class which he defines as follows: "All persons who, according to Defendants' records (a) have a United States mailing address; (b) within one year before the filing of this action; (c) verbally disputed the debt; and (d) were *asked probing questions* regarding the reason for the dispute." (Emphasis added). The definition raises numerous problems under Rule 23, but it suffices to note two glaring ones.

13

### A. Ascertainability

The touchstone of ascertainability "is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Brecher v. Republic of Arg., 806 F.3d 22, 24 (2d Cir. 2008) (internal citations omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010).

Plaintiff's proposed class definition would require a two-step process to identify class members. The first step is to cull those consumers to whom defendant assigned a 050 or 261 code within a one year reach-back period.[8] That is easy enough. But note that it excludes any consumers who were only assigned a 289 code, which also reflects disputes. Let's put that aside.

The second step requires a determination of which of these "050/261" consumers were asked "probing questions." How does plaintiff intend to determine that? I note at the outset that the adjective "probing" is qualitative in nature. One dictionary defines it as "a careful examination or investigation of something." Merriam-Webster, Online Edition, available at http://www.merriam-webster.com/dictionary/probe. Plaintiff apparently intends for someone, I suppose me, to examine each conversation with each "050/261" consumer on a case-by-case basis and determine whether the questions were sufficiently inquisitive to constitute "probing." I do not think Rule 23 permits me to do that.

---

[8] Plaintiff's Reply Brief argues that its proposed class definitions do not contemplate using defendant's account coding system. This is preposterous and in bad faith. Without the use of a coding system there would be absolutely no mechanism by which to identify who has been subject to probing questions when disputing their debt. Further, plaintiff's Motion in Support of Class Certification states that "[m]oreover, Defendants use a coding system to mark consumers . . . such that a list of consumers who were treated exactly the same way by Defendants already exists, at least partially."

Defendant itself uses the word "probing" in its procedures manual to give examples of the kinds of questions that a collection agent should ask under certain verbal dispute scenarios, which further illustrates how subjective any determination of the class would be. For example, if a consumer advises the agent that the debt is the product of fraud, one of the suggested "probing" questions for the agent is, "When was the alleged fraud committed?" That hardly seems probing to me, but apparently it does to defendant. Similarly, if a consumer advises the agent that the debt was previously paid, a suggested "probing" question is, "How much did you pay?" Even if one determines that these questions are "probing" within plaintiff's class definition, we encounter the problem that there is nothing illegal about them under the FDCPA; the class definition thus picks up some conduct that might be illegal as deterring the least sophisticated consumer from disputing his debt, and other conduct that plainly would not.

It is apparent what plaintiff is attempting to do by limiting the class to those who were asked "probing" questions. Obviously, he cannot expressly admit that he is seeking a class of those consumers who were asked *any* questions, as the FDCPA clearly does not prohibit that. So what he really means is to define the class as those who were asked questions "sufficient to deter the least sophisticated consumer from disputing their debt." But he cannot do that either, because it is so obviously qualitative and would so clearly require a case-by-case determination. Therefore, he has seized upon the word used in defendant's procedures manual – "probing" – in the hope of making the inquiry seem less qualitative. But as defendant's procedures manual shows, that inquiry is not less qualitative. It still requires a case-by-case inquiry to determine which questions have an improper deterrent effect and which do not.

Moreover, although defendant's procedures manual gives a few sample questions, the nature of conversation, as plaintiff's exchange with the agent shows, is dynamic. Whether and

15

how topics are covered by a collection agent depends on what she hears from the consumer. A few sample questions may be a starting point, but until artificial intelligence technology increases substantially beyond its current level (at which point collection companies may replace their agents with computers), the particular questions asked will depend on the particular statements that the consumer makes. And yet it is the agent's particular questions that have to be tested under the FDCPA.

But there is more. Despite discovery, plaintiff has given no indication of how we are to ascertain what questions any particular consumer was asked. There is no indication that defendant maintains any recordings of those conversations (unlike plaintiff), and even if it did, as demonstrated above, they would have to be reviewed conversation by conversation. Plaintiff has submitted no written records of any contact between defendant and any consumer, save one – his own. And even that one does not fully disclose what questions he was asked.

Defendant's record of plaintiff's account has a section memorializing contacts with him. One part of that section is a column entitled "Notes," in which the agent summarized the call. In its entirety, she typed in the following:

> RECVD CALL FROM: LEVI HUEBNER VERIFIED ADDRESS REASON: CU ASKING FOR MY CONTACT INFO; GAVE CU ALL INFO NEEDED. ASKING CU HOW CAN HELP. CU STS WANTS TO DISPUTE. ASKED CU WHAT HIS DISPUTE IS. CU STS ITS A NON EXISTANT [sic] ACCT. ADV CU WHAT THAT MEANS. IF HES DISPUTING FRAUD, PAID PRIOR, OR IF HE EVER HAD VERIZON. CU CLAIMIMING [sic] HE DIDNT UNDERSTAND MY QUESTIONS. ASKED CU IF HES EVER HAD VERIZON. CU REPEATED. CU STS WILL CALL BACK ONCE GETS HIS PAPERWORK TOGETHER. ALTHOUGH UNCLEAR OF DISPUTE, WILL UPDATE TO DLT PER NYC ZIP CODE.

