## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

LEVI HUEBNER on behalf of himself and all
other similarly situated consumers,

          *Plaintiff,*

   - against -

MIDLAND CREDIT MANAGEMENT, INC.,
and MIDLAND FUNDING LLC,

          *Defendants.*

**Case: 14-cv-6046 (BMC)**

---

## DECLARATION IN OPPOSITION WITH POINTS OF LAW

Levi Huebner affirms the following under the laws prohibiting perjury and states:

   1.  I am the Plaintiff in this action.

   2.  I make the following declaration in opposition, to the motion for sanctions and fees ("Motion") filed by to Midland Credit Management, Inc. ("MCM") and Midland Funding LLC ("MF") (collectively "Midland" or "Defendants"), based upon personal knowledge and familiarity of the history of this case.  I respectfully request from the Court to enter an order denying Midland's Motion in its entirety.

   3.  This lawsuit was brought in good faith to correct Defendants practices that I believe violate the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. I state the following regarding the purpose of this action.[1]

---

[1] Associate Supreme Court Justice Kennedy explained, "Attorneys are duty-bound to represent their clients with diligence, creativity, and painstaking care, all within the confines of the law." *Jerman v. Carlisle, McNellie, Rini, Kramer*, 130 S.Ct. 1605, 1634 (2010).  "When statutory provisions have not yet been interpreted in a definitive way, principled advocacy is to be prized, not punished." *Id*.  "Surely this includes offering interpretations of a statute that are permissible, even if not yet settled." *Id*.  The FDCPA "is a complex statute, and its provisions are subject to different interpretations." *Id*.

## BACKGROUND

### i.   *Introduction*

4.      This case involves an alleged debt and its tradeline that was parked among several debt collectors.  I disputed the alleged debt with Verizon New York Inc. ("Verizon") upon learning they erroneously charged me $131.21.  (ECF PageID #: 840).  Verizon purported to bill $131.21 for jerry rigging a wire in the Verizon box that was interfering with my phone line.  (ECF PageID #: 840).  The Verizon box was located across the street of my home; as such, Verizon could not charge me work for done outside my home.  *See* 16 NYCRRR §609.2(a).[2] Cablevision had confirmed that there is nothing wrong with the wiring inside my home, and that the interference was coming from Verizon's box outside my home.  (Exhibit A).  Verizon's work log shows that no work was ever conducted inside Plaintiff's home.  (Exhibit B).  After I disputed the alleged debt, Verizon solicited I.C. Systems ("I.C."), a debt collector.  (Exhibit C).  I disputed the alleged debt with I.C. and the alleged debt was marked as disputed.  (Exhibit C). I.C. requested that Verizon verify the alleged debt, and was unable to do so. (Exhibit C). Verizon recalled the alleged debt and solicited Afni, Inc. ("Afni") debt collectors.  (Exhibit D).  I disputed the alleged debt with Afni.

5.      Having failed to verify the alleged debt with I.C. and Afni, Verizon enlisted the alleged debt with Defendants.  (ECF 11-1).

6.      MCM records confirm that they called my residence several times and were unsuccessful in reaching me.  (ECF 65-3).  Upon learning of MCM's call, I investigated my credit report and learned that MFL has listed an alleged debt with Experian without

---

[2] Under New York law, Verizon is not allowed to charge for work done outside my property.  *See* 16 NYCRRR §609.2(a) limiting the scope of charges to "Residential service is basic local exchange service furnished in private homes or apartments, including all parts of the subscriber's domestic establishment."  (ECF  85-8).  The Verizon box located across the street from my residence is not parts of the subscriber's domestic establishment.

communicating the dispute.  (Exhibit E).  The credit report did not attribute the alleged debt to

Verizon.  (Id).  I returned MCM's call to investigate the basis of the alleged debt, and was

greeted by Josh Gables ("Gables"). (Exhibit F at 4-5).  Gables informed me that the alleged debt

is related to Verizon's erroneous charge going back to 2010-2011.  (Exhibit F at 5).  I

immediately informed Gables that I wanted to dispute the debt, and asked for the procedure of

doing so.  (Exhibit F at 7).  Gables never informed that my dispute has been recorded.  (Exhibit F

at 7-8).

   7. MCM records show that Gables had noted on the alleged debt that I called

to dispute the debt.  (ECF 65-3 at PageID #: 895 "CCI NAME ADD VERIFIED CALLED TO

DISPUTE THE A/C ..ADD VERIFIED CALL T/F TO CSS DEPT").  The conversation should

have ended right there; MCM conceded in discovery, that any MCM agent who speaks to a

consumer can mark an alleged debt as disputed.  (Exhibit G at 101-102[3]).

   8. Instead of informing me that the alleged debt has been marked as disputed,

Gables transferred my phone call to an alleged "dispute department," which discovery disclosed

is a so called "customer support" department.  (Exhibit H at 8).  During the transfer of that call,

---

[3] The Defendants 30(b)(6) testified the following:

Q. In other words, if you wanted to verbally dispute a debt and you call MCM and someone picks up the phone, who's the one that does that?  **A.** If you are disputing, it can be either an account manager or Consumer Support Services.

Q. And the initial person could be either one?  **A.** It depends on which number you called. If you just called the number on the letter, it would go to an account manager first.

Q. And then if someone wanted to actually dispute the debt, would the account manager refer them to someone else?  **A.** I'm sorry, I don't understand that question.

Q. The account manager is the first one to pick up if you called the number on the letter, is that correct?  **A.** Yes.

Q. And then would the account manager be able to take the disputed debt and write it down as disputed or would he have to send it to another location?  **A.** No. He could, everyone that speaks to a consumer can mark the account as disputed. For additional help with resolution of the dispute they would transfer it to Consumer Support Services.

MCM informed me that any information obtained would be used to advance the collection of that debt.  (Exhibit H at 8-9).

9.      In discovery I learned that it is MCM's policy to transfer all disputes to this so-called "customer support" department, in an effort to grill consumers with "probing questions."  (Exhibit H at Midland 297 and Midland 299).  MCM calls that process an "effort to resolve the debt" ("effort to resolve the debt" or "effort to resolve a debt"). (Exhibit H at Midland 297).

10.     MCM does not explain whether that so-called "effort to resolve a debt" seeks to resolve the debt in the consumer's favor or MCM's favor.  What is certain, MCM uses the so-called "effort to resolve the debt" process to "document" information about the consumer and the debt, information which  is then available to advance the collection of the debt.  (Exhibit H at Midland 298, Exhibit I at Midland 22, Midland 028 Midland 029, and Midland 030 for example, "Ask what language the consumer speaks, document this in the notes").

11.     Gables transferred my call to the so-called "customer support" department, to enlist me—without my knowledge—in the so-called "effort to resolve the debt" process. (Exhibit F at 8).  Gables did so without informing me of the right to decline this "effort to resolve the debt" process.  (Id). In short, MCM successfully *entrapped* me into communicating with the so-called "customer support" department even though I did not request to speak to them.  (Id).

12.     During the transfer of that call, MCM did inform me that any information obtained would be used to advance the collection of that debt.  (Exhibit F at 8-9).  Having successfully *entrapped* me into speaking with the so-called "customer support" department, I was queried by MCM's agent, Emma Elliot ("Elliot").  (Exhibit F at 11).

13.     Elliot asked me, "How can I assist you on this Verizon New York account?"  I answered, "Well, I want to know what do I have to do if I want to dispute the debt." (Exhibit F at 12).

14.     Elliot did not inform me that Gables had noted that I called to dispute the alleged debt.  (Id). Elliot immediately began fishing, "Just advise me what your dispute is and I can see if I can assist you with that."  (Id). In discovery it was revealed that Elliot uttered those words based on MCM's script requiring its agents to engage with asking "probing questions." (Exhibit H at Midland 300, Exhibit I at: Midland-27 "Responsibility for providing documentation is on the consumer to validate the dispute claim Documentation must be provided to move forward with the dispute," Midland-028, Midland-032).

15.     The Third Amended Complaint classified the "probing question" process as a "reason requirement."  (ECF 35 ¶ 102).

16.      Discovery also confirmed that MCM rejects disputes that are not in "writing."  (Exhibit I at Midland-027 "Issuer follow up- invalid disputes: Consumer is sent a letter requesting proof (QCSSL letter) and account is sent back to collections (024 Warning code).  If CSS does not receive the dispute in writing within the 45 day validation period, the account will then move back to its original queue").

17.     At no point in my conversation with MCM did either Gables or Elliot disclose that the purpose of asking questions is part of the so-called "effort to resolve the debt" process.  (Exhibit F).

18.     Elliot repeatedly grilled me for intimate details about my reasons for disputing the alleged debt.  (Exhibit F and ECF 35-2).  "Well, we need to, you know, work with what your dispute is in order to remove it, sir. So why are you disputing?" ECF 35-2 at *12.  "I

Page 5

need to know what your dispute is . . . So you are saying you want to dispute it. Why is it that

you want to dispute it?" ECF 35-2 at *13.   "Can you elaborate as to what that means. Did you

already pay it with Verizon? Did you never have Verizon?" Id.   "Sir, you called in to dispute the

debt. I need to know why you are disputing.  So I'm asking you questions." ECF 35-2 at *14.

19.     Thereafter, MCM asked me, "Did you want to move forward on your

dispute?"  ECF 35-2 at *15.  In response, I informed MCM, "I told you I dispute it because it's a

nonexistent debt."  (ECF ).  MCM responded, "But you haven't given me why you are disputing.

You are just saying you are disputing. I need to know what you are disputing." ECF 35-2 at *16.

20.     In response to this action, MCM produced an alleged letter, claiming that

this letter confirmed that October 17, 2013 MCM had requested the major credit reporting

agencies to delete  alleged debt from my credit profile. (ECF 11-2).  Later on, MCM revealed

that this alleged deletion request to the credit reporting agencies was not made until October 23,

2013.  (ECF 21-1).

21.     Discovery revealed, in making the alleged communication, MCM

communicated to the credit reporting agencies that I owed $131.21 and MCM did not

communicate the alleged debt is disputed.  (Exhibit  J).

22.     Defendants purport that the communication in Exhibit J was to delete its

report to the credit reporting agencies, the fact still presented that Defendants (1) did not mark

the alleged debt as "disputed"  and (2) that Defendants communicated to at least one third party

that the I owe $131 without communicating that this amount is "disputed."

