

Federal Trade Commission

Board of Governors
of the Federal Reserve System



# Report to Congress
## on the
# Fair Credit Reporting Act
# Dispute Process

August 2006

Federal Trade Commission
Board of Governors of the Federal Reserve System

# Report to Congress
# on the
# Fair Credit Reporting Act
# Dispute Process

Submitted to the Congress pursuant to section 313(b) of the
Fair and Accurate Credit Transactions Act of 2003

August 2006

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. The Reporting Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  The Dispute Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.   FCRA Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Appendix A  Table of Names and Acronyms

Appendix B  Request for Information for Report

Appendix C  Sample Automated Consumer Dispute Verification Form

Appendix D  Frequency of Credit Account Disputes in Federal Reserve Board Study of Data
             from One Repository as of June 30, 20031

Appendix E  Response Rates of Furnishers Responding to One Repository Through E-OSCAR
             and Furnishers Responding in Paper Form (July 2004)

Appendix F  The FCRA After the FACT Act

Case 1:14-cv-06046-BMC   Document 130-12   Filed 09/30/16   Page 4 of 52 PageID #: 1982

# Executive Summary

The Federal Trade Commission ("FTC") and the Board of Governors of the Federal Reserve System ("Board") submit this report pursuant to section 313(b) of the Fair and Accurate Credit Transactions Act of 2003 ("the FACT Act"). The report discusses the steps that consumer reporting agencies ("CRAs") and furnishers of information to CRAs ("furnishers") take after receiving a consumer dispute about the accuracy or completeness of information in the consumer's file. The report first provides background information and describes the Fair Credit Reporting Act's ("FCRA's") dispute provisions. The core portion of the report, titled "The Dispute Process," addresses (1) how the consumer submits a dispute to the CRA, (2) how the CRA forwards the dispute to the furnisher, (3) how the furnisher investigates the dispute and replies to the CRA, and (4) how the CRA reviews the furnisher's response and conveys the results of the reinvestigation to the consumer. The report also discusses the dispute process when consumers submit disputes directly to furnishers. The Board issued a request for public comment, and the report summarizes commenters' overall views on the dispute process.

The report finds that, although the materials that the FTC and the Board reviewed indicated that most disputes seem to be processed within the statutory time frame, there is disagreement as to the adequacy of the CRAs' and furnishers' investigations.

The FACT Act imposes a number of new requirements to enhance the consumer dispute process. These provisions are still being implemented. As a result, this report is based solely on compliance with the pre-FACT Act FCRA dispute process and recommends no additional administrative or legislative action at this time. The FTC and the Board believe that the FACT Act requirements should be given time to take effect before legislators and regulators consider making additional changes to the dispute process. The FTC and the Board will continue to monitor the performance of the dispute process, explore possible enhancements, and make recommendations for action, if appropriate.

Report to Congress ────────────────────────────────────────────

# I.   Introduction

The Federal Trade Commission ("FTC") and the Board of Governors of the Federal Reserve System ("Board") submit this report pursuant to section 313(b) of the Fair and Accurate Credit Transactions Act of 2003 ("the FACT Act").[1] Section 313(b) of the FACT Act, enacted on December 4, 2003, mandates that the FTC and Board jointly study

> [t]he extent to which, and the manner in which, consumer reporting agencies and furnishers of consumer information to consumer reporting agencies are complying with the procedures, time lines, and requirements under the Fair Credit Reporting Act for the prompt investigation of the disputed accuracy of any consumer information, the completeness of the information provided to consumer reporting agencies, and the prompt correction or deletion, in accordance with such Act, of any inaccurate or incomplete information or information that cannot be verified.

Section 313(b) also requires that the FTC and the Board submit a joint report on the results of the study. In preparing the report, the two agencies must consider information relating to complaints filed with the FTC and referred to the nationwide consumer reporting agencies under section 611(e) of the Fair Credit Reporting Act ("FCRA").[2] Lastly, section 313(b) requires that the report include any recommendations that the Board and the FTC jointly determine to be appropriate for legislative or administrative action.

In preparing this report, the FTC and the Board drew upon information provided by various sources. The Board issued a request for public comment on the topics required by section 313(b).[3] The two agencies reviewed over 120 comment letters received from consumers,[4] consumer advocates,[5] creditors and their trade associations,[6] consumer reporting agencies

---

[1]   Pub. L. 108–159, 117 Stat. 1952. Although the FACT Act makes many improvements to the dispute process, the Act's provisions are still in the initial stages of implementation. Consequently, this report is based solely on compliance with the pre–FACT Act FCRA.

[2]   FCRA section 611(e), also enacted as part of the FACT Act, requires that the FTC transmit to the three nationwide consumer reporting agencies ("repositories")—Equifax Information Services, LLC (Equifax), Experian Information Solutions, Inc. (Experian), and TransUnion LLC (TransUnion)—complaints from consumers who appear to have disputed the completeness or accuracy of their files with one or more repositories or otherwise exercised their dispute rights under FCRA section 611(a). FCRA section 611(e) also requires that the repositories review the complaints, report to the FTC on the results of their review, and maintain records sufficient to show compliance.

[3]   Request for Information for Study on Investigations of Disputed Consumer Information Reported to Consumer Reporting Agencies, 69 Fed. Reg. 48,494 (Aug. 10, 2004). *See* appendix B.

[4]   Approximately 100 consumers submitted comments in response to the Board's Federal Register notice.

[5]   The National Consumer Law Center, Consumer Federation of America, Consumers Union, Electronic Privacy Clearinghouse, and U.S. Public Interest Research Group ("consumer groups") submitted a joint comment.

[6]   Commenters that provided information for this report on behalf of furnishers include the Ford County State Bank (Ford County Bank), Juniper Bank (Juniper), Zions Bancorporation (Zions), Wells Fargo & Company (Wells Fargo), Boeing Employees Credit Union (BECU), Branch Banking and Trust Company (BB&T), MBNA America Bank (MBNA), Visa U.S.A. Inc. (Visa), American Bankers Association (ABA), Mortgage Bankers Association (MBA), and Coalition to

("CRAs") and their trade associations,[7] and mortgage industry trade associations.[8] The comment letters are available on the FTC's website, at *www.ftc.gov/os/statutes/fcrajump.htm*. The FTC and the Board also met with consumer advocates and groups representing CRAs and furnishers. In addition, the FTC and the Board reviewed consumer complaint information maintained within their own databases and those of several other federal financial regulators.[9] The Board reviewed information gained through examinations for FCRA compliance by several federal financial regulators. Finally, the FTC and the Board reviewed the existing literature, including studies, reports, and industry manuals, as well as research conducted by the Board's staff economists.

This report summarizes the information provided by these sources. Part II discusses the role of CRAs and furnishers in the dispute process, describes consumer reports, and explains the relevant provisions of the FCRA. Because the process by which information is furnished to CRA databases is important to understanding the dispute process, Part III of this report discusses reporting responsibilities and the systems through which furnishers report information to CRAs. Part IV discusses the various steps that consumers, CRAs, and furnishers take during the dispute process, the systems used to exchange information between CRAs and furnishers when consumers dispute information contained in their consumer files, as well as commenters' overall views on how well the dispute process is working. Part V of the report discusses FCRA enforcement by the FTC, the Board, and other federal agencies; consumer complaints reviewed by the Board and several other federal agencies; and the complaint-referral program that the FTC has entered into with CRAs in compliance with FCRA section 611(e). Finally, Part VI contains the report's conclusions.

# II.  Background

## A.  The Actors

The FCRA dispute process involves CRAs and those who furnish information to the CRAs. The largest CRAs are three nationwide "repositories" of consumer credit information: Equifax

---

Implement the FACT Act (Coalition). The Coalition represents an array of financial services companies that are furnishers and/or users of consumer credit information. Comment of Coalition, at 1.

[7]  For this report, both Equifax and TransUnion submitted comment letters, as did the National Credit Reporting Association (NCRA), a trade association that represents resellers of consumer reports, and the Consumer Data Industry Association (CDIA). Formerly known as Associated Credit Bureaus, Inc., CDIA represents many of the nation's largest CRAs, including Equifax, Experian, and TransUnion. Comment of CDIA, at 1 n.1.

[8]  The following trade associations also submitted comments: the National Association of Realtors, California Association of Realtors, National Association of Mortgage Brokers (NAMB), and Florida Association of Mortgage Brokers.

[9]  This report uses the term "federal financial regulators" to refer collectively to the following entities: the Board, Federal Deposit Insurance Corporation (FDIC), National Credit Union Administration (NCUA), Office of the Comptroller of the Currency (OCC), and Office of Thrift Supervision (OTS).

Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion LLC ("TransUnion").[10] Each repository has records on as many as 1.5 billion credit accounts held by approximately 210 million individuals.[11] According to the Consumer Data Industry Association (CDIA), the repositories receive approximately 4 billion updates of information each month from more than 30,000 furnishers,[12] and normally update their credit records within one to seven days of receiving new information.[13] The repositories issue more than 1 billion consumer reports each year, the vast majority of which go to creditors, employers, and insurers.[14] In 2003, the most recent year for which figures are available, the repositories issued 57.4 million consumer file disclosures, i.e., reports sent to consumers at their request.[15]

The term "consumer reporting agency" in the FCRA covers many entities other than the three repositories.[16] For example, the repositories report that approximately twenty companies, traditionally referred to as "service bureaus" or "affiliates," have contractual relationships with one of the repositories under which the affiliate owns consumer data in certain areas of the country but stores the data on the repository's computer.[17] Other entities that fall within the definition of "consumer reporting agency" include those that collect and report specialized information, such as check writing histories, rental records, employment histories, and medical information.[18]

Another category of CRAs, "resellers," purchase consumer information from one or more of the repositories, provide further input to the consumer report, including merging files from

---

[10]  When the FCRA was enacted in 1970, the credit reporting industry consisted of more than 2,500 independent local and regional credit bureaus across the country. *Written Statement of John A. Ford, Chief Privacy Officer, Equifax Inc.: Hearing Before the House Committee on Financial Institutions and Consumer Credit*, 108th Cong. (June 4, 2003) [hereinafter Statement of John A. Ford], at 5. Over time, however, most of these credit bureaus were consolidated into the three existing repositories. For a detailed discussion of the history and development of the consumer reporting system, *see* Robert M. Hunt, *A Century of Consumer Credit Reporting in America* (Federal Reserve Bank of Philadelphia Working Paper No. 05-13, June 2005).

[11]  *See* Robert B. Avery, Paul S. Calem & Glenn B. Canner, *Credit Report Accuracy and Access to Credit, Federal Reserve Bulletin* (Summer 2004) [hereinafter 2004 FRB Study], at 298.

[12]  Comment of CDIA, at 10.

[13]  2004 FRB Study, *supra* note 11, at 298.

[14]  *Id.*

[15]  Communication from CDIA to the Division of Financial Practices, Federal Trade Commission (Jan. 7, 2005) (on file with the Division of Privacy & Identity Protection) [hereinafter CDIA Communication 01/07/05].

[16]  FCRA section 603(f) defines "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

[17]  In the FTC's Free Annual File Disclosure Rule, these agencies are termed "associated consumer reporting agencies." 16 C.F.R. § 610.1(b)(2). Although each of these arrangements is unique, the repository with which such an agency is associated typically has the right to sell the agency's data to the repository's customers.

[18]  The CRAs in this category that operate on a nationwide basis are referred to as "nationwide specialty consumer reporting agencies." *See* FCRA § 603(w).

multiple repositories or adding information from other data sources, and then resell the report.[19] While this report briefly describes the changes in reseller dispute duties under the FACT Act and includes comments from their trade representatives, the focus of the report with respect to CRAs will be on the repositories, which own and maintain the vast majority of the data held by CRAs.

Unlike "consumer reporting agency," the term "furnisher" is not defined in the FCRA. As the term is generally understood, however, furnishers are entities that provide information about their customers to CRAs, including information about customers' payments on their accounts. Examples of furnishers include banks, thrifts, credit unions, savings and loan institutions, mortgage lenders, credit card issuers, collection agencies, retail installment lenders, and auto finance lenders.[20] The FCRA does not require furnishers to report to CRAs, but, as discussed below, if they do report, they must comply with certain provisions of the statute. According to CDIA, the majority of furnishers report full account payment information, both "positive" information that the account is current and "negative" information, such as delinquencies and accounts placed for collection.[21] Some types of accounts are typically reported only when the payment history turns negative, such as when the debt is transferred to a debt collector. The most common examples of these accounts are those related to medical debts, telecommunications, and power companies.[22]

## B.  Consumer Reports

Full consumer reports issued by the repositories, commonly referred to as "credit reports," generally contain five types of information:[23]

---

[19]   All entities that procure consumer reports for purposes of reselling them must comply with FCRA section 607(e), which requires that these entities take certain steps before reselling the reports. The FACT Act, however, added special provisions with respect to the dispute duties of certain of these entities. The special provisions apply only to "resellers."  A reseller is defined as a

> consumer reporting agency that (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

FCRA § 603(u). Some CRAs that resell repository information merely forward, or "pass through," the information. These entities fall outside the FCRA section 603(u) definition of "reseller," because they do not "assemble and merge" the information, but they still must comply with FCRA section 607(e).

[20]   Comment of CDIA, at 4, 10 n.8.

[21]   Comment of CDIA, at 4.

[22]   *See* Robert B. Avery, Paul S. Calem, Glenn B. Canner & Raphael W. Bostic, *An Overview of Consumer Data and Credit Reporting, Federal Reserve Bulletin* (Feb. 2003) [hereinafter 2003 FRB Study], at 49, 50; Comment of NAMB, at 2; Comment of Equifax, at 5.

[23]   *See* 2003 FRB Study, *supra* note 22, at 48; Statement of John A. Ford, *supra* note 10, at 8–9. In addition to "credit reports," repositories also produce "credit scores," consumer reports that summarize a consumer's credit history in a number, or "score." For a fuller discussion of consumer reports and their uses in consumer transactions, *see* Federal Trade Commission, *Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003* (Dec. 2004) [hereinafter 2004 FTC Report], at 6–11.

◆ *Identification Information*: Information such as the name of the individual, current and previous residential addresses, and Social Security number.

◆ *Trade Line Information*: Detailed information reported by creditors and other furnishers on each current and past loan, lease, or other debt (such as utility and medical debts).

◆ *Public Record Information*: Information derived from financial-related public records, such as records of bankruptcies, foreclosures, tax liens, garnishments, and other civil judgments.

◆ *Collection Account Information*: Information reported by collection agencies regarding credit accounts and other debts.

◆ *Inquiry Information*: Identities of individuals or companies that have requested information from an individual's credit file; the date of inquiry; and an indication of whether the inquiry was by the consumer, for the review of an existing account, or to help the inquirer decide on a potential future account or relationship.

Although Equifax, Experian, and TransUnion are for-profit businesses that compete with one another on, among other things, the completeness of the information in their databases, many items in a consumer's files are common to all three repositories. This is due in large part to the standard formats that furnishers use to report information to the repositories.[24] Nonetheless, some differences remain across repositories. Some furnishers, including some smaller banks and many debt collection agencies, do not report to all three repositories.[25] Differences also can arise from the repositories' treatment of public record information. Because some public record information is accessible only by visiting courthouses and other government buildings in person, the repositories sometimes hire contractors to gather the information.[26] When repositories use different contractors, the contractors sometimes report the same public record information differently, causing additional variations among repository databases.[27] Yet another reason that repositories' databases differ is that the repositories often receive and process information from furnishers at different times during the same reporting cycle.[28]

---

[24] For furnishers that report to more than one repository, the standardized formats, known as Metro and Metro 2, ensure that the bits of information from these furnishers—e.g., last name, first name, address, and current balance—are received in the same data fields in the databases of any repositories to which the furnisher reports. *See infra* section III for a discussion of Metro and Metro 2.

[25] *See, e.g.*, Comment of Coalition, at page 3 of Coalition's attachment; Comment of NAMB, at 2; Comment of CDIA, at 4.

[26] National Consumer Law Center, *Fair Credit Reporting* (5th ed. & Supp. 2005) [hereinafter NCLC Treatise], at 55.

[27] 2003 FRB Study, *supra* note 22, at 51 n.11.