Because we have the transcript, we know exactly what questions were asked. Without it, we could infer some of them from this note, but not all of them. We would also be misled, because we know from the transcript that the agent did not ask about whether there was fraud; he did not

let her get that far. Thus, even putting aside the need to review each of these notes individually to ascertain class membership, I do not see how we can rely on these notes to ascertain whether any particular class member was asked "probing" questions.

Ultimately, although he does not expressly admit it, plaintiff's argument devolves into effectively eliminating the word "probing" from the class definition. His point is that since defendant's policies require the asking of questions, it doesn't matter what questions were asked. But I think any meaningful class would have to distinguish between reasonable, legitimate questions, and questions having an undue, deterrent effect, else we would have class members with no claims under the FDCPA. Plaintiff offers no way to make that distinction because there is none. The class he proposes is utterly unascertainable.

### B. Adequacy of the Representative

The other glaring defect is that plaintiff is an inadequate representative of his class. Adequacy of representation focuses on the fitness of a purported class representative to competently discharge the responsibility of litigating for the class on behalf of absent class members. Under this prong of Rule 23(a), a court must ensure that the putative representative "possess[es] the same interests and suffer[s] the same injur[y] as the class members." In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011) (internal citations omitted). The named plaintiff must show that "there is no conflict of interest between the named plaintiff[] and other members of the plaintiff class." Marisol A. v. Giuliani, 126 F.3d 372, 378 (2d Cir. 1997).

Whether a plaintiff faces unique defenses is an appropriate factor for the court to consider under the adequacy prong. See Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 179 (S.D.N.Y. 2008). "Class certification is inappropriate where a putative class representative is subject to

unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59-60 (2d Cir. 2000). "Regardless of whether the issue is framed in terms of the typicality of the representative's claims ... or the adequacy of [their] representation ... there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, 903 F.2d 176, 180 (2d Cir. 1990).

Plaintiff faces a defense that is undoubtedly unique to him – it certainly wouldn't be one to which the least sophisticated consumer would be subjected – and which will make it very risky for him to adequately represent the entire class. Plaintiff will be subject to the argument that his FDCPA claims should be rejected because by attempting to entrap the collection agent into violating the statute he will be unable to allege a material violation of the FDCPA.[9]

In D'Avanzo v. Global Credit & Collection Corp., No. 10 Civ. 1572, 2011 WL 2297697, at *4 (D. Colo. April 18, 2011), the district court denied plaintiff's summary judgment motion after noting that plaintiff initiated the telephone conversation at issue and asked very pointed questions. The court noted that, "a trier of fact might well conclude that a debt collector's false statements were not material and would not support liability if the consumer initiated the telephone call at the direction of his or her counsel and with the objective to elicit and tape-record potentially incriminating statements by the debt collector." Id.; see also Biggs v. Credit Collections, Inc., No. 07 Civ. 53, 2007 WL 4034997, at *3 (W.D. Okla. Nov. 15, 2007) (whether the plaintiffs entrapped the defendant with respect to certain statements is a disputed circumstance relevant to assessing if an FDCPA violation occurred).

---

[9] The Second Circuit has not yet ruled on whether a statement must be a material misrepresentation in order to state a claim under section 1692e of the FDCPA. However, at least one district court in this Circuit has adopted this standard. See Fritz v. Resurgent Capital Servs., LP, 955 F. Supp. 2d 163, 170 (E.D.N.Y. 2013). Additionally, the Second Circuit has approvingly cited cases from other circuits enforcing a materiality requirement. See Gabriele v. Am. Home Mortg. Servicing, Inc., 503 F. App'x 89, 94 (2d Cir. 2012).

Plaintiff certainly directed his case in a similar fashion. At any trial, plaintiff would be extensively and effectively cross-examined on his attempt to entrap defendant into violating the FDCPA. Specifically, it would be pointed out to the jury that instead of just answering the question of why he was disputing his debt, he engaged in a game of cat-and-mouse. His experience as an FDCPA lawyer would be used to show that he knew exactly what he was doing, and that experience would further differentiate him from the class. It is entirely possible that even if other members of the class had valid claims, plaintiff's behavior would undermine his claim, and would cause him, and therefore the entire class, to suffer an adverse verdict.

## CONCLUSION

Defendant's motion for summary judgment is therefore granted, and the Third Amended Complaint is dismissed. Plaintiff's motion for class certification is denied. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       June 3, 2016