## ii.   *Plaintiff's Contention*

23.     The case focus: Plaintiff asked Defendants to have the alleged debt

marked as disputed.  In simple terms, marking the alleged debt as disputed would still allow

Defendants to continue collection on the alleged debt, and allows Defendants to communicate

the alleged debt, so long it is also communicates the alleged debt as disputed.[4]  This case alleges:

> (i) I had a right to designate the alleged debt as disputed, without being grilled for its reason;

> (ii) Defendants were obligated (on October 23, 2013, November 19, 2013, December 17, 2013, and January 16, 2014) to communicate the dispute when communicating the alleged "deletion" from Plaintiff's credit report; and

> (iii) Defendants should have communicated the disputed (on September 25, 2013) when communicating the alleged debt to the credit reporting agencies, since I.C. previously designated the tradeline as disputed.

24.     The purpose, of having the debt collector designated an alleged debt as

disputed, serves a benefit to the consumer to have the allege debt excluded from the "credit

score."[5]  A credit score is devised by the credit reporting agencies to determine a person's credit

---

[4] This case does **not** focus on whether the dispute was made within thirty (30) days, known as the "validation period."  If a consumer disputes an alleged debt within the validation period, the debt collector must cease collection, verify the debt, and provide the consumer with evidence of the debt.  For the sake of clarity, if a consumer disputes a debt outside the validation period, the debt collector is obligated to communicate the dispute when communicating the dispute, no matter the purpose of the communication; except, the debt collector is not obligated to cease collection or verify the alleged debt.

[5] The consumer has the unequivocal right to have a debt designated as disputed.  "The FDCPA sets forth specific procedures and methods that must be used by debt collectors when attempting to collect outstanding debts: the statute does not give debt collectors the authority to determine unilaterally whether a dispute has merit or whether to comply with the requirements of the FDCPA in a given case."  *Semper v. JBC Legal Group*, 2005 WL 2172377 (W.D. Wash. Sept. 6, 2005).

Debt collectors use the credit reporting mechanism as a tool to persuade consumers to pay their debts, and "is one of the most commonly taken steps in debt collection efforts."  *Koller v. West Bay Acquisitions, L.L.C.*, C 12-00117 CRB, 2012 WL 1189481, at *5 (N.D. Cal. Apr. 9, 2012).  The credit reporting system is a reputation tactic that rates a person's financial creditability.  There are benefits to consumers with a prestige credit report, which is often used in the financial sector to determine trustworthiness.  A consumer with negative markings on its credit report is usually presumed as unreliable.  A credit report is also used by insurers, landlords, and employers for the same purposes to determine trustworthiness.  The credit reporting system is often abused as a "powerful tool" for debt collection.  Quoting *Rivera v. Bank One*., 145 F.R.D. 614, 623 (D.P.R. 1993).

There are important policy considerations involving the right to dispute a debt.  If Debt collectors were to report erroneous, non-existent or disputed debts then the integrity of credit reporting would be undermined with a free reign to ruin a consumer's reputation.  This capability had it existed would no doubt turn credit reporting into an effective tool for debt collector to blackmail consumers regardless of the debts actual validity.

For this reason, Congress has enacted the FDCPA and FCRA to eliminated abuses involved in credit report.  Under the FDCPA Debt collectors cannot hijack a debtors credit and they certainly cannot hold a debtors credit hostage if the debt is disputed.  The FDCPA consists of obligations on the debt collectors advise the consumers, whose debts they seek to collect, of specified dispute rights which congress instituted with the FDCPA. When a Debt Collector reports to a Credit Reporting Agency that a debt is disputed, that notation of dispute will be reflected

status.  If the consumer asks the credit-reporting agency to mark an alleged debt as disputed, the consumer will get not benefit to exclude the alleged debt from the credit score.

25. "The fact that plaintiff is an attorney does not alter the application of the objective 'least sophisticated consumer' standard in this case." *Johnson v Equifax Risk Mgt. Services*, 00 CIV.7836(HB), 2004 WL 540459, at *4 [SDNY Mar. 17, 2004].  "As the Second Circuit observed in *Clomon v. Jackson*, "the basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd," and that this standard "carefully preserves the concept of reasonableness."  988 F.2d 1314, 1318, 1319 (2d Cir.1993)." *Johnson v Equifax Risk Mgt. Services*, 00 CIV.7836(HB), 2004 WL 540459, at *4 [SDNY Mar. 17, 2004].

### iii.   A Call MCM to Mark as Disputed the Alleged Debt

26. As stated above, I called MCM as opposed to writing a dispute letter, to ensure that someone will confirm the basis of the alleged debt, and confirm that the alleged debt—if related to Verizon—was marked as disputed.  The reason, I called as opposed to writing a letter, roots in my experience that I wrote a dispute letter to I.C. and Afni and the collection practice continued apparently without communicating the dispute.

27. *Hooks v. Forman, Holt, Eliades & Ravin, L.L.C.*, 717 F.3d 282, 286 (2d Cir. 2013) afforded me the right to call to dispute the debt.  *See Hooks*, specifically rejecting a

---

in the consumer's credit report.  The report will not be so notated simply because the consumer has submitted a dispute with the Credit Reporting Agency. The standard is objective based on the least sophisticated consumer, to achieve the objective of Congress, which is to eliminate abuses involved with credit reporting. .  *See* Exhibit O *(FTC and FRB, Report to Congress on the Fair Credit Reporting Act Dispute Resolution Process* 22, n.139 (2006)); also *see Toliver v. Experian Info. Solutions, Inc.*, 973 F. Supp. 2d 707, 711–12 (S.D. Tex. 2013) ("[w]hen the dispute notations were removed, however, Toliver's credit score declined significantly. . . . [w]hen the dispute notation was added back, her credit score increased significantly"); *Saunders v. Branch Bank & Trust Co.*, 526 F.3d 142 (4th Cir. 2008) (when a furnisher reports an ongoing dispute by the consumer, TransUnion does not include the disputed information in assessing the consumer's credit score).

writing requirement, so the consumer can have "the fact of the dispute reported whenever the debt collector communicates with others about the debt, in accordance with § 1692e(8)."  *Id.*

28.     As stated above, I recorded the conversation to memorialize that I disputed the alleged debt.  MCM also consented to recording the telephone call by stating, "Your call may be monitored or recorded.  . . .  This is an attempt to collect a debt; any information obtained will be used for that purpose."  Exhibit F at *8.

29.     As a party to the telephone conversation, in accordance with *Hallmark v. Overton, Russell, Doerr & Donovan, LLP*, 952 F. Supp. 2d 507, 510 (W.D.N.Y. 2013) the FDCPA affords the consumer the right to record his own conversation with a debt collector.

30.     At the time when I called MCM to dispute the alleged debt, all I knew was that I have an unequivocal right to dispute the alleged debt; I did not know that it was MCM's company policy to grill consumers for the intimate reason of disputing a debt.  There is no foundation to any allegation that I caused MCM to ask intimate details about the alleged debt. There cannot be an entrapment when "Defendant's policies instruct its employees to ask follow-up questions when a consumer advises that he is disputing his debt."  *Huebner v. Midland Credit Mgmt., Inc.*, 14 Civ. 6046 (BMC) (June 3, 2016) ECF 95 at ¶ 30.  Such policies are subject to judicial review as to whether they are permissible under the FDCPA, as Associate Supreme Court Justice Kennedy explained, "When statutory provisions have not yet been interpreted in a definitive way, principled advocacy is to be prized, not punished."  *Jerman v. Carlisle, McNellie, Rini, Kramer*, 130 S.Ct. 1605, 1634 (2010).  "Surely this includes offering interpretations of a statute that are permissible, even if not yet settled."  *Id.*  The FDCPA "is a complex statute, and its provisions are subject to different interpretations."  *Id.*

31.     The false accusation that I entrapped Defendants employee is foreclosed by the MCM's testimony, "everyone that speaks to a consumer can mark the account as disputed. For additional help with resolution of the dispute they would transfer it to Consumer Support Services."  (Exhibit G, p. 103:3-6).  The transcript of my call vividly shows, that when I first returned MCM's call to dispute the debt, Gables answered.  (Exhibit F at 5-8, ECF 20-2 PageID 104).  After Gables informed me, that the nature of the debt relates to a Verizon home phone service, I asked, "I want to know, if I want to dispute the debt, what do I have to do?"  (Exhibit F, p. 107:20-22).  Gables instead of disclosing that he marked the alleged debt as disputed (which MCM stated Gables was perfectly capable of doing), Gables *sua sponte* transferred my dispute to "Consumer Support."  (Exhibit F, p. 117:24).  I had only requested to dispute the alleged debt, because I wanted to ensure that the alleged debt is marked as disputed; I did not request to resolve the alleged debt.  Yet, I was entrapped[6] for a supposed "resolution" of the alleged debt—the so-called "effort to resolve the debt" process—without MCM ever informing me that the purpose of transferring to Consumer Support is for that supposed "resolution."  Likewise, MCM never informed me—and does inform any consumer—that the so-called "effort

_____

[6] This key fact that anyone in MCM who speaks to a consumer can mark an alleged debt as disputed was unknown to me until examining MCM's 30(b)(6) witness.  Regardless, in terms of the FDCPA, the violation is in misleading the consumer about their right to dispute a debt.  MCM admits it is their policy to entrap consumers for the so-called "effort to resolve the debt" process with Consumer Support. (Exhibit G, p. 168:12-169:24):

> A. ". . . there are follow-up questions to help us resolve it because that's what Consumer Support Services tries to do is resolve the disputes."  Q. "Okay. Do you have to ask the consumer do you want to resolve the dispute before asking further questions or you just get to ask further questions?"  A. "No, you don't have to ask them. I would hope people wanted to resolve their dispute, that's why they are letting us know there's an issue. I would hope most people would  want to resolve it and keep moving forward."  Q. "Let's say a consumer tells you that it's a nondebt, are you supposed to keep on asking him questions as to how  to resolve the dispute or are you supposed to stop right there?"  A. "I don't know how to answer that question."  Q. "Once the consumer disputes the debt, can the specialist keep on asking about the nature of the debt?"  A. "I don't know what you mean by keep on, but, yes, they can ask questions regarding what the dispute is.  They have already accepted that the person is disputing, but they are just trying to find out information which may help them and the consumer resolve the issue."

to resolve the debt" process does not affect the consumer's right to have the alleged debt marked as disputed.