[28] *Id.*; *The Accuracy of Credit Report Information and the Fair Credit Reporting Act: Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs*, 108th Cong. (July 10, 2003) (statement of Stuart K. Pratt, CDIA) [hereinafter Statement of Stuart K. Pratt], at 5.

## C. FCRA Dispute Duties

The FCRA imposes dispute duties on both CRAs and furnishers. If a consumer disputes the completeness or accuracy of an item contained in his or her file directly with the CRA,

- ◆ the CRA must complete a reinvestigation within thirty days after receiving the notice of dispute from the consumer;[29]

- ◆ in conducting the reinvestigation, the CRA must review and consider all relevant information submitted by the consumer; and[30]

- ◆ within five business days of receiving the dispute, the CRA must notify the furnisher of the dispute, and include all relevant information that the CRA received from the consumer.[31]

After receiving a dispute from a CRA, a furnisher must take the following steps:[32]

- ◆ conduct an investigation with respect to the disputed information;

- ◆ review all relevant information provided by the CRA;

- ◆ report the results of the investigation to the CRA;

- ◆ if the investigation finds that the information is incomplete or inaccurate, report those results to all nationwide CRAs to which the furnisher reported the information; and

- ◆ complete the investigation before the end of the thirty-day period that the CRA has to complete its reinvestigation.

If the CRA finds during the reinvestigation that a disputed item is inaccurate, incomplete, or cannot be verified, the CRA must delete or modify the item.[33] No later than five business days after the completion of a reinvestigation, a CRA must provide written notice to the consumer of the results of the reinvestigation.[34] The notice must include

- ◆ a statement that the reinvestigation is completed;

- ◆ a consumer report based on the consumer's file (if the file has been revised as a result of the reinvestigation);

---

[29]   FCRA § 611(a)(1)(A). If a consumer transmits information relevant to the reinvestigation during the thirty-day period, the CRA has fifteen additional days to complete the reinvestigation. FCRA § 611(a)(1)(B). The FCRA uses the term "reinvestigation" when referring to reviews of disputed items conducted by CRAs and the term "investigation" when referring to reviews conducted by furnishers. *Compare* FCRA § 611(a) *with* FCRA § 623(b).

[30]   FCRA § 611(a)(4).

[31]   FCRA § 611(a)(2).

[32]   FCRA § 623(b). The FCRA also imposes other duties on furnishers, a number of which are described in appendix F of this report.

[33]   FCRA § 611(a)(5)(A). FCRA section 611(a) as originally enacted in 1970 required CRAs to delete information found to be inaccurate or unverifiable, but a 1996 amendment gave CRAs the choice of either deleting the information or modifying it.

[34]   FCRA § 611(a)(6).

◆ a notice that the CRA will provide a description of the procedure used to determine the accuracy and completeness of the disputed item to the consumer at the consumer's request;

◆ a notice that the consumer has the right to add a statement to his or her file disputing the accuracy or completeness of the information; and

◆ a notice that the consumer has the right to request that the CRA furnish notification that the item had been deleted, or the consumer's statement of dispute, to certain persons designated by the consumer who had previously received a consumer report that contained the deleted or disputed information.

The FACT Act amended the FCRA in a number of ways that affect the consumer dispute resolution process.[35] One of the changes requires the FTC, the Board, and other federal agencies to promulgate guidelines and regulations requiring creditors to establish reasonable procedures regarding the accuracy of the data they report to CRAs.[36] A second change also requires joint regulations identifying the circumstances under which furnishers, for the first time, must investigate certain disputes received directly from consumers.[37] A third FACT Act change requires that, in disputes received from a CRA, if information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after the furnisher completes the investigation, the furnisher must promptly delete, modify, or permanently block the reporting of that information, as appropriate based on the results of the investigation.[38] The FACT Act amendments also require financial institutions that furnish information to nationwide CRAs to notify consumers in writing if they furnish, or may furnish, negative information about the consumers to a CRA.[39] Because these and other provisions of the FACT Act have not become effective or have only recently become effective, this report focuses on the dispute process as it existed under the FCRA prior to the FACT Act amendments.

---

[35] Appendix F contains a more detailed discussion of the FACT Act changes to the FCRA. Other laws, such as the Fair Credit Billing Act, Electronic Fund Transfer Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, and Servicemembers Civil Relief Act, also contain requirements with respect to disputes or the furnishing of information. This report addresses only those requirements in the FCRA.

[36] *See* FCRA § 623(e), added by FACT Act § 312. In March 2006 the agencies published an Advance Notice of Proposed Rulemaking. 71 Fed. Reg. 14,419 (March 22, 2006).

[37] *See* FCRA § 623(a)(8), added by FACT Act § 312.

[38] FCRA § 623(b)(1)(E), added by FACT Act § 314.

[39] FCRA § 623(a)(7), added by FACT Act § 217. The Board issued two model notices that financial institutions may use to comply with this requirement. One may be used if the institution provides the notice prior to furnishing negative information to a nationwide CRA. The other may be used if the institution provides the notice after furnishing the negative information. 12 C.F.R. pt. 222 app. B.

# III.  The Reporting Process

This section provides an overview of the process through which furnishers report information to the CRAs. According to CDIA, more than 30,000 furnishers provide approximately 4 billion updates of information to the repositories each month.[40] In general, financial services providers such as banks, credit unions, and consumer finance companies provide the majority of positive and negative account information in CRA files.[41]

## A.  Reporting Requirements

The FCRA does not require furnishers to report to CRAs. Some entities that choose to furnish, however, are required by the FCRA to report certain information. For example, a furnisher must notify a CRA if the consumer voluntarily closes a credit account that the furnisher has been reporting to that CRA.[42] The FCRA also requires a furnisher that provides information to a CRA regarding a delinquent account being placed for collection, charged off, or subjected to similar action, to notify the CRA of the month and year that the delinquency began.[43]

Some entities are required to furnish certain information due to contractual or other requirements. For example, the Mortgage Bankers Association (MBA) stated that "[m]ost mortgage companies … are required by investors and government entities, such as Fannie Mae, Freddie Mac, and [the U.S. Department of Housing and Urban Development], to report 'full file' credit information," including both positive and negative information and the exact status of each mortgage serviced as of the last business day of each month, to each of the repositories.[44]

---

[40]   Comment of CDIA, at 10. Some furnishers report to CRAs by contracting with other companies to report on their behalf. Comment of Coalition, at page 1 of Coalition's attachment.

[41]   Comment of TransUnion, at 3.  *See also* Comment of Wells Fargo, at 1.

[42]   FCRA § 623(a)(4). The furnisher must include this notice with the information it regularly furnishes to the CRA for the period in which the account is closed. *Id.* Furnishers that commented on this issue indicated that they report the closure in their next regularly scheduled report to the CRA, as required by law. Comment of BECU, at 3; Comment of Wells Fargo, at 4; Comment of Juniper, at 3; Comment of MBA, at 9; Comment of ABA, at 3; Comment of Zions, at 4; Comment of BB&T, at 5. However, the National Association of Mortgage Brokers stated that instead of reporting that an account is closed, some creditors simply stop sending updates on the account to CRAs. Comment of NAMB, at 7.

[43]   FCRA § 623(a)(5). Some commenters stated that with respect to accounts that have been placed for collection or charged off, they report the date of the first delinquency with their regular monthly update to the CRAs. Comment of MBA, at 8; Comment of Ford County Bank, at 1; Comment of BECU, at 3; Comment of Wells Fargo, at 4; Comment of Zions, at 3–4; Comment of Juniper, at 3. NAMB was concerned that, in some cases, as a collection or charged-off account is sold and resold, a new date is attached to the account by each new furnisher, so it appears that the delinquency is more recent than it really is. Comment of NAMB, at 6. The practice described by NAMB likely would violate the FCRA. As noted above, the FCRA requires a furnisher that reports information to a CRA regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action to notify the CRA of the month and year of the commencement of the delinquency that immediately preceded the action (often referred to as the "date of delinquency"), not later than ninety days after furnishing the information to the CRA. FCRA § 623(a)(5). No matter how many times a delinquent account is sold and resold, its date of delinquency should remain the same.

[44]   Comment of MBA, at 2. In addition, MBA commented that mortgage furnishers are not allowed to report certain negative information. For example, Freddie Mac and Fannie Mae require forbearances on mortgages to be reported as military

Nevertheless, because the FCRA generally does not require reporting, some furnishers choose not to report at all, to report only negative information, or to omit a key element of data such as a credit limit.[45] Others report data on some of their credit products and not others.[46] Commenters proffered a variety of reasons why some furnishers choose not to report or to report only certain kinds of information. CDIA reported that "[s]ome lenders omit the reporting of very elite customers out of concern that other lenders will attempt to compete for this market of consumers."[47] Other lenders choose not to report their subprime portfolios for the same reason.[48] Some regulated entities, such as telephone companies, are limited by regulations as to the types of information they may report to CRAs.[49] Some of these companies, for example, are permitted to report only information about accounts that are in past due or charged-off status.[50] Some entities choose not to report to all the repositories in light of the potential liability imposed on furnishers by the FCRA dispute provisions as well as the costs involved in furnishing.[51] These costs may include those associated with reporting, handling investigation requests, establishing policies and procedures to ensure compliance with the FCRA, and performing audits of reporting systems and information reported.[52]

---

indulgences if the borrower is a service member on active duty and eligible for relief under the Servicemembers Civil Relief Act. Comment of MBA, at 5.

[45] Comment of CDIA, at 4. The ABA reported that only a small percentage of the very smallest institutions report only negative information. Comment of ABA, at 2.

[46] Comment of BB&T, at 1. Many banks in the Coalition's survey of twenty community banks stated that they do not report information on commercial loans and a variety of other loans such as agricultural loans, real estate loans, and overdraft-protection closed-end loans. Comment of Coalition, at page 2 of Coalition's attachment. A state member bank explained that in the course of a bank examination, it reports on all its mortgage and consumer loan products, but not on its commercial loans, as the commercial loan relationships are supported with cash generated from operating income and real estate investments.

[47] Comment of CDIA, at 4. Many creditors obtain lists of consumers from CRAs for the purpose of making "firm offers of credit" (often referred to as "prescreened offers"). The FCRA permits creditors to obtain these consumer lists under FCRA section 604(c) unless a consumer opts out of receiving such offers. By refraining from reporting positive data on their best customers, banks and other creditors can keep competitors from "cherry picking" those customers through prescreened offers.

[48] Comment of CDIA, at 4; Comment of NAMB, at 2.

[49] See, e.g., Cal. Pub. Util. Code § 2891(a) (2004).

[50] Comment of Equifax, at 5.

[51] Comment of CDIA, at 4; Comment of TransUnion, at 4; Comment of Equifax, at 5; Comment of BECU, at 1; Comment of Coalition, at page 3 of Coalition's attachment.

[52] Commenters reported on the policies and procedures implemented to ensure compliance with the FCRA and the periodic auditing performed to ensure that information reported is accurate. See Comment of MBA, at 7–8; Comment of Coalition, at 4; Comment of MBNA, at 5; Comment of ABA, at 3; Comment of Wells Fargo, at 3; Comment of Juniper, at 2; Comment of BB&T, at 4; Comment of BECU, at 2. In addition, BECU reviews annual audits from each CRA to ensure that the CRAs are accurately recording information reported by BECU. Comment of BECU, at 2. Similarly, the Coalition reported that one of its members that performed such a review found that the CRA accurately recorded the reported information more than 99.7% of the time. See Comment of Coalition, at 4.

### B.    Reporting Formats

Most furnishers use one of two standard formats to report credit information to the repositories. In the mid-1970's, the credit reporting industry developed the Metro format, which was designed to ensure greater precision in the data reported to the CRAs.[53] In 1997, CDIA introduced the Metro 2 format.[54] Metro and Metro 2 each provide a standard format, including standard codes, that can be used for virtually any consumer credit transaction. According to CDIA, Metro 2 is "an updated and more robust version of Metro, and provides for complete and accurate reporting."[55] For example, unlike the Metro format, Metro 2 allows a furnisher to report complete identification information for each consumer, including co-debtors and co-signers, which makes it more likely that CRAs will match the reported item to the correct consumer's file.[56] The repositories currently receive over 99% of all data from furnishers in either the Metro or Metro 2 format.[57] Approximately 31% of these furnishers—representing approximately 50% of all data furnished to the repositories—now report through Metro 2.[58] The repositories hope to convert the rest of the furnishers to Metro 2.[59]

Repositories also obtain information from courts, city halls, tax offices, and motor vehicles departments.[60] For those public record sources that are not yet available electronically, the repositories often hire contractors to manually collect the information. This information is then added to the repositories' databases for inclusion in future consumer reports.[61]

## IV.   The Dispute Process

In the consumer dispute process, a consumer first reviews his or her credit report and identifies information in the report that he or she believes is incomplete or inaccurate. The consumer then communicates a dispute to the CRA, which conveys the dispute to the furnisher of the information. The furnisher investigates the dispute and reports back to the CRA the results of its investigation. Finally, the CRA communicates the outcome of the reinvestigation to the

---

[53]   Comment of CDIA, at 10.

[54]   *Id.* Both Metro and Metro 2 are maintained by an industry committee of employees from each of the three repositories. *Id.*

[55]   Communication from CDIA to the Division of Financial Practices, Federal Trade Commission (Jan. 12, 2005) (on file with the Division of Privacy & Identity Protection) [hereinafter CDIA Communication 01/12/05], at 1.

[56]   CDIA, *Credit Reporting Resource Guide* (2003) [hereinafter CDIA Resource Guide], at 2-1.

[57]   General Accounting Office, Report No. GAO-03-1036T, *Consumer Credit: Limited Information Exists on the Extent of Credit Report Errors and Their Implications for Consumers* (July 2003), at 12.

[58]   CDIA Communication 01/12/05, *supra* note 55, at 2.

[59]   Comment of CDIA, at 4.

[60]   NCLC Treatise, *supra* note 26, at 55.

[61]   *Id.* at 55–56.

consumer. In some cases, consumers communicate a dispute directly to the furnisher.[62] This section will discuss each step of the dispute process, as well as the commenters' overall views on how well the current process is working.

## A.  Consumer Reviews Consumer Report and Conveys Dispute to CRA

In a 2004 Government Accountability Office (GAO) survey of 1578 consumers, 58% of consumers had seen their credit report at some point, and 45% of this subgroup had viewed their report within the previous year.[63] Of the 58% who had viewed their report at some point, 53% said they had ordered their report themselves, and 47% said someone else (e.g., a mortgage company, financial institution, or car dealership) had ordered their report and given it to them.[64] CDIA reported that the repositories issued 57.4 million file disclosures (i.e., reports sent to consumers at their request) in 2003.[65] If a consumer requests a credit report from one of the nationwide CRAs, the CRA must provide the consumer with a toll-free telephone number at which personnel are accessible to consumers during normal business hours.[66]

The 58% of consumers in the GAO study who had seen their credit report at some time gave the following as the reasons their credit report had been ordered:[67]

48%   Making a large purchase or refinancing

30%   Checking for completeness and accuracy

8%   Due to an adverse action, such as denial of credit, based on a credit report

4%   Suspected fraud and/or identity theft

1%   Looking for a job

9%   Other reasons

---

[62]   Until new FACT Act rules under FCRA § 623(a)(8) take effect, the FCRA does not specifically require that furnishers investigate disputes conveyed directly to them by consumers. Even before the rules take effect, however, the FCRA prohibits furnishers that report regularly from reporting information they have determined is inaccurate, and requires them to report corrected information. FCRA § 623(a)(2).

[63]   Government Accountability Office, Report No. GAO-05-223, *Credit Reporting Literacy: Consumers Understand the Basics but Could Benefit From Targeted Educational Efforts* (March 2005) [hereinafter 2005 GAO Report], at 3, 20.

[64]   *Id.* at 20–21, 64.

[65]   CDIA Communication 01/07/05, *supra* note 15.  In many cases, a single consumer may have received disclosures from multiple CRAs. Therefore it is difficult to compare CDIA's estimate of file disclosures to the GAO's estimate of the number of reports ordered by consumers.