32.     A lengthy line of consumer case law forecloses the false accusation that I recorded Defendants employee to manufacture a lawsuit.  *See: Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371-73 (1982) established that "testers have standing to sue."  A "tester" is an individual who poses "for the purpose of collecting evidence of unlawful steering practices."  *Id.* In *Murray v. Gmac Mortg. Corp.*, 434 F.3d 948, 952-54 (7th Cir. 2006) "testers... usually are praised rather than vilified."  The cause of action is the "violation of the rights of `testers' to receive `truthful information'," which by itself "supports standing."  *Tourgeman v. Collins Financial Services, Inc.,* 755 F. 3d 1109, 115-6, (9th Cir. 2014); *Alston v. Countrywide Financial Corp.*, 585 F.3d 753, 759-62 (3rd Cir. 2009); *In Re Carter*, 553 F.3d 979, 984 (6th Cir. 2009); *Ragin v. Harry MacKlowe Real Estate Co.*, 6 F.3d 898, 903 (2nd Cir 1993).

33.     In *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2nd Cir. 2008) the Second Circuit held, "the FDCPA enlists the efforts of sophisticated consumers like Jacobson as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others."  *Id.*  "In order to prevail, it is not necessary for a plaintiff to show that she herself was confused by the communication she received; it is sufficient for a plaintiff to demonstrate that the least sophisticated consumer would be confused." *Id.*  "As explained above, by providing for statutory damages and attorney[] fees for successful plaintiffs, the FDCPA permits and encourages parties who have suffered no loss to bring civil actions for statutory violations.  Jacobson's subjective reaction to the letter, therefore, is neither here nor there."  *Id.*  "A plaintiff seeking to vindicate a statutorily created private right need not

allege actual harm beyond the invasion of that private right." *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 194 L.Ed.2d 635, 650, 84 U.S.L.W. 4263 (2016) (Thomas concurring).  In this case, I have shown that MCM interfered with my right to dispute an alleged debt, by grilling me for intimate details about my reason for disputing the alleged debt, a showing that my right to dispute the alleged debt was superseded by MCM's grilling practices.  MCM employs this grilling practice against less sophisticated consumers, who are unlikely themselves to sue under the FDCPA.

        34.     In setting the Case Management Plan, my counsel sought to depose Elliot. The purpose was to evaluate the "intent" of Elliot when uttering the words she uttered because the Court had gone on to accuse me of "entrapment."  The Court said, the reason why Elliot uttered the words she did is immaterial, it is a question of whether MCM "violated the law or they didn't violate the law."  The following exchange transpired:

> THE COURT: All right.  I have reviewed the competing case management plans that you have submitted.  I just have a couple of questions for the plaintiff.
>
> I mean, the plan is not unreasonable.  I'm just wondering, what do you think you're going to get from each of these defense witnesses?
>
> MR. FOGEL: Okay.  It's basically regarding the affirmative defenses, your Honor. Each witness had, at a certain part, is the one that wrote the letter that --
>
> THE COURT: Right.  I pretty much know who they are, there are a couple that I don't know.  But what will they say besides, "I wrote the letter."
>
> MR. FOGEL: For the affirmative defenses are it wasn't intentional.
>
> THE COURT: It wasn't intentional to write the letter?
>
> MR. FOGEL: Well, maybe not -- you know, like when you are speaking on the phone, you could say well, what was your intent? I didn't mean that, I didn't mean to say that, whatever it is that they say. So, you know --
>
> THE COURT: But that testimony would be inadmissible. I would never let that testimony in at trial.
>
> MR. FOGEL: Well, I think intent is the issue in trial.

THE COURT: **Well, first of all, I'm not sure it is.  Is the defendant's intent an issue?  Why?  Either they violated the law or they didn't violate the law.[7]**  (Emphasis added).

35.     The literature provided by the Consumer Financial Protection Bureau ("CFPB") provides that all a consumer only needs to state a dispute to the debt, such as "I do not have any responsibility for the debt you're trying to collect."  (Exhibit K, a sample letter, from http://files.consumerfinance.gov/f/201307_cfpb_debt-collection-letter_1-not-my-debt.doc).  The consumer is not required to state the reason for the dispute.  To dispute a debt, one only need to "state simply, 'I dispute the debt.' These four words alone activate all of Cadleway's obligations under the FDCPA."  *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 507 (7th Cir. 2008) (Rovner concurring in part and dissenting in part).

36.     In *Clark v. Capital Credit & Collection Serv.*, 460 F.3d 1162 (9th Cir. 2006), the debtor directed the debt collector not to call her.  Subsequently, Mrs. Clark did not realize that by calling Hasson, she was consenting to a return telephone call from the debt collector.  Clark sued.  The Ninth Circuit recognized that Clark had raised an issue of first impression.  In short, the consumer informed the debt collector to cease calling, later the consumer called for information regarding the debt, triggering a return call from the debt collector, raising a question of first impression of whether the return call violated the FDCPA.  No one accused the consumer of "entrapment" or "harassment."

_____

[7] "The FDCPA is a strict-liability statute: A plaintiff does not need to prove knowledge or intent."  *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 448-49 (6th. Cir. 2014). If the defendant invokes a bona fide defense, "the issue of intent becomes principally a credibility question as to the defendants' subjective intent to violate the FDCPA."  *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006) followed in Jerman v. Carlisle, McNellie, Rini, Kramer, 130 S.Ct. 1605, 1623 n.20 (2010).  "[I]n the context of a statute imposing liability for 'intentional violations,' that 'if a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent'."  *Jerman v. Carlisle, McNellie, Rini, Kramer*, 130 S.Ct. 1605, 1612 n.6 (2010).  "A debtor generally is not required to show an intentional or knowing violation on the part of the debt collector to recover damages under the FDCPA."  *Russell v. Absolute Collection Services, Inc.*, 763 F.3d 385, 389 (2nd Cir. 2014).  "The FDCPA `imposes liability without proof of an intentional violation."  *Id*.

37.     In *Hudspeth v. Capital Management Services, L.P.*, Civil Action No. 11-cv-03148-PAB-MEH (D. Colorado February 25, 2013) the "plaintiff telephoned defendant and recorded the call." *Hudspeth* asked, (i) "what do I have to do to get this off of my credit," (ii) "What do I have to do to dispute this account," (iii) "Does my dispute have to be in writing," (iv) "Do I need to have a reason to dispute it"? *Capital Management* answered, "the best thing to do would be to pay it off in full," and "Yes. You have to send a letter in writing why you don't owe — why you feel you don't owe the bill, yes." *Id*. *Hudspeth* recognized a FDCPA violation and continued onto the question whether the misrepresentation was material.  No one accused the consumer of "entrapment" or "harassment" for initiating the call, recording the conversation, or asking the questions that revealed the FDCPA violation.

38.     In *Isham v. Gurstel, Staloch & Chargo, P.A.,* 738 F.Supp.2d 986, 990 (D. Arizona 2010) "Isham claims to have recorded most of this call, but no exhibit containing this recording has been filed thus far."  No one accused the consumer of "entrapment" or "harassment" for initiating the call and recording the conversation.

### iv.     *General Facts Applicable to All Causes of Action*

39.     It is undisputed that MCM is a debt collector.  ECF 36 at ¶ 15.

40.     MCM acts in the name of MF in obtaining portfolios of alleged "debt" for MFL.  (ECF 85-2 at 15:23 – 16:23 "MCM would basically, I believe, make those arrangements on behalf of Midland Funding").

41.     MCM services purported debts acquired in the name of MF, including purported debts from Verizon.  (ECF 85-2 at 38:3-8).

42.     Starting August 7, 2013, MCM sought to collect, from me, an alleged consumer debt ("alleged debt") in the name of Verizon.  ECF 36 at ¶ 52.

43.     MCM assumed the alleged debt without my social security number.  ECF 65-3 at PageID #895-896.

44.     The alleged debt originated by Verizon, mistakenly issued in violation of 16 NYCRRR §609.2(a).

45.     The story began when Verizon interfered with Cablevision's right to provide telephone service without interruption.

46.     At some point in 2010, after I became a Cablevision customer Verizon intruded with its competitor-Cablevision right to provided me uninterrupted telephone service, and Verizon disrupted my home phone service.

47.     On July 27, 2010, a Cablevision technician inspected the wiring inside and outside my home, and determined (1) that there is nothing wrong with the wiring inside my home, and (2) there is a Feed in the line coming from the "Verizon Box" (outside my residence), which interferes with Cablevision's signal.  The Cablevision technician was unable disconnect the Feed.  I recall the reason given to me at the time; Cablevision would not trespass into the Verizon Box.  The Cablevision technician offered a possible solution to run a new line; the technician could not ensure that such solution would resolve Verizon's interference.  (Exhibit A).  At my deposition, I testified to that effect.  (ECF 85-1).  I have also maintained the same position throughout this entire case.

48.     I contacted Verizon for a repair of the signal interference.  (ECF 85-1 at 25-26).  Verizon refused because I was not a Verizon customer.  (Id).   I was forced to become a Verizon customer hoping that then Verizon would rectify the line interference to my phone line. (Id). On or about August 28, 2010, I opened an account with Verizon.  (Id).

49.     On a date better known to Verizon, I received a bill wherein Verizon manufactured the alleged debt purporting to be for work done inside my home.  (Id). I disputed the alleged debt with Verizon.  (Id). Verizon informed me that they marked the alleged debt as disputed.  (Id).   Ultimately, Verizon informed me that they were not charging me for the alleged debt.  (Id).

50.     On July 12, 2011, I received a dunning letter from I.C.  (Exhibit C).

---

[8] I testified to the effect of this document and its content; at the time of discovery, I could not locate this document.  (ECF 85-1).  I located this document after Defendants had filed for summary judgment.  I produce them now to confirm that my testimony was truthful in the first place.

51.     I disputed the alleged debt with I.C.  (Exhibit C).

52.     I.C. flagged the alleged debt as disputed.  (Exhibit C).

53.     At I.C.'s request Verizon could not validate the alleged debt. (Exhibit C).

54.     Verizon recalled from I.C. the account of the alleged debt. (Exhibit C).

---

This is in response to the subpoena sent to us regarding Levi Huebner.  I.C. System, Inc. is a collection agency.  Attached are computer screen prints outlining the collection activity on the account.  Our records indicate the following:

1. On July 12, 2011 our client, Verizon, placed an account owing by Levi Huebner to Verizon in the amount of $131.21 with I.C. System for collection.
2. I.C. System sent its initial notice dated July 14, 2011 to the consumer.  A copy of the July 14, 2011 letter is attached for your review.  There is no record of a mail return.
3. On July 27, 2011 I.C. learned of a dispute surrounding the account.  The account was flagged as disputed.  I.C. suspended collection activity, notified its client of the dispute and requested validation of the account.
4. I.C. System did not receive validation of the account.  Subsequently, Verizon recalled the account from our office.