[66]   FCRA § 609(c)(2)(B).

[67]   2005 GAO Report, *supra* note 63, at 21, 64–65. Consumers in many circumstances can obtain a free credit report. *See* FCRA §§ 609, 612. If consumers are not entitled to a free report, they may purchase one for a statutorily capped fee. FCRA § 612(f). The current maximum fee is $10.00. See 70 Fed. Reg. 74,816 (Dec. 16, 2005).

A consumer who believes that an item reported in a credit report is inaccurate or incomplete may contact the CRA by mail, online, by telephone, or in person to dispute the item.[68] According to CDIA, of the 57.4 million file disclosures issued to consumers by the repositories in 2003, 21.8% (12.5 million) led to a reinvestigation by one of the repositories.[69] Approximately 18% of the consumers interviewed in the GAO survey said that they disputed information in their credit file at some point.[70]  The consumers surveyed by GAO reported the following reasons for their disputes:[71]

| | |
|---|---|
| 17% | Someone else's information |
| 14% | Incorrect payment history |
| 14% | Incorrect late payments |
| 13% | Incorrect bill information |
| 13% | Incorrect credit card information |
| 10% | Incorrect personal information |
| 7% | Incorrect balance information |
| 4% | Incorrect bankruptcy information |
| 3% | Incorrect information from a former spouse |
| 2% | Identity theft |
| 4% | Another reason |

To understand how often credit accounts are disputed, the Federal Reserve Board reviewed data provided by one of the three repositories as of June 30, 2003.[72] The data are broken out by percentage of accounts in dispute. The Board found that 0.18% of credit accounts had a pending dispute.[73] Most of the disputes related to open accounts (85.4% of the pending disputes related

---

[68]   CDIA Communication 01/12/05, *supra* note 55, at 2.

[69]   CDIA Communication 01/07/05, *supra* note 15.

[70]   The consumers who said they disputed information in their credit files reported that they had disputed to the following entities: 32% to a CRA only; 29% to the creditor only; 30% to both a CRA and the creditor; 6% to an agency other than a CRA or the creditor; and 3% did not know. 2005 GAO Report, *supra* note 63, at 67.

[71]   2005 GAO Report, *supra* note 63, at 30–31.

[72]   The Board examined the credit records of a large, nationally representative sample of individuals as of June 30, 2003. This sample was previously examined in detail by the Board as part of a series of articles about the credit reporting system. *See* 2003 FRB Study, *supra* note 22, at 47–73; 2004 FRB Study, *supra* note 11, at 297–322.

[73]   *See* appendix D, table 1. With respect to different types of credit accounts, the following percentages of accounts were in dispute: 0.37% of credit card accounts; 0.02% of mortgage loans; 0.0% of auto loans; and 0.04% of other types of credit accounts (such as charge accounts, lines of credit, secured credit, and student loans).

to open accounts and 14.6% related to closed accounts).[74] Of those credit accounts in dispute, 89.9% were credit card accounts.[75]

## B.  CRA Processes Dispute

As discussed above, when a consumer submits a dispute to a CRA, the CRA generally must reinvestigate within thirty days.[76] As part of the reinvestigation, the CRA must review and consider all relevant information submitted by the consumer.[77]  Although the FCRA before the FACT Act did not specifically state that a CRA's reinvestigation had to be "reasonable," courts generally imposed a reasonableness standard. Under the FACT Act, the FCRA now expressly requires that a CRA's reinvestigation be reasonable.[78] Whether a particular CRA's actions constitute a "reasonable" reinvestigation varies depending on the circumstances surrounding the dispute.[79]

The joint comment letter submitted by the National Consumer Law Center, Consumer Federation of America, Consumers Union, Electronic Privacy Clearinghouse, and U.S. Public Interest Research Group ("the consumer groups") asserted that CRAs fail to conduct meaningful reinvestigations and merely "parrot" information received from furnishers as "verified," without

---

[74] *See* appendix D, table 3.

[75] *See* appendix D, table 2.

[76] FCRA § 611(a)(1)(A). If the consumer submits additional information relevant to the reinvestigation during the thirty-day period, the reinvestigation period can be extended for an additional fifteen days. FCRA § 611(a)(1)(B). In addition, the FACT Act provides that CRAs have forty-five days to complete a reinvestigation if the consumer disputes information after receiving an annual free file disclosure pursuant to the FACT Act. FCRA § 612(a)(3), amended by FACT Act § 211.

[77] FCRA § 611(a)(4).

[78] *Compare* section 611(a)(1)(A) of 1996 FCRA ("the agency shall reinvestigate free of charge") *with* section 611(a)(1)(A) of the FACT Act FCRA ("the agency shall, free of charge, conduct a reasonable reinvestigation").

[79] *Compare* Cushman v. TransUnion Corp., 115 F.3d 220, 225 (3d Cir. 1997) (where a consumer alerted CRA to possible fraud, it was not sufficient for CRA to rely merely on the creditor's information; court applied a two-factor test: (1) whether the consumer has alerted CRA to possibility that source may be unreliable or CRA itself knows or should know that source is unreliable, and (2) cost of verifying accuracy of source compared with possible harm inaccurately reported information may cause consumer); Pinner v. Schmidt, 805 F.2d 1258, 1262 (5th Cir. 1986) (unreasonable for CRA only to contact the creditor's agent to re-verify a delinquent account balance reported on the consumer's credit report where plaintiff notified CRA of his personal dispute with the agent); Soghomonian v. U.S., 278 F. Supp. 2d 1151, 1156 (E.D. Cal. 2003) (CRA does not act reasonably by deferring entirely to another source of information, especially in cases where source on which CRA relies does not consider information supplied by consumers in course of verifying information); *with* Bagby v. Experian Information Systems, 162 Fed. Appx. 600, 606-07 (7th Cir. 2006) (CRA had no duty to perform independent investigation where the consumer provided no evidence that source providing information to CRA was unreliable and cost of investigation far outweighed harm to the consumer); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) (CRA's reinvestigation was not unreasonable where CRA exercised independent professional judgment, based on full information, as to how particular account should be reported on credit report and where there was no factual deficiency in credit report); Stewart v. Credit Bureau, Inc., 734 F.2d 47, 55 (D.C. Cir. 1984) (CRA's failure, following reinvestigation of disputed items in credit report, to note that a lien was against the consumer as a business entity, rather than as an individual, and that the consumer contested the lien, did not render report fundamentally incomplete, so as to serve as basis for the consumer's claim that reinvestigation procedures were inadequate to reasonably ensure accurate correction of disputed items); Kettler v. CSC Credit Serv., Inc., 2003 U.S. Dist. LEXIS 14424, *7-8 (D. Minn. Aug. 12, 2003) (where the consumer did not provide specific information regarding nature of inaccuracies in her credit report, court ruled that CRA may rely on information in public records absent more specific evidence that the information is inaccurate).

independently investigating the accuracy and completeness of such information.[80] CDIA, on the other hand, maintained that the repositories meet their obligations to perform reinvestigations. According to CDIA, in some cases the CRA makes the correction without even submitting the dispute to the furnisher. CDIA asserted that the repositories "examine the information provided by a consumer, and where that information demonstrates that the account should be changed or deleted, the account is changed or deleted."[81] Similarly, TransUnion claimed that, "if the documentation [provided by a consumer] can be reasonably verified as being authentic, the account is automatically updated based on the documentation, in lieu of sending" a dispute to the furnisher.[82]

## C. CRA Forwards Dispute to Furnisher

Assuming the CRA does not resolve the dispute itself, the CRA must provide notice of the dispute to the entity that furnished the disputed information, along with "all relevant information regarding the dispute that the CRA has received from the consumer," within five business days after receiving the consumer's dispute.[83]

### 1. How CRA Conveys Dispute to Furnisher

When a consumer contacts a CRA to dispute information on the consumer's credit report, the consumer generally is asked to provide the name of the furnisher that reported the disputed item, the account number relating to the disputed information, the reason for the dispute, and certain identifying information (e.g., date of birth, Social Security number, and current address).[84] A CRA employee typically fills out a consumer dispute verification ("CDV") form based on the information the consumer provides. The CRA either sends the CDV to the furnisher via mail or fax, or electronically in the form of an Automated Consumer Dispute Verification ("ACDV"). (An example of an ACDV form is attached as appendix C.) After investigating the disputed information, the furnisher fills in relevant portions of the CDV or ACDV and returns it to the CRA.

CRAs and furnishers also communicate through Universal Data Forms ("UDFs"). Like CDVs and ACDVs, UDFs are used by furnishers to notify CRAs that information the furnisher

---

[80]  Comment of consumer groups, at 6.

[81]  CDIA Communication 01/12/05, *supra* note 55, at 3. CDIA added that CRAs "also keep in mind that credit repair [organizations] can and do submit falsified documents, including forged letters from credit grantors which advise a consumer reporting agency to delete accurate information." *Id.*

[82]  Comment of TransUnion, at 5.

[83]  FCRA § 611(a)(2).

[84]  *See*, e.g., www.transunion.com, "Dispute"; www.equifax.com, "Online Dispute"; www.experian.com, "Submit a Dispute Online."

  
has reported should be deleted or modified in some way. Unlike CDVs and ACDVs, however, UDFs are initiated by furnishers, rather than by CRAs. For example, if a consumer contacts a furnisher directly to dispute the accuracy of an item that the furnisher has reported to a CRA, and the furnisher determines that the information is inaccurate, the furnisher generally would use a UDF to notify the CRA of the inaccuracy.[85] UDFs sent electronically are referred to as Automated Universal Data forms ("AUDs").

The credit reporting industry's current electronic dispute processing system is known as e-OSCAR[86] ("Online Solution for Complete and Accurate Reporting"). The system is web-based and permits furnishers to receive and send ACDVs, and send AUDs, over the Internet.[87] On the ACDVs they send through e-OSCAR, CRAs provide the furnisher with identifying information about the consumer in the CRA's file; one or two codes summarizing the consumer's dispute; and, if the CRA deems it necessary, a free-form narrative field that supplements the dispute codes.[88] CRAs select the dispute codes from among twenty-six offered by the e-OSCAR system, such as "Not his/hers" and "Claims account closed." CDIA provided the full list of codes to the FTC and the Board but declined to release the list for use in this report, citing concerns that the codes are confidential and that credit repair organizations would misuse their knowledge of the dispute codes to have accurate information removed from consumers' files.[89]

According to CDIA, as of December 2004, e-OSCAR had nearly 15,400 registered users[90] and more than 83% of all disputes were being processed on the e-OSCAR system.[91] The remaining disputes currently are processed through paper CDVs. When a consumer contacts a repository to dispute an item reported by a furnisher that does not participate in e-OSCAR, the

---

[85] FCRA section 623(a)(2) requires that if a furnisher determines that information the furnisher has reported to a CRA is incomplete or inaccurate, the furnisher (1) must promptly notify the CRA of that determination and provide any information necessary for the CRA to make the information complete and accurate and (2) may not furnish the incomplete or inaccurate information to the CRA in the future.

[86] *See* CDIA, "What Is e-OSCAR?" at www.e-oscar.org.

[87] *Id.* Because e-OSCAR is web-based, furnishers are able to avoid the cost of purchasing and updating software. CDIA, "Benefits," www.e-oscar.org/benefits.htm. FCRA section 611(a)(5)(D) requires the nationwide CRAs to implement an automated system through which furnishers may report the results of their investigations to all nationwide CRAs to which the furnishers reported the disputed information. The e-OSCAR system permits such reporting by furnishers.

[88] Comment of CDIA, at 5; Comment of TransUnion, at 4; CDIA Communication 01/12/05, *supra* note 55, at 2.

[89] "Credit repair organizations" generally offer to remove, or assist consumers in removing, derogatory information from consumers' credit files. *See* 15 U.S.C. § 1679b(3) (defining "credit repair organization"). Because of deceptive practices used by many credit repair organizations, Congress enacted the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j, in 1996. TransUnion estimates that between 12% and 20% of all requests for reinvestigations are generated by credit repair organizations. Comment of TransUnion, at 8. Two furnishers, on the other hand, asserted that few, if any, disputes they received came from credit repair organizations. Comment of Coalition, at page 4 of Coalition's attachment; Comment of Zions, at 1.

[90] CDIA Communication 01/12/05, *supra* note 55, at 2.

[91] *Id.* TransUnion estimates that approximately 86% of its dispute notices are sent to e-OSCAR participants; the remaining 14% are sent to paper-based furnishers. Comment of TransUnion, at 6.

repository submits a paper CDV by mail or fax to the furnisher that reported the disputed data. The furnisher investigates the disputed data and returns the paper CDV to the repository, which then uses the information to update the consumer's file as necessary.[92] Some CRAs convey disputes to furnishers through telephone calls. While repositories generally do not use this method,[93] resellers often do, conducting three-way calls with the consumer and the furnisher that reported the disputed item.[94] According to the National Credit Reporting Association (NCRA), a trade association that represents many resellers, resellers generally are willing to provide disputes to furnishers by whatever means the furnisher demands.[95]

Each of the three repositories, however, has announced plans to stop accepting paper-based disputes and require all furnishers to participate in e-OSCAR.[96] MBA commented that it is unclear whether all mortgage servicers or other creditors have access to e-OSCAR.[97] Several furnishers have responded to the repositories' plans to stop accepting paper-based disputes by stating that they will refuse to pay the fee to use e-OSCAR.[98] As a result, these furnishers argue, any disputed information that they report will be deleted because the furnisher has no other way to respond to the dispute.[99] To avoid this, MBA recommended in its comment letter that there be a free alternative to e-OSCAR for CRAs to accept corrections from furnishers.[100]

## 2. "All Relevant Information"

As noted above, when CRAs send disputes to furnishers, the FCRA requires them to include "all relevant information regarding the dispute that the agency has received from the consumer."[101] Comments reflected differing views on whether the current system sufficiently provides "all relevant information" for all disputes. The consumer groups commented that consumers often supply CRAs with information and documentation sufficient to support their disputes (including account applications, billing statements, and letters), but CRAs neither

---

[92]   CDIA Communication 01/12/05, *supra* note 55, at 3.

[93]   *Id.* at 2.

[94]   Resellers are discussed in more detail in section II.A of this report.

[95]   Comment of NCRA, at 2. As discussed more fully in section IV.D.2, NCRA commented that furnishers vary in the degree to which they cooperate when resellers convey consumer disputes to them.

[96]   Comment of CDIA, at 2; Comment of TransUnion, at 4; Comment of Equifax, at 4; Comment of MBA, at 10.

[97]   Comment of MBA, at 3.

[98]   Comment of Ford County Bank, at 1. Similarly, in the course of a Federal Reserve bank examination, a state member bank stated that because it received so few disputes, it decided not to pay the fee to correct information with the CRA. Furnishers that participate in e-OSCAR are charged $0.25 each time they receive an ACDV or send an AUD. They pay a minimum charge of $21 each quarter, regardless of the number of e-OSCAR transactions they conduct during that period. CDIA, "e-OSCAR Costs," at www.e-oscar.org/costs.htm.

[99]   Comment of Ford County Bank, at 1. *See* FCRA § 611(a)(5)(A).

[100]   Comment of MBA, at 11.

[101]   FCRA § 611(a)(2)(A).

review the documentation nor forward it to furnishers.[102] The consumer groups asserted that the twenty-six dispute codes CRAs use in ACDVs and CDVs to describe consumer disputes convey only "generic descriptions" of the disputes.[103]

A number of furnishers commented that the dispute codes are "vague and broad," and that the CRAs do not always provide sufficient information.[104] The Coalition to Implement the FACT Act reported that a significant volume of current disputes—according to some Coalition members, 30%–40% of all disputes—are assigned generic, or "catch-all," dispute codes, such as "other" or "consumer complains data inaccurate; no specific dispute." According to the Coalition, the use of these catch-all codes makes investigations time-consuming and costly.[105] At the same time, most furnishers reported that the information provided to them through e-OSCAR usually is sufficient to investigate the dispute.[106] According to CDIA, the free-form field is used in 30% of all disputes processed through e-OSCAR.[107] MBA also noted that, while the information its members receive from CRAs is often cursory, it generally is not problematic, adding that the bank can contact the borrower directly for information.[108]

According to CDIA, the e-OSCAR system as it currently exists already conveys all relevant information.[109] The two repositories that submitted comments, TransUnion and Equifax,

---

[102]  Comment of consumer groups, at 2, 5–6.