The account has been archived from our system.

Sincerely,

Candice Aguilar
Consumer Affairs Representative
I.C. System, Inc.

---

55.     In or about October of 2011, I received a collection letter from Afni regarding the alleged debt.

56.     I disputed the alleged debt with Afni.  (ECF 20-8).  Afni ceased collection of the alleged debt.

57.     MCM records show that between September 17, 2013 and October 12, 2013, MCM made a minimum of ten phone calls to my residence.[9]  ECF 65-3 PageID 895.

---

[9] For instance, on September 28, 2013, MCM records show they called my home phone twice at 7:22 a.m. and 10:23 a.m., notwithstanding that it is "MCM policy is limited to one contact per day. . ."  (Exhibit I at Midland-039).  Although not part of the Third Amended Complaint, the calls MCM made at 7:22 a.m., 6:09 a.m., and 6:25 a.m. violate 15 U.S.C. 1692d(a)(1) by making calls to the consumer before 8:00 a.m. local time at the consumer's location.

58.     Upon a review of my credit report, I learned that MF had communicated an alleged debt to Experian.  ECF 20-3.

59.     On October 17, 2013, I contacted MCM by phone to investigate the alleged debt and was informed, "Your call may be monitored or recorded. . . .  This is an attempt to collect a debt; any information obtained will be used for that purpose."  ECF 35-2 at *8.

60.     This time, I recorded the conversation to (1) investigate the basis of the alleged debt reported to Experian, and (2) if the alleged debt is related to Verizon as I suspected, to memorialize that I informed Defendants of my dispute of the alleged debt.  (ECF 20-2).

61.     I also called MCM as opposed to writing a dispute letter, to ensure that I can speak to an agent who will confirm that the alleged debt, if involving Verizon, was marked as disputed.  (In the prior times when I wrote to I.C. and Afni, the debt was transferred to a different debt collector without my recording of the dispute).

62.     On October 17, 2013 at 10:22 a.m., I called MCM and informed Gables that I dispute the alleged debt.  MCM records shows, Gables noted that I called to dispute the alleged debt and transferred me to Consumer Support.  (ECF 65-3 at PageID 895).  A transcript of the phone recording shows that MCM did not inform me to have marked the account as disputed.  (Exhibit F).

63.     Elliot introduced herself to me as the Consumer Support for MCM. (ECF 20-2 17:24).

64.     I asked Elliot, "I want to know what do I have to do if I want to dispute the debt."  Elliot did not tell me the account is marked as disputed.  Elliot did not inform me how to get the account marked as disputed.  Elliot grilled me for the reason I disputed the alleged debt without ever informing me that the alleged debt was marked as disputed.  (Exhibit F 13:5-10).

65.     I explained to Elliot that the alleged debt is "nonexistent."[10]  (Exhibit F 13:13-14).  Elliot quarreled that the debt is existent because it is in MCM's system. (Exhibit F 14:6-12).  Elliot insisted that my dispute is "not a dispute."  (Exhibit F 16:10-13).

66.     Subsequently I learned Elliot grilled me for a reason because it is MCM's internal policy to demand from consumers to disclose the reason for disputing a purported debt. I also learned that MCM probes consumers for a reason to advance its collection efforts.

67.     To me this was an apparent violation of the FDCPA.  "The consumer's right to take the position, at least initially, that the debt is disputed does not depend on whether the consumer has a valid reason not to pay."  *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2nd Cir. 2001).

68.     I was faced with the duty imposed by the FDCPA to vindicate those consumers who are unknowingly confronted with MCM's probing questions that violate the FDCPA.  "[A] plaintiff who brings an FDCPA action seeks to vindicate important rights that cannot be valued solely in monetary terms, and congress has determined that the public as a whole has an interest in the vindication of the statutory rights.*"  Tolentino v. Friedman*, 46 F.3d 645, 652-49 (7th Cir. 1995) citing *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)

69.     This lawsuit only charges Defendants for FDCPA violations apparent in the foregoing telephone call and subsequent events, namely probing consumers for the intimate

---

[10] According to MCM, a dispute is when a consumer's states "I do not owe this":

Q. "If I said to you 'I can't pay it because I don't think I owe this,' how would that be marked?"
**A.** "If they said they didn't think they owed it, then likely there would be a -- probably a follow-up question to determine what they meant by that, but that sounds more like a dispute, so that would be a 050."

(Exhibit B at 41:66-11).

reason of disputing the alleged debt, and MCM's failure to communicate the alleged debt as disputed.

### v.    The Basis for the First Claim for Relief

15 U.S.C. § 1692e states:

> "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."

70.    *Part I* of the First Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(8) MCM communicated to me that a reason or valid reason is required to dispute the alleged debt, and MCM communicated that, unless a reason or valid reason is provided, it will fail to communicate that a disputed debt is disputed.  (ECF 35 ¶ 134).

71.    *Part II* of the First Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(8) MCM communicated to me that a reason or valid reason is required to dispute the alleged debt, MCM also threatened that, unless a reason or valid reason is provided, it will fail to communicate that a disputed debt is disputed.  (ECF 35 ¶ 135).

72.    I had a factual basis to assert the following claims for relief.  MCM understood the nature of my phone call is "CU [Customer] STS [states] WANTS TO DISPUTE."  ECF 65-3 at PageID #895 at 10:22:08 a.m. MCM did not inform me that the alleged debt is marked as disputed.  (Exhibit F).

73.    I asked MCM, "I want to know what do I have to do if I want to dispute the debt."  In response, MCM informed me, "advise me what your dispute is, and I can see if I can assist you with that."  (Exhibit F at *9).

74.     MCM insisted, "I need to know what your dispute is . . . So you are saying you want to dispute it. Why is it that you want to dispute it?"  (Exhibit F at *13).

75.     MCM unequivocally stated to me, "Sir, you called in to dispute the debt.  I need to know why you are disputing.  So I'm asking you questions."  (Exhibit F at *14).

76.     I informed MCM, "It's a nonexistent debt."  MCM then responded, "okay, sir, but that's not a dispute."  (Exhibit F at *16).

77.     Thereafter, MCM asked me, "Did you want to move forward on your dispute?"  (Exhibit F at *15).  In response, I informed MCM, "I told you I dispute it because it's a nonexistent debt."  MCM responded, "But you haven't given me why you are disputing.  You are just saying you are disputing.  I need to know what you are disputing."  (Exhibit F at *16).

78.     Based on the foregoing communications posed by MCM, a hypothetical consumer would understand that MCM will not accept a dispute made verbally unless the consumer submits qualifying answers to the questioning posed by MCM.

79.     Based on the foregoing questions posed by MCM, a hypothetical consumer would be threatened—for not submitting to answer the questions posed by MCM—the debt will not be communicated as disputed.

80.     My basis for asserting the first claim for relief is founded upon case law. The FDCPA affords consumers the unequivocal right to dispute a debt. *See Hooks v. Forman, Holt, Eliades & Ravin, L.L.C.*, 717 F.3d 282, 286 (2d Cir. 2013) ("The right to dispute a debt is the most fundamental of those set forth in § 1692g(a), and it was reasonable to ensure that it could be exercised by consumer debtors who may have some difficulty with making a timely written challenge").  It is well established, "The consumer's right to take the position, at least

initially, that the debt is disputed does not depend on whether the consumer has a valid reason not to pay." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2nd Cir. 2001).

81.     The right to dispute does not hinge on the debtor's reason for the dispute.[11] The general dispute rights afforded by the FDCPA give the debtor an unconditional right to contest or dispute any debt.[12]  The reason the right to dispute is unconditional is to protect the debtor from becoming the victim of a grueling cross-examination by the debt collector.  Otherwise, the consumer would unjustly be subject to a debt collector's self-governing process of harassment, interrogation, deliberation, and determination contrary to the purpose of the FDCPA to protect the consumer from a debt collector's self-governing process.

---

[11] *See Mendez v. M.R.S. Assoc.,* 2005 U.S. Dist. LEXIS 13705 (N.D.ILL. 6-27-2005) ("There is no requirement that the consumer have a valid reason for disputing the debt") along with 2004 U.S. Dist. LEXIS 14901 (8-3-2004) ("A consumer is entitled to dispute the validity of a debt for a good reason, a bad reason, or no reason at all."); *also see Desantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2nd Cir. 2001) (The FDCPA "gives the consumer the right to notify the debt collector that the debt 'is disputed'," also "A recipient, especially if unsophisticated, might well have understood that the collector's obligation to obtain verification would arise only if the consumer presented a valid reason for nonpayment. That would be inconsistent with the required message."); *Brady v. The Credit Recovery Company, Inc.*, 160 F.3d 64, 66 (1st Cir. 1998); *Semper v. JBC Legal Group,* 2005 U.S. Dist. LEXIS 33591 (W.D. Wash. 9-6-2005) ("the statute does not give debt collectors the authority to determine unilaterally whether a dispute has merit or whether to comply with the requirements of the FDCPA in a given case . . . 'failure to communicate that a disputed debt is disputed' violated the statute.")

[12] *Jones-Bartley v. McCabe, Weisberg & Conway, P.C* ., 2014 U.S. Dist. LEXIS 157571, 2014 WL 5795564 (S.D.N.Y. 11-6-2014):

"Plaintiff has stated a claim for an FDCPA violation based on this language. Although Defendant's letter does not request that the recipient indicate a 'valid' reason for the dispute, *DeSantis* did not turn on this fact; instead, it held that a hypothetical least sophisticated consumer 'might well have understood' the notice to mean something that 'would be inconsistent with the [statutorily] required message.' *Id*. at 162. It further defined the 'required message' as one notifying the consumer of his or her 'right to notify the debt collector that the debt 'is disputed,' and it held that the consumer may exercise this right 'regardless of the absence of a valid reason for nonpayment.' Id. Because the statute, under *DeSantis*, does not require a 'valid reason,' and because it also just as surely does not require an 'invalid reason,' the clear implication of the Second Circuit's interpretation of the statute is that it requires no reason at all. Therefore, to the extent that Plaintiff alleges that Defendant's letter notifies the recipient that he or she must 'indicate the nature of the dispute,' Plaintiff has stated a claim for an FDCPA violation."