[103]  Comment of consumer groups, at 7.

[104]  Comment of BB&T, at 6; Comment of MBA, at 9; Comment of Wells Fargo, at 5; Comment of ABA, at 4; Comment of Zions, at 4; Comment of Coalition, at 2–3; Comment of MBNA, at 3–4.

[105]  Comment of Coalition, at 2. The Coalition recommended that several of these catch-all dispute codes be made more precise. *Id.* The Coalition noted, however, that those members that addressed whether the information from the CRAs is sufficient to conduct an investigation reported that the information is almost always sufficient. *Id.* at 4.

[106]  Comment of Coalition, at 1; Comment of MBNA, at 2; Comment of Ford County Bank, at 1; Comment of ABA, at 4; Comment of Wells Fargo, at 5; Comment of Juniper, at 4.

[107]  CDIA Communication 01/12/05, *supra* note 55, at 2 n.2.

[108]  Comment of MBA, at 9.

[109]  Comment of CDIA, at 7.  The courts that have addressed the issue of whether the ACDV system and its use of codes to convey the relevant consumer information complies with the FCRA have concluded that, at least in concept, it does. *See* Davis v. Equifax Information Services LLC, 346 F. Supp. 2d 1164, 1176 (N.D. Ala. 2004) (where consumer did not know what information CRA asked furnisher to investigate and consumer's only evidence that CRA failed to convey "all relevant information" to furnisher was fact that CRA conveyed the information electronically, court granted summary judgment for CRA); Perry v. Experian Info. Solutions, No. 05C1578, 2005 U.S. Dist. LEXIS 26040, *22-23 (N.D. Ill. Oct. 28, 2005) (based on scant information in consumer's dispute letters, CRA's reinvestigation using ACDVs was reasonable); and Lee v. Experian Info. Solutions, No. 02C8424, 2003 U.S. Dist. LEXIS 17420, at 19–20 (N.D. Ill. Oct. 2, 2003) ("[T]he CDV procedure alone is accepted by courts as an adequate method both for assuring accuracy and for reinvestigation" (citing Dickens v. TransUnion Corp., 18 Fed. Appx. 315, 319 (6th Cir. 2001))). Several courts, however, have found that under particular circumstances, the CRA should take additional steps to override or correct the standard procedures when it knows or should know those procedures are not functioning properly in that case. *See* Apodaca v. Discover Financial Services, 2006 U.S. Dist. LEXIS 12505, *32 (D.N.M. Mar. 2, 2006) (where potential harm to the consumer is great and the consumer provides specific and detailed information, a rational factfinder may find this "weigh[s] strongly in favor of investing the resources necessary to complete a more thorough investigation that goes beyond the minimal CDV procedure," which the CRA knew would be inadequate to correct the problems created by its reporting procedures); and Soghomonian v. U.S., 278 F. Supp. 2d 1151, 1157 n.3 (E.D. Cal. 2003) (CRA acted unreasonably in failing to provide furnisher with copy of IRS

agreed.[110]  CDIA reported that 22% of consumer disputes submitted to the repositories are
submitted by telephone,[111] and that many other disputes are submitted on the standardized
form that CRAs provide when they give consumers copies of their consumer reports. Thus,
CDIA commented, most disputes are not accompanied by additional relevant information.[112]
TransUnion also reported that most consumer disputes it receives do not reference or contain any
specific information or documentation.[113] CDIA added that, "due to credit repair activity or even
individual choices, not all information or documentation that a consumer submits is truthful or
authentic, nor are all requests for reinvestigations valid."[114]

TransUnion stated that it typically does not supply copies of consumer-supplied
documentation to furnishers but added that, "if the documentation can be reasonably verified
as being authentic, the account is automatically updated based on the documentation, in lieu
of sending an ACDV or CDV."[115] Equifax noted that it currently provides two methods of
supplementing the e-OSCAR dispute codes and free-form field: (1) a copy of the documentation
can be faxed to the furnisher as appropriate and (2) furnishers can contact CRAs with questions
they have about a particular dispute.[116]

In April 2006, CDIA stated that its members "have continued to research both the
technological and legal questions that might arise from providing consumer-submitted
information directly to data furnishers."  It concluded that "the viability of the concept of making
consumer-submitted information available through the e-OSCAR system to data furnishers is
now questionable."[117]

---

document supplied by the plaintiffs that proved the plaintiffs' tax lien had been extinguished). Thus, the issue of whether the
CRA has conveyed "all relevant information" is a fact-dependent one.

[110]   Comment of TransUnion, at 6; Comment of Equifax, at 7.

[111]   CDIA Communication 01/12/05, *supra* note 55, at 3 n.4.

[112]   Comment of CDIA, at 6. CDIA's members report that they do not have a tracking mechanism that allows them to report on
how many written disputes are submitted using only a standardized form and how many contain additional documentation.
CDIA Communication 01/12/05, *supra* note 55, at 3.

[113]   Comment of TransUnion, at 6.

[114]   Comment of CDIA, at 7.

[115]   Comment of TransUnion, at 5.

[116]   Comment of Equifax, at 7.

[117]   Communication from CDIA to the Division of Privacy & Identity Protection, Federal Trade Commission (Apr. 14, 2006)
(on file with the Division of Privacy & Identity Protection). Among other things, CDIA noted that some consumers submit
disputes with information about different accounts and furnishers commingled, and that it was unclear whether individual
furnishers should be permitted to *see* information other than that which relates to their account. According to CDIA, masking
or editing consumer documents to maintain privacy would be technologically difficult. In its original comment letter, CDIA
had stated that under the e-OSCAR system, "it has become feasible to consider some additional enhancements to an already
successful technology. Discussions have begun on a means of delivering or making available consumer documentation,
submitted to a consumer reporting agency along with a dispute, to data furnishers to ensure that a furnisher can more fully
consider a consumer's dispute." Comment of CDIA, at 5.

## D.  Furnisher Investigates and Sends Response to CRA

### 1. Furnisher's Investigation

A furnisher that receives notice of a dispute from a CRA is required to

(A)  conduct an investigation with respect to the disputed information;

(B)  review all relevant information provided by the consumer reporting agency . . .;

(C)  report the results of the investigation to the consumer reporting agency; and

(D)  if the investigation finds that the information is incomplete or inaccurate, report those results to all other [nationwide] consumer reporting agencies to which the person furnished the information.[118]

Whether a furnisher's actions constitute a sufficient investigation depends on a number of factors, including the information the furnisher received about the dispute and the steps the furnisher takes to investigate the dispute.[119]

According to the consumer groups, "regardless of where the dispute is made (directly with the furnisher or through a CRA), furnishers are simply *not* conducting meaningful reinvestigations; they do *not* train their employees on effective reinvestigation procedures; and they repeatedly default simply to verifying the existence of an account."[120] The consumer groups

---

[118]  FCRA § 623(b)(1). The FACT Act imposes additional duties on furnishers, described in appendix F of this report.

[119]  Examples of courts ruling that a furnisher's investigation was sufficient include Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005) (investigation was reasonable where CRA did not inform furnisher that plaintiff was victim of identity theft and furnisher verified name, address, and date of birth of account and reported to CRA that account belonged to plaintiff); Malm v. Household Bank, N.A., 2004 U.S. Dist. LEXIS 12981, *14-15 (D. Minn. July 7, 2004) (where CRA's CDV stated only "Not his/hers. Provide complete ID" and did not specify that plaintiff believed account belonged to ex-wife only, or that she forged his signature to open it, furnisher conducted reasonable investigation by verifying that plaintiff's personal information matched its records and updating account balance; furnisher did not have to review the actual credit card application). Other courts, however, have ruled that a furnisher's investigation was or might have been insufficient. *See, e.g.*, Johnson v. MBNA, 357 F.3d 426, 431-32 (4th Cir. 2004) (upholding jury verdict finding that credit card issuer's investigation was not reasonable where company was notified that consumer disputed that she was co-obligor on the account and company reviewed only information in its computerized customer information system and did not consult underlying documents, such as account applications); Schaffhausen v. Bank of America, 393 F. Supp. 2d 853, 858 (D. Minn. 2005) ("Bank of America's convoluted and inconsistent responses to the CRAs' inquiries … create at least a jury question as to the reasonableness of BOA's procedures."); Bruce v. First U.S.A. Bank, 103 F. Supp. 2d 1135, 1143 (E.D. Mo. 2000) (court held that standard for reasonable investigation for furnishers is analogous to that of CRAs, and found issues of material fact where furnisher reviewed only its internal records, which revealed that signature on credit application did not match plaintiff's signature, and furnisher did not contact either the plaintiff or his ex-wife regarding allegations of fraud).

[120]  Comment of consumer groups, at 4 (emphasis in original). NAMB reported that in some cases, instead of confirming that the furnisher cannot validate the information, the furnisher will do nothing, or actually report back to the CRA that the information is accurate as reported. Comment of NAMB, at 4. NAMB also commented that there are times when the furnisher is, in fact, given conclusive information about the disputed information, but the corrections or modifications reported back to the CRA are not accurate—e.g., discharge dates are reported inaccurately or balances are not indicated accurately as zero. *Id.*

assert that furnishers rarely research the underlying dispute, review documents, or analyze the furnishers' own data for inconsistencies and errors.[121]

Other commenters provided varying information on the level of investigation that furnishers conduct in response to disputes. Several furnishers commented that they compared the information provided on the dispute notice with the information contained in the furnishers' records.[122] Wells Fargo and Company (Wells Fargo) indicated that such information could include the

- consumer's name, address, and Social Security number;

- consumer's account number;

- account payment history;

- account servicing notes and collection notes;

- loan documents; and

- deferral, modification, and extension history.[123]

Similarly, Zions Bancorporation (Zions) indicated that its consumer loan servicing department researches the account history to match the consumer's identifying information and to determine the timing of the payment compared to the payment due dates.[124] If the department's staff members determine that they reported incomplete or inaccurate information, they send a correction to CRAs through the e-OSCAR system.[125]

Some commenters stated that furnishers generally correct their internal records to ensure that the incorrect information is not re-reported to CRAs.[126] In some cases, the furnisher will also send a letter to the consumer indicating that the information was incomplete or inaccurate and that a correction will be made.[127] NAMB asserts, however, that some furnishers do not correct their internal records, and, as a result, the incorrect information is reinserted into the consumer's file at the CRA the next time the furnisher sends an electronic update to the CRA.[128] As amended by the FACT Act, however, the FCRA now requires furnishers to delete, modify, or permanently block the reporting of disputed information that is found to be inaccurate or incomplete or

---

[121] Comment of consumer groups, at 4.

[122] Comment of Wells Fargo, at 4; Comment of MBA, at 6–7, 9; Comment of Juniper, at 4; Comment of Zions, at 4.

[123] Comment of Wells Fargo, at 5.

[124] Comment of Zions, at 4.

[125] *Id.* at 3.

[126] Comment of MBA, at 10; Comment of Wells Fargo, at 6; Comment of Zions, at 5; Comment of Juniper, at 4–5; Comment of BB&T, at 7; Comment of CDIA, at 7.

[127] Comment of MBA, at 10.

[128] Comment of NAMB, at 3, 6.

cannot be verified.[129] This change is likely to reduce the instances of incorrect information being reinserted.

### 2.   Furnisher Communicates Results to CRA

If a furnisher determines that the information in dispute is neither incomplete nor inaccurate, the furnisher generally selects "Verified as Reported" on the ACDV or CDV and returns it to the CRA.[130] If, instead, the furnisher determines that the information the consumer disputed is incomplete or inaccurate, the furnisher generally makes the correction on the ACDV or CDV and returns it to the CRA.[131] If the furnisher is using e-OSCAR, the system forwards the information automatically to any other nationwide CRA to which the furnisher reported the disputed item.[132] According to CDIA, e-OSCAR also edits for illogical furnisher responses and provides furnishers with an error message if the data they enter in responding to a dispute are inconsistent with the dispute code.[133] MBA commented that disputes returned to CRAs through e-OSCAR are more quickly reflected in consumers' credit reports than are disputes conveyed to CRAs through paper.[134]

In contrast to the experience of the repositories, the National Credit Reporting Association commented that where the dispute has been reported to a reseller and then forwarded to the furnisher, furnisher practice varies. Some furnishers provide the correct information to the reseller and then forward the correction to the proper repository. Other furnishers do not respond at all, causing the reseller to delete the disputed information, whether it is accurate or not.[135] The FACT Act amended the FCRA to no longer require resellers to forward disputes to the furnisher that reported the disputed item. Instead, resellers generally are permitted to forward the consumer dispute to the CRAs from which they obtained the disputed item ("source CRA").[136] The source CRA then must reinvestigate the dispute as if it had come directly from the consumer. This new process is likely to alleviate the problems that the NCRA described.

---

[129]   FCRA § 623(b)(1)(E), added by FACT Act § 314.

[130]   Comment of Juniper, at 5; Comment of BB&T, at 7; Comment of Wells Fargo, at 6; Comment of CDIA, at 7; Comment of Equifax, at 7; Comment of TransUnion, at 7.

[131]   Comment of MBA, at 10; Comment of Wells Fargo, at 6; Comment of Zions, at 5; Comment of Juniper, at 4–5; Comment of BB&T, at 7; Comment of BECU, at 3; Comment of CDIA, at 7; Comment of TransUnion, at 7.

[132]   CDIA Resource Guide, *supra* note 56, at 14-3; CDIA, "e-OSCAR Benefits," at www.e-oscar.org/benefits.htm; Comment of Equifax, at 3. As noted above, the FCRA was amended in 1996 to require nationwide CRAs to implement an automated system through which furnishers may report the results of their investigations to all nationwide CRAs to which the furnisher reported the disputed information. FCRA § 611(a)(5)(D).

[133]   CDIA Resource Guide, *supra* note 56, at 14-3.

[134]   Comment of MBA, at 10.

[135]   Comment of NCRA, at 2.

[136]   FCRA § 611(f), added by FACT Act § 316.

If a consumer continues to dispute information after the formal dispute process has been concluded, some furnishers offer the consumer the option of submitting additional evidentiary information that the furnishers then review.[137] Under the FCRA, the consumer has a right to include a statement of dispute in the consumer report if the reinvestigation does not resolve the dispute.[138] Several furnishers commented that they advise consumers of this option, although some commenters questioned its value.[139] TransUnion reported that approximately 4% of all consumer file disclosures result in a statement of dispute being added to the file after the repository completed its reinvestigation.[140] Of the 18% of consumers in the GAO survey who disputed information in their file and either (1) the information was not deleted from their files or (2) they did not know whether the information was deleted, 30% submitted such a dispute statement to the CRA.[141]

### 3. Furnishers' Response Times and Rates

Based on the information that the FTC and the Board reviewed, it appears that most disputes are processed in the statutory time frame, regardless of whether they are processed by e-OSCAR or by fax and mail. According to CDIA, e-OSCAR allows furnishers to prioritize all disputes to ensure that the most urgent ones are processed first and that all disputes can be processed within the time frames established by the FCRA.[142] As the time limit for responding to a dispute approaches, e-OSCAR notifies the furnisher of the impending deadline.[143]  CDIA noted that, of the disputes that all three repositories sent through e-OSCAR in April 2004, furnishers responded within the following time periods:

- ◆ 54% within 0–7 days;

- ◆ 18% within 8–14 days;

- ◆ 22% within 15–30 days; and

---

[137]   Comment of MBA, at 11; Comment of BECU, at 4; Comment of Juniper, at 5.

[138]   FCRA § 611(b).

[139]   Comment of ABA at 4; Comment of Zions, at 5. However, Juniper stated that these post-investigation dispute statements are not very helpful to consumers, because credit scoring models do not take the statements into account. Comment of Juniper, at 3. A leading producer of credit scoring models, Fair Isaac Corp., reported that, although its scoring models do not take post-investigation dispute statements into consideration when calculating "FICO scores," the models do consider disputes that are still being investigated. The Fair Isaac representative added that some lenders may choose to consider post-investigation statements in their credit decisions. E-mail from Karlene E. Bowen, Director-Client Relationships, Fair Isaac Corp., to the Division of Financial Practices, Federal Trade Commission (Jan. 12, 2005, 23:32 EST) (on file with the Division of Privacy & Identity Protection).