82.     Based on the foregoing facts and case law,[13] I had a colorable basis of fact and law to assert the first claim for relief, because the least sophisticated consumer would understand that MCM would not communicate a dispute unless a reason is provided.  The consumer would be bullied into providing a reason for the dispute against his or her will.  Likewise, the policy of MCM to endeavor into the reason for the dispute would discourage consumers from exercising the right to dispute a debt.

### vi.     The Basis for the Second Claim for Relief

15 U.S.C. § 1692e states:

> "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

---

[13] In a nearly identical case, *Gomez v. Portfolio Recovery Assocs., LLC*, No. 15 C 4499 (N.D. Illinois E.D. June 20, 2016) the court concluded (emphasis added):

> "Portfolio argues that Gomez should not be able to pursue a Section 1692e(8) claim, contending that Gomez did not have a valid basis for disputing the Debt.  Gomez has shown that she had a good faith basis to dispute the Debt.  **In any case, the ultimate validity of the dispute is immaterial**. Section 1692e(8) relates to a debt collector's reporting obligations. Gomez informed Portfolio that the Debt was disputed and it was Portfolio's obligation under the FDCPA to report that fact to TransUnion. **Portfolio cannot avoid liability for its misconduct by questioning the validity of the dispute in the aftermath of its false statements**.  The FDCPA did not obligate Portfolio to report the Debt as disputed only if in retrospect Portfolio determined that the dispute was justified. *See Emerson v. Fid. Capital Holdings, Inc.*, 2015 WL 5086458, at *1 (N.D. Ill. 2015)(quoting *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2d Cir. 2001) for the proposition that " [t]he consumer's right to take the position . . . that a debt is disputed does not depend on whether the consumer has a valid reason not to pay"); *Hoffman v. Partners in Collections, Inc.*, 1993 WL 358158, at *4 (N.D. Ill. 1993)(stating that '[t]here is no requirement that any dispute be 'valid' for the FDCPA 'to apply; only that there be a dispute'). **Nor was Portfolio authorized under the FDCPA to demand a reason for the dispute and then judge for itself whether the Debt should be deemed disputed.** *See DeKoven [v. Plaza Associates,* 599 F.3d 578 ( 2010)](indicating that 'the consumer can, without giving a reason, require that the debt collector verify the existence of the debt before making further efforts to collect it').  Thus, Portfolio cannot avoid liability by contesting the validity of the dispute.  Portfolio also attempts to present arguments as to whether Gomez instructed her attorney to tell Portfolio that the Debt was disputed.  Again, however, the ultimate validity of any dispute is not relevant.  Gomez's attorney acted on her behalf and made the determination to indicate that the Debt was disputed.  Based on the above, the undisputed facts in this case show that Portfolio did not accurately report to TransUnion that the Debt was disputed. Portfolio has not shown that it made a bona fide mistake, and Gomez is entitled under the FDCPA to be compensated for Portfolio's improper credit collection practices.  Therefore, Gomez's motion for summary judgment is granted and Portfolio's motion for summary judgment is denied."

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

83.     The Second Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(10) MCM probes consumers for intimate detail about a debt, improperly obtaining or attempt to obtain information that serves to advance the collection of such debt.  The probing of questions in violation § 1692e(8) constitute making to the consumer a false representation of the law, a deceptive means to advance the collection to collect the debt, and is used against the consumer to obtain information for further collection activities.

84.     I had a factual basis to assert this claim for relief.  MCM informed me, "Your call may be monitored or recorded. . . .  This is an attempt to collect a debt; any information obtained will be used for that purpose."  (Exhibit F at *8).

85.     Afterwards, MCM asked me, "So you are saying you want to dispute it.  Why is it that you want to dispute it?"  In response, I informed MCM, "Because it is a nonexistent debt."  MCM still inquired "elaborate as to what that means.  Did you already pay it with Verizon?  Did you never have Verizon?"  (Exhibit F at *12-13).  MCM questioned me, "So I need you to elaborate so I can assist you with your dispute.  Did you ever have Verizon?" (Exhibit F at *14).

86.     MCM repeated its question, "Did you ever have Verizon, sir?"  I replied, "I don't understand the question you are asking me.  This is a nonexistent debt."  MCM responded, "It's a very straightforward question.  Did you ever have Verizon service?"  (Exhibit F at *16).

87.     These questions are made to elicit information that is either used to intimidate a consumer into paying a disputed debt or used by the debt collector in a civil proceeding to state with personal knowledge that the consumer owes the disputed debt, based on

Page 24

the "recorded" answer of having had Verizon and not having paid an alleged debt that is disputed.

88.     My basis for asserting the first claim for relief is founded upon case law. "An example of such illegal conduct is the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. § 1692e(10)."[14] *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2nd Cir. 1996).  The "Act bans debt collection agencies from using any deceptive representation or deceptive means to collect or attempt to collect debts or to obtain information concerning debtors." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172-72 (11th Cir. 1985).  If "terminology was vague or uncertain [this] will not prevent it from being held deceptive under § 1692e(10) of the Act." *Foti v. NCO Financial Systems, Inc.*, 424 F.Supp.2d 643, 659-48 (2006) and *Akalwadi v. Risk Management Alternatives, Inc.*, 336 F.Supp.2d 492, 498-97 (Md. 2004).  "15 U.S.C. § 1692e(10) makes it unlawful for a debt collector to use any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.  A single violation of Section 1692e(10) is sufficient to establish liability under the Act." *Rumpler v. Phillips & Cohen Associates, Ltd.*, 219 F.Supp.2d 251, 254-55 (E.D.N.Y. 2002).

89.     Based on the foregoing facts and case law, I had a colorable basis of fact and law to assert the second claim for relief, that the least sophisticated consumer would be deceived to reveal intimate details that advance the collection of a debt.  The least sophisticated

---

[14] "The legislative history of the passage of the FDCPA explains that the need for the FDCPA arose because of collection abuses such as use of obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." *Kropelnicki v. Siegel*, 290 F.3d 118, 126-25 (2nd Cir. 2002).

consumer would also be led to believe that the debt collector did not accept the dispute for the failure to provide such intimate details.

### vii.    The Basis for the Third Claim for Relief

15 U.S.C. § 1692e states:

> "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false representation of—(A) the character, amount, or legal status of any debt (5) The threat to take any action that cannot legally be taken or that is not intended to be taken. (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

90.    The Third Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(2)(A), § 1692e (5) and § 1692e (10) MCM made a false representation that they had deleted the alleged debt tradeline on October 17, 2013, when actually that alleged deletion had not occurred that day.

91.    I had a factual basis to assert that this claim for relief.  On October 17, 2013, MCM issued a letter stating, "we have instructed the three major credit reporting agencies to delete the above-referenced MCM account from your credit file."  (ECF 11-2).  Per MCM's admission, the alleged "request to delete the Account from Mr. Huebner's credit file was processed and transmitted to the three major credit reporting agencies on October 23, 2013." (ECF 22 ¶ 9).

92.    My basis for asserting the third claim for relief is founded upon case law. "Collectors may not use false or misleading statements." [15]  *Hart v. FCI Lender Servs., Inc.*, 797

---

[15] "At the outset, it should be emphasized that the use of any false, deceptive, or misleading representation in a collection letter violates § 1692e — regardless of whether the representation in question violates a particular subsection of that provision." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir 1993).  "Because the list in the sixteen subsections is non-exhaustive, a debt collection practice can be a false, deceptive, or misleading practice in

F.3d 219, 220-22 (2nd Cir 2015).  In this case, MCM stated, "we have instructed," when that instruction actually had not happened on that day.  Even if "it may be obvious to specialists or the particularly sophisticated that a given statement is false or inaccurate does nothing to diminish that statement's 'power to deceive others less experienced'."  *Brown v. Card Service Center*, 464 F.3d 450, 452-53 (3rd Cir. 2006).

93.     Based on the foregoing facts and case law, I had a colorable basis of fact and law to assert the third claim for relief, that the least sophisticated consumer would be deceived into a state of no-action to assume falsely that the alleged debt is resolved.  MCM had falsely stated, "we have instructed," when that instruction actually had not happened.[16]  The deception was intentional, as apparent that Defendants waived any right to a bone fide defense. (ECF 44 "Midland does not assert the bona fide error defense").

### viii.    *The Basis for the Fourth Claims for Relief*

15 U.S.C. § 1692e states:

> "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false representation of—(A) the character, amount, or legal status of any debt.  (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed. (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

violation of § 1692e even if it does not fall within any of the subsections of § 1692e.  *Id.*  "A single violation of § 1692e is sufficient to establish civil liability under the FDCPA." *Id.*  Our "courts have held that collection notices violate the FDCPA if the notices contain language that 'overshadows' or 'contradicts' other language that informs consumers of their rights." *Id* at 1319-18.  Likewise, "courts have held that collection notices can be deceptive if they are open to more than one reasonable interpretation, at least one of which is inaccurate." *Id* at 1319.

[16] *See Burke v. Messerli & Kramer P.A.*, Civil No. 09-1630 ADM/AJB. (U.S. Dis. Minn. August 9, 2010) the debt collector was informed that the debt is disputed.  The debt collector issued a March 13 letter to have ceased the collection of the debt.  *Burke* held, "the March 13 letter is a communication in connection with the collection of a debt" and the allegation "that Messerli violated the FDCPA by failing to cease collection activities and communications without having first verified the debt after Burke disputed the debt survives summary judgment."

94.     *Part I* of the Fourth Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(2)(A), § 1692e (8) and § 1692e (10) MCM falsely represented the legal status of the Alleged Debt when stating it is valid "because it's here in our system," after Verizon—the original creditor—informed me that the bill is marked as disputed, the character, amount, and legal status of the debt was disputed.

95.     *Part II* of the Fourth Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(2)(A), § 1692e (8) and § 1692e (10) that MCM falsely represented the legal status of the Alleged Debt is valid "because it's here in our system."  MCM knew or should have known from the record of the Alleged Debt tradeline that the disputed debt is disputed after I disputed the Alleged Debt with I.C. Systems and Afni, as neither debt collector could verify the validity of the debt.

96.     *Part III* of the Fourth Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(2)(A), § 1692e (8) and § 1692e (10), after I disputed the debt, MCM communicated the Alleged Debt to third parties—as an amount owed—without communicating the dispute, misrepresenting the legal status of the Alleged Debt.