[140]   Comment of TransUnion, at 7. As noted in section IV.A, CDIA reported that 21.8% of the file disclosures issued by the repositories to consumers in 2003 led to a reinvestigation by one of the repositories.

[141]   2005 GAO Report, *supra* note 63, at 67–68.

[142]   Comment of CDIA, at 6.

[143]   Comment of Equifax, at 7; Comment of CDIA, at 6; Comment of Wells Fargo, at 5.

◆ 6% did not respond within 30 days.[144]

CDIA also supplied statistics (*see* appendix E) showing the July 2004 response rates of furnishers that responded to one of the three repositories using e-OSCAR and furnishers that responded to the repository in paper form.[145] According to CDIA, as of day 10, 50.98% of the e-OSCAR furnishers had responded to this CRA regarding the disputes forwarded to them by the repository. At the same time, 24.33% of paper-based furnishers had responded. By day 20, 79.47% of e-OSCAR furnishers and 71.50% of paper-based furnishers had responded. By the end of the month, e-OSCAR furnishers had responded to 94% of the disputes from the repository, and paper-based furnishers had responded to 82%.

A number of furnishers reported that disputes received from CRAs by paper or by e-OSCAR are normally resolved within twenty days, and often within the first five days after receipt.[146] The Coalition to Implement the FACT Act (Coalition) reported that its members meet the FCRA's thirty-day response requirement 100% of the time when using e-OSCAR.[147]

The consumer groups commented that the length of time CRAs and furnishers take to complete reinvestigations generally is not a problem, and that reinvestigations usually are finished very quickly through the e-OSCAR system.[148]

### E.  CRA Communicates Reinvestigation Results to Consumer

If a furnisher does not respond to the CRA within the 30-day period established by the FCRA, the CRA is required to treat the disputed information as unverifiable and delete the information.[149] TransUnion stated that if a response is not received within twenty-eight days, the information in dispute is automatically deleted from the consumer's credit file.[150]

Of the 18% of consumers in the GAO study who had disputed information in their files, 69% reported that the disputed information had been removed from their credit files. Another 23% reported that their disputed information had not been removed, and 7% said they did not know

---

[144]  Comment of CDIA, at 3.

[145]  Communication from CDIA to the Division of Financial Practices, Federal Trade Commission (Feb. 2, 2005) (on file with the Division of Privacy & Identity Protection).

[146]  Comment of Wells Fargo, at 5; Comment of BECU, at 4; Comment of Zions, at 4. *See also* Comment of Coalition, at 5 and pages 8–9 of Coalition's attachment; Comment of MBNA, at 5; Comment of MBA, at 6, 9 (which mentions disputes communicated by paper).

[147]  Comment of Coalition, at 5; Comment of MBNA, at 5.

[148]  Comment of consumer groups, at 5.

[149]  The FCRA mandates that CRAs modify or delete disputed information if the furnisher does not verify it within the thirty-day reinvestigation period. FCRA § 611(a)(5)(A). *See also* Comment of BECU, at 3; Comment of Juniper, at 4; Comment of CDIA, at 6.

[150]  Comment of TransUnion, at 5.

whether it had been removed.[151] Of those consumers in the survey who reported that information they disputed had been removed, approximately 72% said the information was not reinserted later, 13% reported that the information had been reinserted, and 15% did not know.[152]

CDIA provided the following data for the first five months of 2004, showing the resolution of disputes processed through the e-OSCAR system.[153]

| Result of Dispute | % of Disputes |
| --- | --- |
| Data modified per data furnisher's instructions | 53.64 |
| Information verified as reported | 22.37 |
| Data deleted per data furnisher's direction | 17.74 |
| Data deleted due to furnisher not responding within the thirty-day period | 6.27 |

We note that the percentage of consumers in the GAO survey who reported that disputed information had been removed from their file—69%—is similar to the percentage of consumers whose disputed information was either modified or deleted based on the furnisher's instructions—71.38%. According to CDIA, however, with respect to the "Data modified per data furnisher's instructions" category, the data may have been modified due to an update of information, rather than the data being found to be inaccurate as of the date reported.[154] With respect to the fourth category—data deleted due to the furnisher not responding within the thirty-day period—CDIA stated that it cannot be determined whether these data were accurate.[155]

TransUnion noted that it identified approximately 5% of disputes as "repeats," meaning that the repository recently processed the same dispute and the consumer has provided no new information.[156] In such cases, TransUnion may treat the dispute as frivolous and notify the consumer accordingly, without sending a dispute notice to the furnisher.[157]

---

[151]   2005 GAO Report, *supra* note 63, at 32.

[152]   *Id.* at 32, 67. If an item is deleted from a consumer's file because a reinvestigation finds that the item is inaccurate, incomplete, or could not be verified, the CRA may not reinsert the item in the consumer's file unless the entity that furnished the item certifies that the item is complete and accurate and the CRA notifies the consumer of the reinsertion. FCRA § 611(a)(5)(B). CRAs also must maintain reasonable procedures designed to prevent the reappearance of previously deleted items in a consumer's file and in consumer reports issued about the consumer. FCRA § 611(a)(5)(C).

[153]   Communication from CDIA to the Division of Financial Practices, Federal Trade Commission (Oct. 26, 2004) (on file with the Division of Privacy & Identity Protection).

[154]   Statement of Stuart K. Pratt, *supra* note 28, at 14.

[155]   *Id.*

[156]   TransUnion reported that it does not treat as "repeats" disputes containing additional information, or those made after a reasonable length of time has passed since the last dispute. Comment of TransUnion, at 7.

[157]   Comment of TransUnion, at 7.

## F.  Consumer Disputes Information Directly to Furnisher

In addition to disputes received from CRAs, furnishers also receive disputes directly from consumers about information reported to CRAs. As noted earlier, of the consumers in the GAO survey who said they disputed information in their credit files, 32% reported that they disputed with a CRA only, 29% reported that they disputed with the creditor only, and 30% reported that they disputed with both a CRA and the creditor.[158] Furnishers that submitted comments generally reported that they receive most of their disputes from CRAs.[159] As discussed above, until the new consumer-direct-dispute provision of the FACT Act takes effect, the FCRA does not specifically require that furnishers investigate disputes conveyed directly to them by consumers.[160] However, the FCRA does (1) prohibit furnishers that report regularly from reporting information they have determined is inaccurate and (2) require them to report corrected information.[161]

Some furnishers that commented reported that they provide or plan to provide a specific address or other information sufficient for consumers to initiate a dispute directly with them.[162] For example, Juniper Bank reported that it provides a specific address for direct disputes on all of its monthly billing statements.[163] Similarly, Wells Fargo commented that while some of its divisions and affiliates already do so, virtually all of them plan to begin providing addresses soon to consumers who want to dispute information directly.[164] Some furnishers do not provide a specific address dedicated to receiving disputes on information reported to CRAs, but instead provide general contact information that consumers can use to raise complaints and inquiries generally, including disputes on information provided to CRAs.[165] Furnishers that did not provide a specific address for reporting disputes directly provided various reasons for not doing

---

[158]  2005 GAO Report, *supra* note 63, at 67.

[159]  Comment of Coalition, at 3 and page 5 of attachment; Comment of MBNA, at 4; Comment of Wells Fargo, at 2; Comment of BB&T, at 4; Comment of ABA, at 2; Comment of MBA, at 6; Comment of Juniper, at 1; Comment of Zions, at 2 (regarding its mortgages). Zions, for example, reported that its Consumer Loan Servicing Department receives 60% of its disputes through CRAs, 20% directly from consumers, and 20% from internal requests. Comment of Zions, at 1. On the other hand, some furnishers suggested that a higher percentage of their disputes came from consumers. BECU reported that it received only half of its disputes through CRAs and the other half directly from consumers. Comment of BECU, at 1. One community bank in the Coalition's survey reported that 100% of the disputes it receives come directly from consumers. Comment of Coalition, at page 5 of attachment.

[160]  *See* FCRA § 623(a)(8), added by FACT Act § 312(c).

[161]  FCRA § 623(a)(2).

[162]  Comment of Coalition, at 3; Comment of MBNA, at 4; Comment of Wells Fargo, at 2; Comment of Juniper, at 2. The FCRA currently does not require furnishers to provide consumers with a specific address for submitting disputes, but furnishers that provide such an address are exempt from certain kinds of liability under the FCRA. *See* FCRA § 623(a)(1). In addition, as required by the FACT Act, the FTC and the federal financial regulators will promulgate rules that will require consumers who wish to submit disputes directly to furnishers to do so at "the address specified by the [furnisher] for such notices." *See* FCRA § 623(a)(8)(D), added by FACT Act § 312.

[163]  Comment of Juniper, at 2.

[164]  Comment of Wells Fargo, at 2.

[165]  Comment of ABA, at 2; Comment of MBA, at 2.

so, including that (1) such disputes represent too small a percentage of the total inquiries and disputes received to justify establishing a specific address for such disputes; (2) a specific address would not be provided at a useful time; while the address would appear on initial disclosures or periodic statements, consumers generally learn of potential inaccuracies from receiving and reviewing consumer reports—not from the disclosures; and (3) the more appropriate address to publicly disclose is that of the three repositories.[166]

Whether or not a furnisher provides a specific address for receiving disputes directly from a consumer, most furnishers reported that they use a similar procedure for investigating direct disputes as they use for disputes received through a CRA,[167] including making any necessary corrections by sending the results of their investigations through e-OSCAR or in paper form.[168] Some furnishers commented that, upon receiving disputes directly from consumers, they compare information and documentation submitted by the consumers to information contained in their files.[169] In some cases, furnishers send letters to consumers notifying them that the information will be corrected.[170] Furnishers also report updating their own records to ensure that the erroneous information does not "re-pollute" the CRA's files when the furnisher sends its next monthly update.[171] If the information is found to be accurate, a letter may be sent to the consumer and reporting continues as before.[172] In general, the furnisher commenters stated that they investigate and attempt to resolve disputes directly from consumers as soon as possible, usually within one to twenty—and no more than thirty—days.[173]

Several furnishers reported that while most consumers provide sufficient information for the furnisher to investigate the consumer's dispute,[174] disputes received directly from consumers sometimes lack clarity as to the precise information disputed or fail to provide information sufficient to justify the dispute. According to the Coalition, for example, one of its members reported that 30% of all direct consumer disputes it receives fall into this category;

---

[166] Comment of ABA, at 2; Comment of BB&T, at 2; Comment of Ford County Bank, at 1.

[167] Comment of MBA, at 6–8; Comment of BECU, at 1–2; Comment of ABA, at 2–3; Comment of Wells Fargo, at 2–5; Comment of Juniper, at 3; Comment of BB&T, at 4; Comment of Zions, at 2.

[168] Comment of MBA, at 6–7; Comment of ABA, at 3; Comment of Wells Fargo, at 2; Comment of Zions, at 2; Comment of Juniper, at 2; Comment of BECU, at 2–3; Comment of BB&T, at 4.

[169] Comment of MBA, at 6–7; Comment of Wells Fargo, at 2. As described above, the consumer groups maintain that furnishers typically are not consulting underlying documents when investigating disputes. *See supra* section IV.D.1.

[170] Comment of MBA, at 7; Comment of Zions, at 2.

[171] Comment of MBA, at 6–7; Comment of Juniper, at 2; Comment of Zions, at 3; Comment of BB&T, at 4. As described above, NAMB reports that some furnishers are not correcting the information in their own records. *See supra* note 126 and accompanying text.

[172] Comment of BECU, at 2–3; Comment of MBA, at 6–7; Comment of Zions, at 2.

[173] Comment of ABA, at 2–3; Comment of Wells Fargo, at 2; Comment of Juniper, at 2; Comment of BB&T, at 4; Comment of Zions, at 2; Comment of MBA, at 6; Comment of BECU, at 2.

[174] Comment of MBA, at 7; Comment of Juniper, at 2; Comment of Zions, at 3.

another member that is a major credit grantor reported that 40% of its direct disputes contained insufficient information to conduct an investigation.[175] The type of information that is usually missing from consumers in direct disputes includes the consumer's full account number, Social Security number, date of birth, and address.[176] MBA noted that, on occasion, a consumer will refuse to send in a copy of his or her credit report. If the mortgage furnisher is given the authority by the CRA to view its tradeline as it appears in the CRA's database without impacting the consumer's credit score (i.e., as an inquiry), the mortgage furnisher will do so if this is relevant to the dispute.[177] Several furnishers commented that when relevant information is missing, the furnisher generally contacts the consumer by telephone or mail to request the necessary additional information.[178]

## G. Commenters' Overall Views on the Dispute Process

The consumer groups and the credit reporting industry hold differing views on how well the current dispute process is working. The consumer groups maintain that the reinvestigation system in its current form is flawed because of what they regard as failures by both the CRAs and furnishers to conduct meaningful investigations of disputes.[179] As noted above, the consumer groups assert that CRAs typically do not provide furnishers with the documentation of the error that the consumer sent to the CRAs, that the CRAs generally do not review that documentation, and that the codes used by the CRAs to convey the nature of the dispute are too general and vague. The consumer groups also state that furnishers' investigations of disputed information are inadequate because they typically consist merely of verifying that their own records show that a debt exists.[180] They believe that CRAs and furnishers have little incentive to conduct thorough reinvestigations because such investigations are expensive and the relatively small number of lawsuits that CRAs and furnishers face for failing to conduct adequate investigations impose almost no economic cost.[181] According to the consumer groups, furnishers actually have an incentive to keep derogatory information in a consumer's credit file, "even if it is inaccurate …

---

[175]   Comment of Coalition, at 3–4. Wells Fargo commented that up to 25% of disputes it receives directly from consumers do not contain sufficient relevant information to conduct a proper investigation. Comment of Wells Fargo, at 3.

[176]   Comment of Coalition, at 3–4; Comment of MBNA, at 4–5; Comment of ABA, at 3; Comment of BECU, at 2; Comment of Zions, at 3. Some commenters suggested that one reason consumers may not provide full information is that credit reports typically do not show the full account number on specific accounts. Comment of NAMB, at 8; Comment of Zions, at 3.

[177]   Comment of MBA, at 7. Zions explained that it uses a service available through Experian, called "Bullseye," to obtain information on individual accounts. Comment of Zions, at 3.

[178]   Comment of Juniper, at 2; Comment of ABA, at 3; Comment of Coalition, at 3–4; Comment of MBNA, at 4–5; Comment of MBA, at 7.

[179]   Comment of consumer groups, at 2.

[180]   *Id.*

[181]   *Id.* at 9.

because the negative information limits the consumer's options to obtain other, less expensive debt, and is often the impetus to force a consumer to pay the furnisher even on an unjust claim."[182]

The consumer groups recommend that the current system be reformed to shift or counter these economic incentives. They suggest a role for lay advocates or independent third-party review in the reinvestigation system. They also recommend making statutory damages more readily available, so that CRAs and furnishers would take their duties more seriously.[183]

The consumer groups also suggest increasing the duties on furnishers as another option for improving the current system. These groups state that consumers currently have the impossible burden of proving that the disputed information is not correct to both furnishers and CRAs. They believe that the burden of proof should be shifted so that furnishers are required to rebut a consumer's specific disputes by providing documentation to the CRA that shows that the information furnished is correct. In particular, the consumer groups believe that furnishers should not be allowed simply to tell the CRA that the consumer is wrong and the original information was correct, and CRAs should not be allowed to accept such a report. Instead, the furnisher should be required to give the CRA the underlying information—copies of documents with original signatures to rebut a forgery claim, for example, or copies of the payment record to demonstrate that the claimed balance is correct. Then, the CRA should be required to evaluate the data and reach its own conclusions.[184]

The consumer groups believe that the dispute process should require, at a minimum, the following:

- ◆ CRAs to convey to furnishers the actual documents that support the consumer's dispute, with failure to do so being per se unreasonable;

- ◆ furnishers to reinvestigate, rather than merely verify, that the information appears in their records, including reviewing the actual documents provided by the consumer and, in appropriate circumstances, reviewing documents in the furnisher's possession or the possession of others;

- ◆ furnishers to respond specifically and in detail to the consumer's dispute and include enough material so that the CRA can evaluate the response and reach an independent conclusion;

- ◆ CRAs to review and evaluate furnishers' responses; and

---

[182] *Id.*

[183] *Id.*

[184] *Id.* at 8–10.