97.     *Part IV* of the Fourth Claim for Relief alleges that in violation of 15 U.S.C. § 1692e(2)(A), § 1692e (8) and § 1692e (10), after I disputed the debt, MFL communicated the Alleged Debt to third parties—as an amount owed—without communicating the dispute, misrepresenting the legal status of the Alleged Debt.

98.     *Part V* of the Fourth Claim for Relief alleges that in violation of 15 U.S.C. § 1692e (8) and § 1692e (10), MFL continued collecting the Alleged Debt after I had disputed the Alleged Debt with I.C. and Afni who neither debt collector could verify the validity of the debt.

99.     These misrepresentations are material because even though I have disputed the alleged debt separately with Verizon, I.C., and Afni, Defendants continued handling the alleged debt without communicating the alleged debt as being disputed.

100.     These misrepresentations are material because they demonstrate that MCM will recklessly disregard a dispute to an alleged debt.

101.     I had a factual basis to assert these claims for relief.  MCM records show that they knew on October 17, 2013 at 10:22:08 that I "CALLED TO DISPUTE THE A/C." ECF 65-3 at PageID #895.  This knowledge was confirmed when MCM's employee asked me, "I need to know what your dispute is . . . So you are saying you want to dispute it. Why is it that you want to dispute it? . . ."  MCM also admits that I replied, "Because it's a nonexistent debt." ECF 35-2 at *13; ECF 65-3 at PageID #894-5.  MCM confirmed to understand the purpose of the call, "So you are saying you want to dispute it."  ECF 35-2 at 13; see also ECF 35-2 at *14 ("Sir, you called in to dispute the debt.").  At the minimum, because MCM knew that I called to dispute the Alleged Debt, the legal status of the Alleged Debt is disputed.  MCM falsely represented the legal status of a debt the Alleged Debt when stating it is valid "because it's here in our system."  A consumer would have been deceived that MCM did not accept the dispute under the aspect of the alleged debt being valid for being in its system.

102.     I had a factual basis to assert these claims for relief.  On or about July 14, 2011, I received a dunning collection letter from I.C.  I responded to I.C. disputing the alleged debt and informing them that they are attempting to collect "a nonexistent debt."  I requested from I.C. to verify the Alleged Debt.  (Exhibit C).  I.C. corroborated the same information, that they marked the alleged debt as disputed, and stated Verizon failed to verify and failed to provide a "validation of the account."  (Exhibit C).  Thereafter, MCM stated to me that the

alleged debt "is existent because it's here in our system."  ECF 35-2 at *14.  MCM also stated to

me "you haven't given me why you are disputing."  ECF 35-2 at 16.  Plaintiff informed MCM,

"It's a nonexistent debt."  MCM replied, "Okay, sir, but that's not a dispute."  Id. MCM falsely

represented the legal status of a debt the Alleged Debt when stating it is valid "because it's here

in our system."[17]

        103.     I had a factual basis to assert these claims for relief.  MCM has repeatedly

represented to the Court that the Cessation Letter represents that MCM has deleted the alleged

debt Verizon has attributed to me.  *See* ECF 36 ¶ 11 ("on October 17, 2013, MCM marked the

debt at issue as disputed and sent a letter to Plaintiff informing him that MCM had requested that

the credit bureaus delete the debt from Plaintiff's credit history."); see also ECF 11 ¶ 17 ("MCM

decided to cease collections on Plaintiff's valid and delinquent debt obligation as evidenced by

the October 17, 2013 MCM deletion letter sent to Plaintiff.").  Yet, on four later dates (October

23, 2013, November 19, 2013, December 17, 2013, and January 16, 2014), MCM communicated

to at least one third party that my "HDCBAL" is $131.00 and "HDPUE" is $131.00.  See Exhibit

J (Midland 290 defines "HDCBAL= current balance" and "HDPDUE=past due amount").  In

communicating the $131.00 amount of the alleged debt from October 23, 2013 onwards, without

communicating the dispute, MCM failed to communicate that the amount is disputed.[18]  Indeed,

---

[17] Defendants improperly bicker that the Alleged Debt is valid.  At discovery, my counsel requested from Defendants to produce the Contract of Sale.  I believe that the Contract of Sale would show that Verizon made no guarantee as to whether the Alleged Debt is valid, and would show that Verizon sold the alleged debt as a questionable.  Defendants objected.  (ECF 44).  "Midland cannot, on the one hand, block any discovery into the question of whether it acted willfully, and then, on the other hand, ask the Court to dismiss this action because Edeh has not discovered any evidence that it acted willfully." *Edeh v. Midland Credit Management, Inc.*, 748 F.Supp.2d 1030, 1037-38 (Minn. 2010).  In the same vein, Defendants blocked discovery into the contract of sale.  Defendants proffered no evidence that the Alleged Debt is valid.  At the minimum, I did produce evidence that I disputed the Alleged Debt with I.C.

[18] The focus is on the communication of the amount owed.  Because MCM decided to communicate the balance of $131 it was also required to communicate that the amount is disputed.

MCM records do **not** show that the alleged debt was marked "HDCOMPLYC" which would otherwise stand for the "compliance code.  (1 ☐clean Z ☐deleted)."

104.    I had a factual basis to assert the following claims for relief.  As of April 23, 2015, CreditCheck Total records show that MF communicated that I have an alleged balance of $131.21, and that Defendants did *not* communicate my dispute when they reported information about my alleged account to CreditCheck Total.  ECF 35-3 at PageID #453.  Defendants conceded, "If MF appears on Plaintiff's CreditCheck Total document, it is because MCM reported that Plaintiff owed a debt owned by MF." (ECF 60 ¶ 3).  "Assisted Credit still reported an unpaid debt to CreditCheck Total, knowing that Plaintiff had already paid her remaining balance directly to MCM."  *Baeza v. Assisted Credit Servs., Inc.,* Case No. 8:15-cv-01451-ODW (JCG) (C.D. California July 19, 2016) "This reportage failed to mention that Plaintiff's debt had been paid, and is thus inaccurate under the CCRAA."  *Id*.  "Even if technically accurate, information provided by a furnisher is still inaccurate if the information is misleading or incomplete." *Id* citing *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 579 (1995)

105.    My basis for asserting the fourth claims for relief is founded upon case law.  "A debt collector's false statement is presumptively wrongful under the Fair Debt Collection Practices Act, see 15 U.S.C. § 1692e(2)(A), even if the speaker is ignorant of the truth." *Randolph v. Imbs, Inc.*, 368 F.3d 726, 728 (7th Cir. 2004).  "15 U.S.C. § 1692e(8), which makes illegal 'communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.'  This standard 'requires no notification by the consumer at all, let alone a written communication.  It depends solely on the debt collector's knowledge, regardless

of how or when the collector acquires that knowledge." *Fasten v. Zager*, 49 F.Supp.2d 144, 148 (E.D.N.Y 1999).  The FCPA  "permits a private right of action against a furnisher of information for failing to comply with its duties after a debt is disputed as set forth in 15 USC § 1681 s-2(b)." *Daley v. A & S Collection Assocs., Inc.*, *Daley v. A & S Collection Assocs., Inc.*, 717 F. Supp. 2d 1150, 1155 (D. Or. 2010).  *See Midland Funding L.L.C. v. Brent*, 644 F. Supp. 2d 961, 966 (N.D. Ohio 2009) found MCM and MFL liable for relying on its "system" to determine a debt as valid.[19]

106.     My basis for asserting the fourth claims for relief is founded upon case law.  The FDCPA "mandate that, if a debt collector elects to communicate `credit information' about a consumer, it must not omit a piece of information that is **always** material, namely, that the consumer has disputed a particular debt." *Plummer v. Atlantic Credit & Finance, Inc.*, 66 F.Supp.3d 484, 490 (SDNY Dec. 8, 2014) (emphasis added).  The "reporting a debt to a credit reporting agency can be seen as a communication in connection with the collection of a debt, the reporting of such a debt in violation of the provisions of § 1692e(8) can subject a debt collector to liability under the FDCPA." *Id* at 491-2.  Likewise, "debt collectors may not benefit from unlawful collection practices merely by enlisting third party debt collectors to act on their behalf." *Id* at 492.  "To allow a creditor to hire a debt collector after receiving actual knowledge that the consumer has retained legal representation for that debt and then withhold knowledge of this representation from the debt collector would blatantly circumvent the intent of the FDCPA. *Id*.

---

[19] In *Edeh v. Midland Credit Management, Inc.*, 748 F.Supp.2d 1030, 1038 (Minn. 2010), summary judgment was entered in favor of plaintiff on the claim that Midland relied in its "system" to implicit a permission for automatic phone calls.

107.    My basis for asserting the fourth claims for relief is founded upon case law.  *See Jones-Bartley v. McCabe, Weisberg & Conway, P.C.*, 59 F.Supp.3d 617, 646 (S.D.N.Y. Nov. 6, 2014) "the clear implication of the Second Circuit's interpretation of the statute is that it requires no reason at all. Therefore, to the extent that Plaintiff alleges that Defendant's letter notifies the recipient that he or she must 'indicat[e] the nature of the dispute,' Plaintiff has stated a claim for an FDCPA violation."  *Id.*

108.    My basis for asserting the fourth claims for relief is founded upon case law.  The FDCPA "statute requires the debt collector to notify a consumer of his or her right to dispute a debt."  *Id.*  A debt collector may not dictate the merit of a dispute to a debt; 15 U.S.C. § 1692e(2)(A) prohibits a debt collector from misrepresenting the legal status of a debt.  If the debt collector engaged in acquiring some information about the nature of the dispute, the debt collector must make clear to the consumer that its questions are without passing judgment as to the merit of the dispute.[20]  The debt collector must inform that those questions will not affect the consumer's dispute.  Here the Defendant admits it "asks for a description and asks the borrower to verbalize the dispute is consistent with Plaintiff's allegation that such a request is inconsistent with the statute, which does not require a consumer provide such a 'description' or 'verbalization' when disputing a debt."  *Jones-Bartley* at 647.  The facts vividly showed that

---

[20] "As the Supreme Court has held in the general context of consumer protection--of which the Fair Debt Collection Practices Act is a part—'it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line'."  *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2nd Cir. 1996) (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393, 85 S. Ct. 1035, 13 L. Ed. 2d 904 (1965).  "It is unnecessary to prove the contradiction is threatening."  *Id at Russell*.  "[B]ecause the FDCPA is a remedial statute aimed at curbing what Congress considered to be an industry-wide pattern of and propensity towards abusing debtors, it is logical for debt collectors repeat players likely to be acquainted with the legal standards governing their industry to bear the brunt of the risk."  *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1171 (9th Cir. 2006).  "The question is whether, from the perspective of the least sophisticated consumer, language contained in the notice overshadowed or contradicted the mandatory validation notice; if so, then the Act is violated.  *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2nd Cir. 1996).