◆ CRAs to establish an appeals process that involves a telephone conference between the consumer and a CRA employee who has the consumer's dispute and all the documentation provided by the furnisher and the consumer.[185]

Approximately 100 consumers provided comments for this report, generally expressing a variety of problems they encountered in resolving their disputes.[186] For the most part, these individual accounts parallel the concerns raised by the consumer groups.

The California Association of Realtors recommended that sufficient financial penalties be imposed for violations of the FCRA to allow the FTC to protect the integrity of credit reports and to create the proper incentives for creditors and CRAs to comply.[187] The Mortgage Bankers Association recommended that the e-OSCAR system be changed to permit furnishers to submit comments to CRAs when they return ACDVs.[188]

Most industry commenters—furnishers and their trade groups and the repositories and their trade group—asserted that while there is still room for improvement, the current dispute process generally is working well, and that legislative and regulatory changes would not be appropriate at this time.[189] Visa U.S.A. Inc. (Visa), a membership organization composed of financial institutions, gave several reasons it believes that the current system is effective in removing inaccuracies.[190] First, Visa argued, financial institutions have strong incentives to investigate disputed information adequately in order to maintain good relationships with their customers. Visa also pointed out that, in providing information to CRAs, financial institutions typically report information as it appears that month in the institution's own records. According to Visa, financial institutions have strong incentives to ensure that their own records are accurate, because the records are essential for the institution's own collection activities and other important business purposes, for making reports to their federal and state bank regulatory agencies, and, where applicable, for making securities filings.

---

[185]  *Id.* at 10.

[186]  Certain furnishers also maintained that obtaining correction of erroneous information was difficult.  Comment of Coalition, at page 11 of Coalition's attachment; Comment of MBA, at 3.

[187]  Comment of California Association of Realtors, at 3.

[188]  Comment of MBA, at 12. According to CDIA, the "Remarks" field on the ACDV form does allow furnishers to convey certain additional information (e.g., that the account is being paid under a partial payment agreement or has been closed due to transfer) through codes describing the status of the accounts at issue. Communication from CDIA to the Division of Privacy & Identity Protection, Federal Trade Commission (July 21, 2006) (on file with the Division of Privacy & Identity Protection), at 1.

[189]  Comment of Coalition, at 1, 4; Comment of MBNA, at 2, 5; Comment of ABA, at 1–2, 4–5; Comment of Wells Fargo, at 6; Comment of Juniper, at 5; Comment of Visa, at 3–5; Comment of CDIA, at 7; Comment of TransUnion, at 7–9.

[190]  Comment of Visa, at 4–5.

Visa warned that any additional requirements and liability on furnishers would have a negative impact on the nationwide credit reporting and credit granting systems.[191] According to Visa, the more requirements imposed on, and the more liability risks incurred by, furnishers, the less likely it is they will continue to furnish information to CRAs. Visa noted that, should this occur, the entire nationwide credit system would suffer. A reduction in the supply of credit information, Visa argued, would increase the risks associated with extending credit because creditors would be required to make credit decisions on less complete information. The increased risk would be reflected in an increase in the costs consumers must pay for credit. Visa contended that this increased risk also would have an anticompetitive impact on financial institutions, where smaller lenders are less able to absorb the cost of this increased risk than larger lenders. Thus, smaller lenders could find it difficult to price their products to compete with larger lenders. Visa also warned that a shortage of consumer report information would decrease competition by making it difficult for creditors to serve consumers across the country through national credit programs. In addition, the types and amounts of credit available to consumers could be restricted.

Visa and Juniper also warned that potential changes in the dispute process (such as shorter time frames to investigate disputes) could impact industry's fraud prevention efforts.[192] Several commenters indicated that the financial industry continues to be plagued by "debt elimination" schemes and abuses by some borrowers and credit repair organizations that initiate disputes designed to overwhelm the dispute system, forcing removal of accurate, but unfavorable, information.[193] Visa warned that any changes to shorten the time periods to investigate and correct consumer report information would benefit credit repair organizations by forcing the deletion of correct, but unfavorable, information that cannot be verified in a shorter period.[194] According to Visa, this would lead to less accurate consumer report files and greater risk for

---

[191] *Id.* at 4.

[192] *Id.* at 3; Comment of Juniper, at 5. The National Association of Realtors, a trade group representing realtors, suggested shortening the reinvestigation period from thirty days in light of the increased use of technology and the consolidation of CRAs. This trade group suggested that shortening the reinvestigation period would force the CRAs to complete their reinvestigations faster, which would minimize the adverse impacts on consumers caused by incorrect information in their credit histories. Comment of National Association of Realtors, at 2–3. The consumer groups commented, however, that the length of time CRAs and furnishers take to complete reinvestigations usually is not a problem, because they ordinarily are finished quickly through the e-OSCAR system. Comment of consumer groups, at 5.

[193] Comment of Juniper, at 5; Comment of MBA, at 4; Comment of TransUnion, at 8. MBA and TransUnion suggested that changes should be made to curb these types of abuses. MBA suggested that limits should be placed on the number of disputes allowed to be filed by a consumer or credit repair organization within the investigation time period on the same issue on the same trade-line. Comment of MBA, at 11. *See also* Comment of BECU, at 4. TransUnion suggested expanding the definition of "credit repair organization" in the Credit Repair Organizations Act (CROA), 15 U.S.C. sections 1679-1679j, to include not-for-profit agencies and professional associations that advertise their credit repair or counseling services. CROA is intended to protect consumers from deceptive and abusive practices by companies engaged in credit repair. According to TransUnion, amending the definition of "credit repair organization" in this way would give consumers, CRAs, and furnishers a private right of action to enforce their rights under CROA against these entities. Comment of TransUnion, at 8.

[194] Comment of Visa, at 3.

creditors who rely on consumer reports to underwrite credit requests. Juniper argued that any new proposals need to be examined to ensure that they are not providing another avenue for individuals to avoid legitimate debt.[195]

Other commenters indicated that, given the FACT Act provisions, further legislative and regulatory actions are not needed at this time. The Coalition and MBNA report that to the extent problems have occurred, they almost entirely relate to cases of identity theft.[196] These commenters point out that the FACT Act contains a number of key provisions to deal with problems of identity theft and should be fully implemented before it is possible to determine whether there are any remaining reinvestigation issues. According to TransUnion, the improvements made through the 1996 FCRA amendments, combined with the as-yet unknown impact of the FACT Act's amendments concerning accuracy, reinvestigations, and the processing of consumer disputes by furnishers and resellers, make further statutory or regulatory changes inadvisable at this time.[197]

## V.   FCRA Enforcement

The FTC and the federal financial regulators are responsible for enforcing the FCRA.[198] The FTC's jurisdiction extends to all CRAs and other persons not specifically committed to another agency's jurisdiction.[199] The FTC does not formally examine its regulated entities for compliance with the FCRA, but rather conducts selected law enforcement investigations and brings legal actions against violators. The FTC has brought a number of actions against CRAs[200] and furnishers[201] for violations of the FCRA's dispute and accuracy provisions.

---

[195]   Comment of Juniper, at 5.

[196]   Comment of Coalition, at 4; Comment of MBNA, at 5.

[197]   Comment of TransUnion, at 7.

[198]   FCRA § 621. Other entities, such as the individual states, the U.S. Department of Transportation, and the U.S. Department of Agriculture, also have FCRA enforcement authority under certain circumstances.

[199]   FCRA § 621(a).

[200]   *See, e.g.*, United States v. Far West Credit, Inc., Civ. No. 2:06CV00041-TC (D. Utah 2006) (consent decree settling charges that reseller failed to follow reasonable procedures to ensure the accuracy of its reports); First American Real Estate Solutions, LLC, 127 F.T.C. 85 (1999) (consent order with reseller concerning the reinvestigation obligations of CRAs). The FTC also settled cases with the three repositories, charging that they failed to establish a toll-free number with "personnel accessible" during normal business hours to answer consumers' questions about their consumer reports, as mandated by FCRA section 609(c)(1). The complaints in these cases alleged that the repositories failed to maintain adequate personnel, resulting in busy signals, excessive hold times, and the blocking of consumer calls from particular locations. The orders require the repositories to maintain adequate personnel, establish auditing requirements to ensure future compliance, and pay a total of $2.5 million in civil penalties. *See* FTC v. Equifax Credit Info. Services, Inc., No. 1:00-CV-0087 (N.D. Ga. 2000); FTC v. Experian Mktg. Info. Solutions, Inc., No. 3-00CV0056-L (N.D. Tex. 2000); FTC v. TransUnion LLC, 00C 0235 (N.D. Ill. 2000); *see also* United States v. Equifax Credit Info. Servs., Inc., Civ. No. 1:0-CV-0087-MHS (N.D. Ga 2003) ($250,000 disgorgement remedy for alleged violation of consent decree).

[201]   *See* FTC v. NCO Group, Inc., 2004 WL 1103323 (E.D. Pa. 2004) (providing inaccurate delinquency dates; $1.5 million civil penalty); United States v. Fairbanks Capital Corp., Civ. Action No. 03-12219 DPW (D. Mass 2003) (furnishing information

Financial institutions regulated by the federal financial regulators generally are subject to the FCRA dispute provisions primarily due to their role as furnishers of information to CRAs. The federal financial regulators examine these institutions for compliance with the FCRA, including the FCRA dispute provisions. The federal financial regulators have FCRA examination procedures that each decides how to implement. For example, the Federal Reserve System implements these procedures as part of routine consumer compliance examinations. A Federal Reserve Bank examiner considers the bank's processes for complying with the FCRA accuracy and dispute provisions when performing a preliminary risk assessment of the bank and setting the scope of the consumer compliance examination, and applies the FCRA examination procedures, as appropriate.

While state-chartered banks make up only a portion of the furnishers, for this study, bank examiners for the Federal Reserve and Federal Deposit Insurance Corporation (FDIC) looked at violations by state-chartered banks of the dispute provisions governing furnishers and found an insignificant number of violations.[202] These two federal financial regulators, along with the OCC, also surveyed their complaint databases for this study to determine the number and types of consumer complaints regarding disputed consumer file information.[203] Both the Board and the OCC provided data from 2000 to 2004; the FDIC provided data from 2002 to 2004. While some consumers complained that inaccurate or incomplete information remained in their files, or that a furnisher failed to conduct or complete an investigation to the consumers' satisfaction, in general, the data did not indicate a large number of complaints regarding failures by furnishers to properly reinvestigate information disputed by consumers.

Under section 611(e), the FTC is required to transmit to the repositories complaints from consumers who appear to have disputed the completeness or accuracy of their files with one or more repositories or otherwise utilized their dispute rights under FCRA section 611(a). Section 611(e) also requires that the repositories review the complaints, report to the FTC on the results of their review, and maintain sufficient records to show compliance. To implement section 611(e), the FTC entered into a complaint-referral program with the three repositories

---

to a CRA knowing, or consciously avoiding knowing, that the information is inaccurate); FTC v. DC Credit Servs., Inc., No. 02-5115 (C.D. Cal. 2002) (furnishing information to a CRA knowing, or consciously avoiding knowing, that the information is inaccurate, failing to notify and provide corrections to CRAs when previously reported information was found to be inaccurate, failing to provide accurate delinquency dates, failing to report accounts as "disputed"; $300,000 civil penalty); FTC v. Performance Capital Mgmt., Inc., 2:01cv1047 (C.D. Cal. 2000) (providing inaccurate delinquency dates, failing to properly investigate disputes, failing to report accounts as "disputed"; $2 million civil penalty). All these cases were settlements resulting in consent decrees.

[202]   The Federal Reserve System regulates, among others, state-chartered banks that are members of the System. The FDIC regulates, among others, insured state-chartered banks that are not members of the Federal Reserve System.

[203]   The OCC regulates national banks.

and a number of affiliate CRAs that store their data in the repositories' databases.[204] Under the program, the FTC refers to the repositories and the affiliates' complaints that it receives from consumers who report that their disputes about accuracy or completeness have not been resolved to their satisfaction. The FTC makes no determination about the merits of the complaints. The CRAs review the complaints to ensure that they have complied with the applicable provisions of the FCRA and periodically provide reports to the FTC on the disposition of a sample of the complaints. The program does not limit the FTC's ability to pursue law violations under the FCRA.

Because the data that the FTC has obtained through the complaint-referral program to date are insufficient to provide probative evidence of the functioning of the dispute resolution process, this report contains no findings on that issue.

## VI.  Conclusion

In compliance with FACT Act section 313(b), the FTC and the Board have studied the FCRA dispute process by reviewing information from a number of sources. There is general consensus that CRAs and furnishers usually are conducting their investigations within the thirty-day period set forth in FCRA section 611(a)(1). However, many commenters held differing views on the subject of FCRA compliance by CRAs and furnishers. Consumer groups that commented, for example, assert that CRAs do not convey "all relevant information" to furnishers, and that both CRAs and furnishers typically fail to conduct meaningful investigations. These groups recommend that the current system be reformed to induce CRAs and furnishers to take their duties to investigate disputes seriously. Most industry commenters, however, maintain that, while there is room for improvement, the current dispute process generally is working well and additional legislative and regulatory changes are not advisable at this time. Courts also have reached different conclusions on the subject of CRA and furnisher compliance, generally applying a reasonableness standard to CRA and furnisher investigations and then determining whether the investigation at issue was reasonable based on the facts of each case.[205]

With respect to the FCRA's requirement that CRAs forward to the furnisher "all relevant information," it appears that CRAs generally do not convey to furnishers documents that some consumers give CRAs in connection with their disputes.  By itself, however, this does not mean that CRAs fail to convey "all relevant information" to furnishers. It is unclear how

---

[204]  The FTC announced the program on April 23, 2004. *See* www.ftc.gov/opa/2004/04/cra.htm. The affiliates are discussed in more depth in section II.A.

[205]  *See supra* notes 79 and 117 and accompanying text.

often consumers submit documents along with their disputes, or how often these documents contain relevant information. When consumers do submit documents, the CRAs summarize the information in a numeric code supplemented, in some instances, by a narrative in a free-form field. Although this process may be sufficient in most cases to resolve the dispute properly, in certain situations, the failure to convey the actual documents may lead to incorrect outcomes. The information that the FTC and the Board have obtained on this subject is inconclusive as to the prevalence of this result.

Likewise, the question of whether CRAs and furnishers generally are conducting investigations that comply with the FCRA cannot be resolved definitively. Although some consumers ultimately file a dispute statement regarding information that has not been corrected or deleted after reinvestigation, it is not clear whether these disputes reflect a failure to comply with the FCRA reinvestigation procedures or simply consumer dissatisfaction with the results of the reinvestigations, despite CRA and furnisher compliance. Similarly, evidence regarding compliance by the consumer reporting industry is inconclusive. The FTC and the Board agree with courts holding that (1) CRA and furnisher investigations must be reasonable and (2) whether an investigation is reasonable depends on the facts in each case.

FACT Act section 313(b)(4) requires that the FTC and the Board include in this report any legislative or administrative recommendations for improvements to the dispute process that the agencies jointly determine to be appropriate. The agencies recommend that no legislative action be taken at this time, in large part because the agencies believe such action would be premature. The FACT Act imposes a number of new requirements on CRAs and furnishers that should enhance the consumer dispute process and improve accuracy, including measures to reduce identity theft and new requirements on furnishers.[206] Many of these requirements are still being implemented, and their effects on the dispute process have yet to be seen. The FTC and the Board believe that the FACT Act requirements should be given time to take effect before legislators and regulators consider making additional changes to the dispute process. This is particularly important given the voluntary nature of the reporting system and the uncertainty of how additional requirements and burdens would affect that system.  As additional information becomes available, the agencies will reassess the need for administrative actions.