MCM passed judgment as to the validity of the debt, MCM's agent rejected the dispute,[21] and MCM did not inform me that the Alleged Debt has been marked as disputed.

109.    My basis for asserting the fourth claims for relief is founded upon case law. In *Irvine v. I.C. System, Inc.*, Civil Action 14-cv-01329-PAB-KMT (U.S. Dis. Col. March 31, 2016) analogue to the fourth claims for relief, summary judgment was entered in favor of Plaintiff. *Irvine* decided, "Other courts have found that disputing the amount of a debt is sufficient to dispute the debt itself." *Irvine v. I.C. System, Inc.*, Civil Action 14-cv-01329-PAB-KMT (Col. March 31, 2016). When disputing the amount charged, "plaintiff's statements were sufficient to communicate to defendant that plaintiff disputed the debt." *Id*. "The instant case involves a debt collector who, in the process of updating information regarding plaintiff's account, updated only some of the information - plaintiff's address - without updating the information regarding the fact that the debt was disputed." *Id*. A debt collector may not update other account information without also updating 'a piece of information that is always material, namely, that the consumer has disputed a particular debt'." *Id*. Because the facts show, that in the process of its so-called deletion, MCM communicated the amount owed without communicating the dispute; I had a colorable basis for the fourth claims of relief.

### ix.    *Defendants Failed to Act with Diligence As Required Under Rule 11*

110.    The foregoing facts and law as outlined confirm that I had a colorable basis to assert the claims for relief. If Defendants truly believed that I had no cause of action, they could have moved under FRCP 12(b)(6) with a pre-answer motion to dismiss the Amended Complaint or the Third Amended Complaint. If Defendants truly believed their evidence

---

[21] The precise language "You are just saying you are disputing. I need to know what you are disputing. You haven't given me why you are disputing." ECF 35-2 at 16. I replied, "It's a nonexistent debt." *Id*. MCM passed judgment, "that's not a dispute." Id.

showed that I had no cause of action, Defendants could have produced such evidence either in its reply to Plaintiff's response to the Court's order to show cause, or in a FRCP 12(b)(6) pre-answer motion to dismiss the Third Amended Complaint.  Defendants' did not act under Rule 11(b)(1) to either mitigate a so-called "unnecessary delay" or mitigate its "expense of litigation".

111.    The record shows that the Court was "inclined" to dismiss this case from the onset.  (Quoting ECF 16).  Plaintiff in response provided a "more complete record, which he has now supplied." (ECF 26 at 2).  While the Order to show Cause was pending, Defendants failed to put their best foot forward with either the evidence or a contention that would have assisted the Court in disposing this action.  This case survived the Court's sua sponte motion to dismiss. (ECF 26).  The Court said, "The case shall proceed in the normal course to determine if the new version of the claim that plaintiff has now set forth has any merit." (ECF 26 at 3).  "The case will proceed in the normal course based on plaintiff's new theory of the case." (ECF 26 at 12).

112.    Thereafter, I amended the complaint to the Third Amended Complaint to clarify the factual content of this case.  Again, Defendants' failed to act under Rule 11(b)(1) to either mitigate unnecessary delay or mitigate its expense of litigation and did not move with a FRCP 12(b)(6) pre-answer motion to dismiss the Third Amended Complaint.[22]

113.    The Defendants did not take any course as required under Rule 11 and made a business decision to allow this case to proceed.  Defendants failed to provide safe harbor notice to specify **with particularity** the conduct warranting voluntarily dismissing of this

---

[22] Defendants also cite the Joint Mandatory Letter (ECF 13) the parties submitted January 28, 2015 as an outline of why Plaintiff should have dismissed his Amended Complaint.  Defendants cannot overcome the inevitable, once "a party is granted leave to replead, the filing of an amended pleading resets the clock for compliance with the safe harbor requirements of Rule 11(c)(2) before a party aggrieved by the new filing can present a sanctions motion based on that pleading to the district court."  *Lawrence v. Richman Group of CT LLC*, 620 F.3d 153, 158-57 (2nd Cir. 2010).  The Third Amended Complaint was filed June 5, 2015.

case.  The Rule 11 notice mandates informing: "... inter alia the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense. Indeed, only conduct explicitly referred to in the instrument providing notice is sanctionable." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 381-83 (2nd Cir. 2003).  "This notice requirement permits the subjects of sanctions motions to confront their accuser and rebut the charges leveled against them in a pointed fashion." *Id*.  The Defendants failure to file a pre-answer motion to dismiss or utilizing Rule 11's procedure demonstrate that Defendants always knew that this case had a cognizable basis and is warranted on the facts and the law.

114.    Likewise, as Defendants concede with ECF 99-3, on February 10, 2015, my counsel outlined the colorable basis for this action.[23]  To date, Defendants never answered

---

[23] As the outline reads:

The consumer wanted to dispute the debt. Pursuant to 1692 a reason is not necessary. Initially, the agent kept asking the same question, and the consumer responded with his answer.

Question: "Advise me what your dispute is and I can see if I can assist you with that"
Collection Agency: "why are you disputing?"
Collection Agency: "why is it you want to dispute it?"
Consumer: "because it's a non-existent debt"
The Collection Agency again asked why the consumer is disputing and the consumer responded.
Collection Agency: "you called in to dispute the debt I need to know why you're disputing"
Answer: "it's a non-existent debt"

Furthermore, the Collection Agency informed the Consumer that regardless of the Consumer's dispute the debt is existent and that a contact number will not assist the Consumer with his dispute.

Collection Agency: "it is existent because it's here in our system"
Consumer: "do you have a contact number?"
Collection Agency: "my contact number is not going to assist you with your dispute"

Ultimately, the Collection Agency informed the Consumer that the Consumer's reason is not a dispute.

Collection Agency: "did you want to move forward on your dispute?"
Consumer: "I told you I dispute it because it's a nonexistent debt"
Collection Agency: "I understand sir but you haven't given me why you're disputing your just saying what your disputing,
I need to know what you're disputing"
Consumer; "It's a non-existent debt"

why the outline is mistaken, unreasonable, or erroneous.  As the Court held, "The parties agreed that if, in fact, a violation occurred during the recorded telephone call, than even prompt dispatch of the cessation notice following the call would not absolve defendant of a technical violation." (ECF 16).  Counsel for Plaintiff adequately informed Defendants what Plaintiff believe is the theory of this case showing a colorable violation.  (ECF 99-3).  In short, if Defendants believed that Plaintiff's theory is mistaken, then Defendants held back the "theory of the case for some later date" in violation of Rule 16(f)(1)(B).[24]  (*See* ECF 26).

### x.    *Defendants Have No Basis to Claim Fees under 15 § 1692k or 28 § 1927*

115.    "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2nd Cir. 1999).  It is Circuit law, "bad faith may be inferred `only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 142-41 (2nd Cir. 2012), *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2nd Cir. 1999).  A finding that an "action was brought 'in bad faith and for the purpose of harassment,' 15 U.S.C. § 1692k(a)(3)" does not exist where "the merits turned on a question of law."  *Simmons v. Roundup Funding, LLC*, 622 F.3d

---

Collection Agency: "ok sir but that's not a dispute"

[24] In a separate order, the Court said, Defendants "contend that this will result in a series of 'mini-trials' involving each potential class member because defendants will need to depose each individual who has been contacted. That is up to defendants. **If plaintiffs are going to put in the work to prosecute their case, defendants can put in the work to defend it. Regardless of whether defendants' disagree with the merits of plaintiff's approach to class certification**, the production of these records is relevant to plaintiff's claim." (ECF 54 at 3)(emphasis added).

93, 97 (2nd Cir. 2010).  The Court decided summary judgment based on a question of law, a finding of bad faith is therefore foreclosed.

116.    "The showing of bad faith required to support sanctions under 28 U.S.C. § 1927 is similar to that necessary to invoke the court's inherent power." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2nd Cir. 2012).  "We have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes." *Star Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce*, 682 F.3d 170, 179 (2nd Cir.  2012).

117.    As outlined above in paragraphs 1 through 114, each claim of relief is based upon facts that are colorable under relevant case law also cited.  Defendants Memorandum goes into great length to cite the bad faith standard and still fail to articulate how that standard is invoked for the underlying case. (ECF 98).  "Defendant must provide evidence of plaintiff's bad faith (as opposed to counsel's bad faith)." *Puglisi v. Debt Recovery Solutions, LLC*, 822 F.Supp.2d 218, 23 (E.D.N.Y 2011).  "Part of the [due process] function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact." *Wolff v. McDonnell*, 418 U.S. 539, 563 (1974).  "Due process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2nd Cir. 1999).

118.    "At a minimum, the notice requirement mandates that the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." *Id.*  "Indeed, only conduct explicitly referred to in the instrument providing notice is sanctionable."  Defendants do not articulate the

evidence of bad faith.  Defendants fail to provide notice of which specific conduct or omission

the sanctions are sought.  As such, I am unable to respond to a specific conduct or omission,

which Defendants are unable and fail to identify.

119.    Indeed, "The standard for bad faith is higher than the standard for mere

frivolousness" *Sanchez v. United Collection Bureau, Inc.*, 649 F.Supp.2d 1374, 1382 (N.D.

Georgia 2009).  "[I]n assessing bad faith, the court focuses primarily on Plaintiffs conduct and

motives, and not on the validity of the case." *Id.*  "'Bad faith' requires more than a showing that

the plaintiff's claim lacked merit; instead, it requires a showing that the plaintiff knew of the

claim's lack of merit and nevertheless decided to press that claim." *Marshall v. Portfolio

Recovery Associates, Inc.*, 646 F.Supp.2d 770, 776 (E.D. Pennsylvania 2009).

120.    In any way, I outlined above the facts for each claim of relief and the

evidence upon which they were based upon.  I also outlined how the facts are colorable and

cognizable under relevant case law.  At the same time, throughout this entire case, Defendants

failed to cite a single case law upon which it contended that no question of law existed under the

facts presented by this case.