With respect to the "all relevant information" issue, there may be a number of ways to address the concerns that have been expressed about the process, ranging from different or more specific codes, to greater use of the narrative field, to better training of personnel who do the coding, to the scanning or other conveyance of documents to furnishers.  The costs and

---

[206]  *See supra* notes 35-39 and accompanying text.  *See also* appendix F.

benefits of each of these steps cannot be determined on the basis of the current record.  The FTC and the Board intend to explore further these issues and possible solutions with the CRAs, furnishers, consumer advocates, and other interested parties, and, if appropriate, will make recommendations for action.

# Appendix A
# Table of Names and Acronyms

| | |
|---|---|
| ABA | American Bankers Association |
| ACB | Associated Credit Bureaus |
| ACDV | Automated Consumer Dispute Verification |
| AUD | Automated Universal Data |
| BB&T | Branch Banking and Trust Company |
| BECU | Boeing Employees' Credit Union |
| Board | Board of Governors of the Federal Reserve System |
| CDIA | Consumer Data Industry Association |
| CDV | Consumer Dispute Verification |
| Coalition | The Coalition to Implement the FACT Act |
| Consumer Groups | National Consumer Law Center, Consumer Federation of America, Consumers Union, Electronic Privacy Clearinghouse, and U.S. Public Interest Research Group |
| CRA | Consumer Reporting Agency |
| e-OSCAR | Online Solution for Complete and Accurate Reporting |
| FACT Act | Fair and Accurate Credit Transactions Act of 2003 |
| FCRA | Fair Credit Reporting Act |
| FDIC | Federal Deposit Insurance Corporation |
| Federal Financial Regulators | The Board, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, and Office of Thrift Supervision. |
| FTC | Federal Trade Commission |
| GAO | Government Accountability Office |
| Juniper | Juniper Bank |
| MBA | Mortgage Bankers Association |
| MBNA | MBNA America Bank |
| Metro/Metro 2 | Standard layouts for furnishers to report information to consumer reporting agencies |
| NAMB | National Association of Mortgage Brokers |

| | |
|---|---|
| NCRA | National Credit Reporting Association |
| OCC | Office of the Comptroller of the Currency |
| UDF | Universal Data Form |
| Visa | Visa U.S.A. Inc. |
| Wells Fargo | Wells Fargo & Company |
| Zions | Zions Bancorporation |
| 1996 FCRA | The FCRA as amended in 1996 and 1999 but before the FACT Act amendments in December 2003 |

# Appendix B
# Request for Information for Report

Board of Governors of the Federal Reserve System, August 4, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–18212 Filed 8–9–04; 8:45 am]
BILLING CODE 6210–01–S

---

## FEDERAL RESERVE SYSTEM

## Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR Part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The applications listed below, as well as other related filings required by the Board, are available for immediate inspection at the Federal Reserve Bank indicated. The application also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)). If the proposal also involves the acquisition of a nonbanking company, the review also includes whether the acquisition of the nonbanking company complies with the standards in section 4 of the BHC Act (12 U.S.C. 1843). Unless otherwise noted, nonbanking activities will be conducted throughout the United States. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than September 3, 2004.

**A. Federal Reserve Bank of St. Louis** (Glenda Wilson, Community Affairs Officer) 411 Locust Street, St. Louis, Missouri 63166-2034:

 1. *Centennial Bancshares, Inc.,* Little Rock, Arkansas; to become a bank holding company by acquiring 100 percent of the voting shares of Pine State Bancshares, Inc., Kingsland, Arkansas, and thereby indirectly acquire Pine State Bank, Kingsland, Arkansas.

**B. Federal Reserve Bank of Kansas City** (Donna J. Ward, Assistant Vice President) 925 Grand Avenue, Kansas City, Missouri 64198-0001:

 1. *Wilber Co.,* Wilber, Nebraska; to acquire 100 percent of the voting shares of Hickman Corporation, Hickman, Nebraska, and thereby indirectly acquire First State Bank, Lincoln, Nebraska.

 2. *Wilber Co.,* Wilber, Nebraska; to acquire 100 percent of the voting shares of Yutan Bancorp., Inc., Yutan, Nebraska, and thereby indirectly acquire Bank of Yutan, Yutan, Nebraska.

In connection with this application, Wilber Co. also has applied to acquire indirect control of Yutan Insurance Agency, Inc., Yutan, Nebraska, and thereby engage in insurance agency activities pursuant to section 225.28(b)(11)(iii)(A) of Regulation Y.

**C. Federal Reserve Bank of Dallas** (W. Arthur Tribble, Vice President) 2200 North Pearl Street, Dallas, Texas 75201-2272:

 1. *First Metroplex Capital, Inc.,* Dallas, Texas; to become a bank holding company by acquiring 100 percent of the voting shares of T Bank, National Association, Dallas, Texas (in formation).

Board of Governors of the Federal Reserve System, August 4, 2004.

**Robert deV. Frierson,**
*Deputy Secretary of the Board.*
[FR Doc. 04–18211 Filed 8–9–04; 8:45 am]
BILLING CODE 6210–01–S

---

## FEDERAL RESERVE SYSTEM

[Docket No. OP–1209]

## Request for Information for Study on Investigations of Disputed Consumer Information Reported to Consumer Reporting Agencies

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Notice of study and request for information.

**SUMMARY:** Pursuant to section 313(b) of the Fair and Accurate Credit Transactions Act of 2003 (FACT Act), the Board of Governors of the Federal Reserve System is conducting a study on investigations by furnishers of consumer information to consumer reporting agencies when that information is disputed. The FACT Act generally amends the Fair Credit Reporting Act. In preparing this study, the Board requests public comment on a number of issues relating to the prompt investigation, completeness, and correction or deletion of information reported to credit reporting agencies.

**DATES:** Comments must be received by September 17, 2004.

**ADDRESSES:** You may submit comments, identified by Docket No. OP–1209, by any of the following methods:

• Agency Web site: *http://www.federalreserve.gov*. Follow the instructions for submitting comments on the *http://www.federalreserve.gov/generalinfo/foia/ProposedRegs.cfm*.

• Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.

• E-mail: *regs.comments@federalreserve.gov*. Include docket number in the subject line of the message.

• FAX: 202/452–3819 or 202/452–3102.

• Mail: Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue, NW., Washington, DC 20551.

All public comments are available from the Board's Web site at *www.federalreserve.gov/generalinfo/foia/ProposedRegs.cfm* as submitted, except as necessary for technical reasons. Accordingly, your comments will not be edited to remove any identifying or contact information. Public comments may also be viewed electronically or in paper in Room MP–500 of the Board's Martin Building (20th and C Streets, NW.) between 9 a.m. and 5 p.m. on weekdays.

**FOR FURTHER INFORMATION CONTACT:** Minh-Duc T. Le or Ky Tran-Trong, Senior Attorneys, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, at (202) 452–3667 or 452–2412; for users of Telecommunications Device for the Deaf ("TDD") only, contact (202) 263–4869.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Fair and Accurate Credit Transactions Act of 2003 (FACT Act) was signed into law on December 4, 2003. Pub. L. 108–159, 117 Stat. 1952. In general, the FACT Act amends the Fair Credit Reporting Act (FCRA) to enhance the ability of consumers to combat identity theft, to increase the accuracy of consumer reports, and to allow consumers to exercise greater control regarding the type and amount of marketing solicitations they receive. The FACT Act also restricts the use and disclosure of sensitive medical information. To bolster efforts to improve financial literacy among consumers, title V of the Act (entitled the "Financial Literacy and Education Improvement Act") creates a new Financial Literacy and Education Commission empowered to take

appropriate actions to improve the financial literacy and education programs, grants, and materials of the Federal government. Lastly, to promote increasingly efficient national credit markets, the FACT Act establishes uniform national standards in key areas of regulation regarding consumer report information.

As part of the effort to increase the accuracy of consumer reports, section 313(b) of the FACT Act requires the Board to conduct a joint study with the Federal Trade Commission (FTC) regarding the extent to which, and the manner in which, consumer reporting agencies and furnishers of consumer information to consumer reporting agencies are complying with the procedures, timelines, and requirements under the FCRA for (1) the prompt investigation of disputed information, (2) the completeness of information provided to consumer reporting agencies, and (3) the prompt correction or deletion of any inaccurate or incomplete information or information that cannot be verified. Furnishers of information to consumer reporting agencies may include banks, retailers, mortgage companies, medical establishments, and others.

The FTC and the Board must jointly submit a progress report to Congress on the results of this study no later than December 4, 2004, which is 12 months after the date of enactment of the FACT Act. The report also must contain recommendations for legislative or administrative actions as the Board and FTC jointly determine to be appropriate.

In this notice, the Board requests specific information about the current duties and practices of furnishers regarding the prompt investigation of information, the completeness of information, and the prompt correction or deletion of information. The Board also seeks comment on possible legislative and regulatory action to improve the dispute process.

## II. The Fair Credit Reporting Act

The FCRA was amended in 1996 to impose duties on furnishers of consumer information. Consumer Credit Reporting Reform Act of 1996 (Pub. L. 105–347), 15 U.S.C. 1681 *et seq.* With the passage of the FACT Act, certain duties were amended and additional duties were imposed. The first section below will discuss the furnishers' duties imposed by the FCRA in effect prior to the FACT Act amendments, since the amendments have not, or have only recently become effective. The second section will discuss the new obligations arising from the FACT Act amendments.

### The FCRA—Pre FACT Act

The 1996 amendments to the FCRA established duties for furnishers of consumer information. These duties, found in FCRA section 623, include the duties to report accurate information; to provide notice of a dispute; to provide notice of closed accounts; to provide notice involving delinquent accounts; and to investigate after receiving notice of a dispute from a consumer reporting agency.

Section 623(a)(1) of the FCRA prohibits a furnisher from reporting any information to a consumer reporting agency that it knows or consciously avoids knowing is inaccurate. This general prohibition, however, does not apply if a furnisher provides an address for consumers to use to notify the furnisher that specific information is inaccurate. If the furnisher provides such an address, the furnisher may not report information relating to a consumer to any consumer reporting agency if the consumer has notified the furnisher at the specified address that the information is inaccurate, and the information is in fact inaccurate.

Section 623(a)(2) of the FCRA provides that when a furnisher who regularly and in the ordinary course of business reports information to one or more consumer reporting agencies determines that the information provided is not complete or accurate, the furnisher must promptly notify the consumer reporting agency. The furnisher must also provide the consumer reporting agency any corrections to that information, or any additional information necessary to make the information provided by the furnisher to the consumer reporting agency complete and accurate. Thereafter, the furnisher must not report to the consumer reporting agency any of the information that remains incomplete or inaccurate.

Section 623(a)(3) of the FCRA requires that if the completeness or accuracy of any information reported by the furnisher to a consumer reporting agency is disputed by a consumer directly to the furnisher, the furnisher may not report that information to any consumer reporting agency without notice that the information is disputed by the consumer.

Furnishers have a duty to provide notice of closed accounts and delinquent accounts. Under section 623(a)(4), a furnisher—who regularly and in the ordinary course of business reports information to a consumer reporting agency about a consumer who has a credit account with the furnisher—must notify the consumer

reporting agency of the voluntary closure of the account by the consumer. This notice must be included with information regularly furnished for the period in which the account is closed. Under section 623(a)(5), a furnisher that reports to a consumer reporting agency that a delinquent account is being placed for collection, charged off, or subjected to any similar action must notify the consumer reporting agency of the month and year of the commencement of the delinquency that immediately preceded the collection, charge off, or similar action. The month and year must be reported within 90 days of the furnisher reporting the collection, charge off, or similar action.

A furnisher also has duties when a consumer disputes information with a consumer reporting agency. Section 611 of the FCRA requires that the consumer reporting agency notify the furnisher of the dispute received from the consumer and provide the furnisher with all the information relevant to the dispute. When the furnisher receives this notification, section 623(b) of the FCRA requires the furnisher to conduct an investigation with respect to the disputed information, review all the relevant information provided, and report the results to the consumer reporting agency generally within 30 days of the consumer reporting agency having received notice of the dispute from the consumer. If the furnisher's investigation establishes that the information was incomplete or inaccurate, the furnisher must report that result to all other nationwide consumer reporting agencies to whom the furnisher provided that information. The time period for investigation, review, and report may be extended for 15 days if the consumer reporting agency receives additional relevant information from the consumer.

### The FCRA—Post FACT Act Amendments

The FACT Act amends the FCRA with respect to furnishers' duties in several ways. For example, section 312(b) of the FACT Act amends the FCRA's prohibition on knowingly reporting inaccurate information to prohibit reporting of information if the furnisher "knows or has reasonable cause to believe that the information is inaccurate." "Reasonable cause to believe that the information is inaccurate" means "having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information."

Other provisions of the FACT Act add to a furnisher's duties. For example, section 312(c) of the FACT Act requires the Board, FTC, and other federal banking regulators to jointly prescribe regulations that would identify when a furnisher would be required to reinvestigate a dispute concerning the accuracy of information contained in a consumer report on the consumer, based on a direct request from a consumer. The furnisher, upon receiving this notice would generally have 30 days to investigate the disputed information, review all relevant information provided by the consumer, and report the results to the consumer. If the furnisher finds that the information reported was inaccurate, the furnisher also must promptly notify each consumer reporting agency to which the furnisher had reported the inaccurate information and provide any correction to that information that is necessary to make the information accurate. Section 314(b) of the FACT Act would further require furnishers that find an item disputed by a consumer to a consumer reporting agency to be inaccurate, incomplete, or unverifiable after any reinvestigation to promptly modify, delete, or permanently block the reporting of that item of information.

Since these provisions of the FACT Act generally have not become effective, the Board understands that information about a furnisher's practices with respect to reporting and dispute investigations will be mostly about practices as they exist under the FCRA prior to the FACT Act amendments.

### III. Request for Specific Information

As described above, section 313(b) of the FACT Act requires the Board and the FTC to jointly study the extent to which, and the manner in which, consumer reporting agencies and furnishers of consumer information to consumer reporting agencies are complying with the procedures, timelines, and requirements under the FCRA for the prompt investigation of the disputed accuracy of any consumer information. The agencies also must study the completeness of the information provided to consumer reporting agencies and the prompt correction or deletion of any inaccurate or incomplete information or information that cannot be verified. In conducting the study, the Board is requesting public comment from furnishers, consumers, and other persons on the following issues:

*General Information*

• What type of entity reports negative and/or positive information to a consumer reporting agency and what type of entity does not report negative and/or positive information to a consumer reporting agency? If an entity does not report information to a consumer reporting agency, why not?

• Of all disputes received by the furnisher, what percentage of the disputes or complaints comes through a consumer reporting agency? What percentage comes directly from consumers? What percentage comes from other sources (*e.g.*, credit repair entities)?

• Do the answers to the questions below vary based on industry, size of entity, type of credit, or other characteristics? Are there any generalizations that can be made based on industry, size of entity, type of credit, or other characteristics?

*Disputes Communicated by Consumers Directly to Furnishers*

• Does the furnisher provide an address for consumers to use if they want to dispute information directly with the furnisher? If not, why? If an address is provided, how is the consumer informed about this address?

• Regardless of whether an address is provided, what is the furnisher's process and timeline in handling disputes and complaints that come directly from consumers? Under what circumstances do furnishers currently investigate disputes regarding information in a consumer file, based on a direct request of the consumer?

• Is sufficient relevant information provided to the furnisher by the consumer? If not, what relevant information is often missing, and why? If relevant information is lacking, how does the furnisher resolve the dispute?

• What are consumers' experiences in resolving a dispute where the furnisher provided an address? What are their experiences locating and using this address to resolve their dispute?

• What are consumers' experiences in resolving disputes where the furnisher does not provide an address? How were the disputes resolved and what entity or person (*e.g.*, furnisher, consumer reporting agency, credit repair entity, legal representative, etc.) was instrumental in resolving the dispute?

*Other Furnisher Duties*

• How does the furnisher ensure that it complies with the applicable statutory requirements regarding the accuracy and completeness of information it reports to the consumer reporting agency?

• What are the furnisher's procedures and timelines if it finds the information is not complete or accurate?