121.    Defendants entire purported hook for its motion, is that the Court (1)

rejected class certification without using defendants account coding system (ECF 98 PageID

1441 n1),(2) "Plaintiff attempted to entrap Midland into violating the FDCPA" (ECF 98 PageID

1439), and (3) Plaintiff is a "improper class representative" for attempting to "entrap the

collection agent into violating the FDCPA" (ECF 98 PageID 1439-40).  Each of these purported

issues fail to state a claim for 15 § 1692k or 28 § 1927, besides having no merit whatsoever.  For

instance: In terms of the "coding system" there seems to be a clear misunderstanding here.[25]  My former counsels (Pomerantz LLP) sought to clarify to the Court, "Plaintiff's proposed Class definitions do not contemplate [relying exclusively on] Defendants' account coding system [of 050 and 261]." (ECF 94 Page ID 1400).  Rather "Defendants' coding lists are important here to show that databases of consumers who would comprise the Class already exist."  (Id).   Meaning, I as the Plaintiff called to dispute the debt; yet, Defendants failed to mark my purported account with "050" and according to Defendants marked the account as "289."[26]  According to Defendants, the reason is that I failed to provide a "valid reason" and evidence for my dispute.[27]  Pomerantz took into account that according to Defendants testimony, not all consumers who call to dispute a debt are marked "050"[28], only those whose dispute was recorded.[29]  The predominance inquiry allows focusing on the pattern of the violation giving rise to liability, without looking at each individual facts giving rise to the FDCPA violation, even if MCM did

---

[25] I did not draft the class motion papers.  I maintain that there is no bad faith present of either Plaintiff's counsels or myself.  Defendants fail to "provide evidence of plaintiff's bad faith (as opposed to counsel's bad faith)." *Puglisi v. Debt Recovery Solutions, LLC*, 822 F.Supp.2d 218, 23 (E.D.N.Y 2011).

[26] Q. "If Mr. Huebner's account was marked 050 between the date range October 13th, 2013, through October 15th, 2014, would his name appear on Exhibit Q?" A." Yes."  Q. "So is it correct to state Mr. Huebner's account was not marked as 050 between the dates October 11th, 23 2013, and October 15th, 2014?"  A. "Yes." (Exhibit M, p. 19:17-23).

[27] "Given Plaintiff's failure to marshal any supporting evidence that the Account is invalid, there is no genuine dispute as to whether the account exists.  As such, Plaintiff's claim that the account was 'non-existent' fails."  (ECF 66 at PageID 965).

[28] Q. "Is it Midland's policy to mark it as 289 and not 050 if the customer tells them they are disputing the debt?" A. "That doesn't apply in every situation.  If the -- in the course of that conversation it's from our standpoint going to resolution or being closed, then you would use a -- you could use a 289 to signify that it's resolved or, you know, the dispute is -- or the account is being closed at that point." Q. "Isn't it correct that it's Midland's policy for New York residents if they verbally dispute the debt to always mark their account as 050?"  A. "No, not if the account is being closed."  (Exhibit A p. 32:2-17).

[29] Q. "What does the 050 signify?  What does that mean to you?"  A. "That means there was a verbal dispute documented on the account."  Q. "050 would only be for verbal disputes as opposed to written disputes?" A. "Correct." (Exhibit M, p. 15:17-23).

not mark the account with the coding system of "050." [30]  The predominate issues presented by this case is the FDCPA violation of grilling the consumer for a reason to have a debt designated as disputed.  Indeed, on September 2, 2015, the Court noted, "Plaintiff's letter makes it clear that he has grounds to move for class certification known to him."  (ECF 09/02/2015).

122.    In terms of the "entrapment" allegation Defendants have yet to elucidate this absurd allegation.  As cited above in Section ii, Defendants admit that (1) any MCM employee can mark a debt as disputed, (2) it is not MCM's policy to inform the consumer whether the dispute has been marked, and (3) MCM will transfer the consumer to Consumer Support for a grilling of the reason to the dispute, under the so-called rubric of "resolving" the dispute.  It is simply impossible to entrap Defendants to ask questions, when company policy is to grill consumers for the reason to dispute a debt.

123.    As cited above in paragraph 32, "a tester who 'may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home,' had standing to sue by virtue of his allegation that his statutorily created right to truthful information about the availability of housing was violated." *Ragin v. Harry MacKlowe Real Estate Co.*, 6 F.3d 898, 903 (2nd Cir. 1993).  Even if I only called MCM to gather evidence of a FDCPA violation (and never mind that I only called to ensure my debt was marked as disputed), Defendants argument of entrapment still fails to void the longstanding of testers.

---

[30] "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v Bouaphakeo,* 136 S Ct 1036, 1045, 194 L Ed 2d 124 (2016).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id.*

124.     Indeed, that very allegation of entrapment was the cornerstone of the order to show cause.  (ECF 16).  Despite the allegation of "entrapment," the Court allowed this case to "proceed in the normal course to determine if the new version of the claim that plaintiff has now set forth has any merit."  By this virtue, the Court allowed the case to proceed as appearing there is a colorable basis for suit.

### xi.     Defendants Refusal to Comply with Discovery

125.     On July 7, 2015, I had completed production to Defendants discovery demands.

126.     On July 21, 2015 the Court ordered, "Defendants are to respond to plaintiff's written discovery requests by 8/10/15."  (ECF 07/21/2015).

127.     On August 17, 2015 the Court denied Defendants motion to stall discovery "To the extent not all written discovery was produced, it must be produced at least 72 hours before the 30(b)(6) deposition or the Court may impose sanctions on defendants."  (ECF 08/17/2015).

128.     On September 4, 2015, the Court addressed Defendants failure to complete discovery production, "Any supplemental discovery that is ordered must be produced by 10/9/15."  (ECF 09/04/2015).

129.     On May 7, 2015, at the discovery conference the Court directed there shall be no speaking objections at the depositions. In contravention of the Court's order, on August 24, 2015 at the deposition of Defendants' 30(b)(6) witness, Defendant's counsel Matt Johnson in addition to over 250 objections to form, Defendant's counsel additionally made no less than 50 unrelated speaking objections. (ECF 50, p.4, Joint Letter). Notably, in the Joint Letter, (required

due to Defendant's continued non-compliance with discovery), counsel for Midland does not deny that he made 50 speaking objections in contravention of this Court's order.

130.     On September 22, 2015 the Court ordered, "To the extent that plaintiff has requested relevant documents, but defendants have not produced them, defendants will be precluded from relying on those documents at summary judgment or trial."

131.     On October 15, 2015, Defendants appeared with "new arguments of burden and responsiveness that it had ample opportunity to bring to this Court's attention over the past several months." (ECF 54).  "Defendants fail to explain why they did not discover and alert the court to these issues of burden as part of the extensive discovery disputes in this matter and why they waited until only four days before the conclusion of supplemental discovery to raise these issues." *Id*.  "This Court previously held that any supplemental discovery must be produced by October 9, 2015. In light of defendants failure to comply with the Court's prior order any supplemental discovery must be produced by October 30, 2015."

132.      On November 19, 2015, the Court ordered, "Defendants are required to file a certification by November 23, 2015 that they have produced all such documents in their possession, custody, or control." (ECF 59).

133.     On December 6, 2015, the Court had to marshal again Defendants failure to comply with discovery, "Defendants have to produce all calls with EITHER codes 050 or 261 by 12/18/15.  That was always the Court's clearly expressed intent."  (ECF 12/06/2015).

134.     To date Defendants have failed to produce the contract of the alleged debt sale under the unexplained excuse of burdensome.  Defendants also failed to produce a true copy of the actual data Verizon provided regarding Plaintiff.  This information is material as the

Consumer Financial Protection Bureau found, that Defendants purchase debts knowing that they are disputed or questionable.  (Exhibit N).

135.     Midland's discovery delays, ultimately resulted in depriving Plaintiff of court ordered discovery prior to the deposition of  Defendants' 30(b)(6) witness.

136.     This practice of Defendants dragging discovery until the Court forces compliance, is a vexatious practice that Defendants employed in this case.  Likewise, Defendants' did not act under Rule 11(b)(1) to either mitigate a so-called "unnecessary delay" or mitigate its "expense of litigation".

## CONCLUSION

137.     Defendants' motion for sanctions is without merit.  Defendants cite *Ford v. Principal Recovery Group, Inc.*, No. 09-CV-627-JTC (W.D.N.Y. Sept. 29, 2011) where sanctions and a finding of bad faith were denied even though the Plaintiff posed the questions in the telephone call.  Defendants also cite *Jacobson v. Healthcare Fin. Servs., Inc.*, 434 F. Supp. 2d 133, 138 (E.D.N.Y. 2006) where sanctioned were reversed on appeal.  *See Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008).

138.     There is no basis to say that this "action was brought 'in bad faith and for the purpose of harassment,' 15 U.S.C. § 1692k(a)(3)" or sanctions where "the merits turned on a question of law." *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 97 (2nd Cir. 2010).  This case was decided on the merits on the question of law as to whether Defendants may probe consumers when designating a debt as disputed.

139.     Defendants have failed to cite a single case or fact illustrating contentions of "bad faith," "unreasonable," "harassment," and "clearly vexatious" against Plaintiff's or Plaintiff's counsels.  The little case law Defendants cite show that Defendants know that the

mere prevailing in a case is insufficient to trigger a motion for sanctions; "there is a general presumption that an attorney is generally not liable for fees unless that prospect is spelled out." *Hyde v. Midland Credit Management, Inc.*, 567 F.3d 1137, 1140-41 (9th Cir. 2009).  Defendants "motion has no legally cognizable basis in law or fact."  *Nakash v. U.S. Dept. of Justice*, 708 F.Supp. 1354, 1367 (S.D.N.Y. 1988).  By bringing a motion for sanctions against attorneys under 15 U.S.C. § 1692k(a)(3) Defendants "contravened the very standards that they have accused" Plaintiff.

140.    Defendants' Motion is based on frivolous arguments, which Defendants have already been forewarned, have no basis in law.  *See, Hyde*.

141.    I respectfully request from the Court to enter an order denying Midland's Motion in its entirety and awarding Plaintiff costs and attorney's fees for being forced to defend myself against the Defendants' frivolous motion and any other relief which this court deems just and proper.

Dated: Brooklyn, NY
           September 30, 2016,

                                                    Respectfully submitted,
                                                    /s/ Levi Huebner
                                           _____
                                                    Levi Huebner,
                                                    535 Dean Street, Suite 100
                                                    Brooklyn, NY 11217