• What are the furnisher's procedures and timelines for reporting information that has been directly disputed by a consumer?

• What are the furnisher's procedures and timelines for reporting when a delinquency began on an account that has been placed for collection, charged off, or subjected to similar action?

• What are the furnisher's procedures and timelines for notifying a consumer reporting agency that a consumer has voluntarily closed a credit account with the furnisher?

• What are consumers' experience with communicating with furnishers, with the timing of the notice of dispute appearing on the credit report, or any other matter related to having the notice of dispute placed on the credit report when disputed information continues to be reported but with a notice of the dispute?

• What are consumers' experiences with furnishers reporting that credit accounts with the furnishers have been voluntarily closed? What is the time span between the consumer closing the account and information about the closure appearing on the credit report?

*Disputes Communicated by Consumers to Consumer Reporting Agencies*

• When a consumer reporting agency receives notice of consumer disputes and forwards the information to the furnisher, how does the consumer reporting agency provide the furnisher with the notices and relevant information? What information does the consumer reporting agency transmit to the furnisher? Describe any guidelines or procedures, voluntary or otherwise, that apply to this process.

• How does a consumer reporting agency ensure that furnishers comply with the requirements and timelines established under the FCRA for disputes communicated to a consumer reporting agency?

• What are the furnisher's procedures and timelines for investigating the disputes and reviewing the information provided?

• Is sufficient relevant information provided to the furnisher by the consumer through the consumer reporting agency? Is all relevant information from a consumer provided to the furnisher through the consumer reporting agency? If not, what relevant information is often missing, and why? If relevant information is lacking, how does the furnisher resolve the dispute?

• If the furnisher finds that the information it reported to the consumer reporting agency was incomplete or inaccurate, what steps does the furnisher take?

• If the furnisher does not find the information reported to the consumer reporting agency to be incomplete or inaccurate, what steps does the furnisher take?

• Describe any guidelines or procedures that may apply to the treatment of information that continues to be disputed by the consumer after the formal dispute process has been concluded. How often do the furnisher and consumer fail to reach an agreement after the conclusion of the formal dispute process, for example, where the consumer maintains that the disputed information is inaccurate and the furnisher maintains that it is accurate?

*Recommendations*

• What, if any, legislative or regulatory changes do you recommend besides changes made by the FACT Act and its implementing rules? How would these recommendations improve the system? What benefits or burdens should be considered?

By order of the Board of Governors of the Federal Reserve System, August 5, 2004.

**Jennifer J. Johnson,**

*Secretary of the Board.*

[FR Doc. 04–18290 Filed 8–9–04; 8:45 am]

BILLING CODE 6210–01–P

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Announcement of Anticipated Availability of Funds for Family Planning Services Grants**

**AGENCY:** Department of Health and Human Services, Office of the Secretary.

**ACTION:** Notice; correction.

---

**SUMMARY:** The Office of Population Affairs, Office of Public Health and Science, DHHS, published a notice in the **Federal Register** of Wednesday, July 7, 2004 announcing the anticipated availability of funds for family planning services grants. This notice contained an error. An eligible Population/area was not listed as available for competition in 2005. This document corrects the omission of the Seattle Population/area as competitive in 2005.

**FOR FURTHER INFORMATION CONTACT:** Susan B. Moskosky, 301–594–4008.

**Correction**

In the **Federal Register** of July 7, 2004, FR Doc. 03–15514, on page 41,114, in the second column under II. Award Information, correct the 7th line of the first paragraph to read ''planning services grant awards in 17;'' and on page 41,115, correct Table I to read:

Report to Congress

# Appendix C
# Sample Automated Consumer Dispute Verification Form[1]

**Return this dispute response to:**

ICRA - exp affiliated

123 Street New Town, NY 12603--

FAX # -

| | | | |
|---|---|---|---|
| **Account Number** | 37012345678 | Date : | 05-19-2006 |
| | | Control # | 9070605040 |
| **Subscriber Code** | DF Credit/dfcreditexp | **DNR Date** | 05-10-2006 |
| | | **Response Date** | 05-19-2006 |

Please check the SAME box for each identification item appearing on the CDV which is identical to your records; or provide differing information in the shaded area.

| | | SAME | | |
|---|---|---|---|---|
| **Name/Gen Code** | John Q Consumer / ---- | ☐ | **Name/Gen Code** | - Quentin - / ---- |
| **Address** | 123 Main St, atlanta GA 30328-- | ☑ | **Address** | -, - -- --- |
| **Prev Name/Prev Gen Code** | - - - / ---- | ☐ | **Prev Name/Prev Gen Code** | - - - / ---- |
| **Prev Address** | 8946 S Water St, Chicago IL 60601-- | ☐ | **Prev Address** | 525 W Belmont St, Chicago IL 60657-- |
| **SSN** | 909122242 | ☑ | **SSN** | - |
| **DOB** | 04-15-1965 | ☑ | **DOB** | - |
| **Telephone Number** | 4045251212 | ☐ | **Telephone Number** | 4048325454 |
| **2nd Prev Addr** | -, - -- --- | | | |

| Consumer States/Comments: |
|---|
| Dispute Code 1: 24:Claims account closed by consumer. Verify Compliance Condition Code, Account Status, Date Closed, and Payment Rating. |
| Dispute Code 2: |
| FCRA Relevant Information:<br>Account paid in full and closed on 5/4/06. Check number 7682 |

**Please write clearly and report changed information in the shaded box directly below where it is currently reported.**

| Verified as Reported ☐ | | Change Data as Shown ☑ | | Delete Account ☐ | | | Delete due to Fraud ☐ | | |
|---|---|---|---|---|---|---|---|---|---|
| Acct Status | Pay Rate | MOP | Cond/Cumm Status | Date Opened | Balance | Amt Past Due | High Cr/Org | Credit limit | Org Chg Off Amt |
| 11 | 0 | - | | 02-05-1999 | 14386 | | 68000 | - | - |
| 13 | 0 | - | | - | 0 | 0 | - | - | - |

| Acct Type | Portf Type | Terms Dur | Freq | Date of Account Information | Date Closed | Date of Last Pymnt | Sch Pymnt | ECOA | Status Date (EXP only) | FCRA DOFD |
|---|---|---|---|---|---|---|---|---|---|---|
| 6D | I | - | - | 04-15-2006 | | 04-15-2006 | 734 | 1 | | |
| - | | - | - | 05-19-2006 | 05-09-2006 | 05-09-2006 | | | | |

| CCC | SCC | CII | Orig Cr Name | Orig Cr Class | Spec Pymnt Ind | Deferred Start Date | Balloon Date | Balloon Amt |
|---|---|---|---|---|---|---|---|---|
| - | - | - | | | | - | - | - |

| Accounts History | Agency ID | Sec Mktg Agency Acct # | Mortgage ID |
|---|---|---|---|

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | | |
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | |

| Agency ID | Sec Mktg Agency Acct # | Mortgage ID |
|---|---|---|
| - | - | |
| **Actual Pymnt** | **Portfolio Indicator** | **Prchsd from/Sold to** |
| 900 | - | - |
| Remarks : - | | |

DF Contact # : 9723903912

| Authorized Name | | Tel # | |
|---|---|---|---|

**When you sign this form, you certify that you have verified the accuracy of the entire item in compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect changes noted above.**

© 2006 Online Data Exchange LLC

[1]Source: Consumer Data Industry Association.

Case 1:14-cv-06046-BMC   Document 130-12   Filed 09/30/16   Page 48 of 52 PageID #: 2026

# Appendix D
# Frequency of Credit Account Disputes in Federal Reserve Board Study of Data from One Repository as of June 30, 2003[1]

Table 1

Frequency of pending disputes, by number of accounts affected

|  | Credit card | Mortgage | Auto | Other | All types |
|---|---|---|---|---|---|
| No dispute | 99.63% | 99.98% | 100% | 99.96% | 99.82% |
| Pending dispute | 0.37% | 0.02% | 0 | 0.04% | 0.18% |
| Number of accounts of this type | 666,152 | 88,014 | 7,176 | 719,140 | 1,480,482 |

Table 2

Share of pending disputes, by type of credit

|  | Credit card | Mortgage | Auto | Other |
|---|---|---|---|---|
| Pending dispute | 89.86% | 0.73% | 0.00% | 9.41% |

Table 3

Distribution of pending disputes based on status of account

|  | Credit card | Mortgage | Auto | Other | All types |
|---|---|---|---|---|---|
| Pending disputes on open accounts | 87.41% | 89.47% | N/A | 66.15% | 85.39% |
| Pending disputes on closed accounts | 12.59% | 10.53% | N/A | 33.85% | 14.61% |

---

[1]Source:  Federal Reserve Board.

# Appendix E
# Response Rates of Furnishers Responding to One Repository Through E-OSCAR and Furnishers Responding in Paper Form (July 2004)[1]

| Response Time (# Days) | E-Oscar: Monthly accumulated % of responses to all disputes | Paper: Monthly accumulated % of responses to all disputes |
|---|---|---|
| 0 | | |
| 1 | | |
| 2 | 4.96% | 3.08% |
| 3 | 12.46% | 6.39% |
| 4 | 19.12% | 8.27% |
| 5 | 26.71% | 9.74% |
| 6 | 32.29% | 12.19% |
| 7 | 38.89% | 16.60% |
| 8 | 44.90% | 19.20% |
| 9 | 48.40% | 21.93% |
| 10 | 50.98% | 24.33% |
| 11 | 54.13% | 27.95% |
| 12 | 57.15% | 31.32% |
| 13 | 59.69% | 36.78% |
| 14 | 62.43% | 44.18% |
| 15 | 65.33% | 51.14% |
| 16 | 68.15% | 57.02% |
| 17 | 71.05% | 61.25% |
| 18 | 74.64% | 64.43% |
| 19 | 78.06% | 68.08% |
| 20 | 79.47% | 71.50% |
| 21 | 80.82% | 74.80% |
| 22 | 82.56% | 77.12% |
| 23 | 84.35% | 78.29% |
| 24 | 85.95% | 79.32% |
| 25 | 88.09% | 80.13% |
| 26 | 89.98% | 80.85% |
| 27 | 92.24% | 81.60% |
| 28 | 94.00% | 82.00% |

[1]Source: Consumer Data Industry Association.

# Appendix F
# The FCRA After the FACT Act

In the FACT Act amendments, Congress made three changes to the core dispute duties of CRAs. The provision stating that CRAs "shall reinvestigate" information that consumers dispute was amended to require CRAs to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate."[1] In addition, a CRA that learns during a reinvestigation that information disputed by a consumer is inaccurate, incomplete, or cannot be verified, now must notify the furnisher that the information has been modified or deleted from the CRA's file on the consumer.[2] Finally, the FACT Act amendments give CRAs forty-five days to reinvestigate a dispute from a consumer that is made following the consumer's receipt of a free annual file disclosure under the Act's new free file disclosure provisions.[3]

The FACT Act substantially changed the dispute duties for resellers.[4] Because resellers are CRAs, the FCRA, prior to the FACT Act, required them to carry out all of the CRA dispute duties described in section II.C of the attached report. A new provision added by the FACT Act, however, changed those duties. If a consumer disputes directly to a reseller the completeness or accuracy of an item in a consumer report issued by the reseller, the reseller must, within five business days of receiving notice of the dispute, and free of charge, do the following:[5]

- ◆ determine whether the item is incomplete or inaccurate because of an act or omission of the reseller; and

- ◆ if the reseller determines that the item is incomplete or inaccurate because of an act of the reseller, not less than 20 days after receiving the notice, correct the information in the consumer report or delete it; or

- ◆ if the reseller determines that the item is not incomplete or inaccurate because of an act or omission of the reseller, convey the notice of dispute, together with all relevant information provided by the consumer, to each CRA that provided the disputed item to the reseller ("source CRA").

---

[1]   FCRA § 611(a)(1)(A), as amended by FACT Act § 317.

[2]   FCRA § 611(a)(5)(A), as amended by FACT Act § 314.

[3]   FCRA § 612(a)(3), as amended by FACT Act § 211.

[4]   FCRA § 611(f), as amended by FACT Act § 316. FCRA section 603(u) defines a "reseller" as a CRA that "assembles and merges" information contained in the database of a repository.

[5]   FCRA § 611(f)(2), as amended by FACT Act § 316.

Another FACT Act provision requires a source CRA to reinvestigate a dispute conveyed by a reseller.[6] Upon completion of its reinvestigation, the source CRA must provide to the reseller a written notice stating the results of the reinvestigation.[7] The reseller must immediately reconvey the notice to the consumer.[8]

The FACT Act also amended the FCRA with respect to furnishers' dispute duties in several ways. Under one of the amendments, the FTC and the federal financial regulators are required to issue joint regulations that will identify the circumstances under which a furnisher must investigate a dispute made directly by a consumer to the furnisher. In prescribing the regulations, the agencies must weigh several factors, including the benefits to consumers versus the costs to furnishers and the credit reporting system. In those circumstances identified in the rules, the rules must provide that, when a consumer submits a proper notice of dispute to a furnisher, the furnisher must conduct an investigation of the disputed information; review all relevant information provided by the consumer with the notice; complete the investigation within thirty days (or forty-five days, if the consumer provides additional relevant information during the thirty-day period); and, if the investigation finds that the disputed item was reported inaccurately, promptly provide corrections to each CRA to which the information was furnished.[9] These provisions do not apply if the dispute is frivolous or irrelevant or comes from a credit repair organization.

The FACT Act also provides that, in disputes received through a CRA, if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after the furnisher completes the investigation, the furnisher must promptly delete, modify, or permanently block the reporting of that information as appropriate based on the results of the investigation.[10] In addition, the FACT Act provides that furnishers must establish reasonable procedures to avoid re-furnishing to CRAs information after (1) a CRA notifies the furnisher that the CRA has blocked the information because it might be the result of identity theft or (2)

---

[6]   FCRA § 611(a)(1)(A), as amended by FACT Act § 317.

[7]   FCRA § 611(f)(3)(A), as amended by FACT Act § 316.

[8]   FCRA § 611(f)(3)(B), as amended by FACT Act § 316. Resellers still are free to conduct their own reinvestigations of consumer disputes, but they are no longer required to do so. See FCRA § 611(f)(4), as amended by FACT Act § 316(b).

[9]   FCRA § 623(a)(8), as amended by FACT Act § 312(c). When completed, the regulations will be available at www.ftc.gov/credit and www.federalreserve.gov.

[10]   FCRA § 623(b)(1)(E), as amended by FACT Act § 314.

the consumer submits an identity theft report stating that the information resulted from identity theft.[11]

Prior to the FACT Act, furnishers could not furnish information about a consumer to a CRA if the furnisher knew or consciously avoided knowing that the information was inaccurate.[12] Under the FACT Act, the standard is now "knows or has reasonable cause to believe that the information is inaccurate."[13] The term "reasonable cause to believe that the information is inaccurate" is defined as "having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information."[14]

The FACT Act amendments require a financial institution that furnishes negative information about a consumer to a nationwide CRA to notify the consumer in writing.[15] In addition, the amendments require federal financial regulators and the FTC to promulgate guidelines and regulations dealing with the accuracy and integrity of information that furnishers provide to CRAs.[16]

---

[11]   FCRA § 623(a)(6), as amended by FACT Act § 154(a) A furnisher may re-report the information if the furnisher subsequently knows or is informed by the consumer that the information is correct. FCRA § 623(a)(6)(B), as amended by FACT Act § 154(a).

[12]   FCRA § 623(a)(1)(A) of 1996 FCRA.

[13]   FCRA § 623(a)(1)(A), as amended by FACT Act § 312(b)(1). If a furnisher clearly and conspicuously supplies an address to which disputes should be sent, however, this duty does not apply to the furnisher. FCRA § 623(a)(1)(C).

[14]   FCRA § 623(a)(1)(D), as amended by FACT Act § 312(b)(2).

[15]   FCRA § 623(a)(7), as amended by FACT Act § 217. The financial institution may choose to convey this notice before furnishing the information to the CRA. 12 C.F.R. pt. 222 app. B.

[16]   FCRA § 623(e), as amended by FACT Act § 312(a). The FACT Act amendments also added several other furnisher provisions that are not discussed here.